**\*\* E-filed December 14, 2010 \*\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SANTA CLARA VALLEY HOUSING GROUP, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendants.<br>_____/ | No. C08-05097 HRL<br><br>**ORDER DENYING PLAINTIFFS' MOTION TO COMPEL THIRD PARTY DOUGLAS DUNCAN TO TESTIFY**<br><br>[Re: Docket No. 42] |

## BACKGROUND

This action involves a tax strategy, known as the S-Corporation Charitable Contribution Strategy, or "SC2," that was developed and marketed to S-corporations by accounting firm KPMG, LLP ("KPMG") during the early-2000s.[1] In 2000, plaintiff Santa Clara Valley Housing Group, Inc. ("SCVHG") engaged KPMG to implement this strategy on behalf of its shareholders, including plaintiff Kristen Bowes ("Bowes"). Following an audit, the Internal Revenue Service ("IRS") disallowed tax benefits that Plaintiffs' received as a result of this strategy. SCVHG and Bowes (collectively, "Plaintiffs") thereafter filed the instant action seeking a refund of IRS taxes, penalties, and interest (paid under protest) that they allege were assessed improperly for taxable years 2000-2003.[2]

---

[1] According to the parties, SC2 is pronounced "SC-squared."
[2] SCVHG seeks a refund for taxable year 2000 and Bowes seeks a refund for taxable years 2000-2003.

Third party Douglas Duncan was an employee of KPMG from 1999 to 2002, and, according to the Government, was a part of the KPMG team that developed, marketed, sold, and implemented most, if not all, of the SC2 solutions sold by KPMG, including the transaction at issue here. Docket No. 46 ("Gov't Non-Opp'n") at 3-4. It thus contends that Duncan is an important witness in this case whose testimony "may be relevant in determining the merits of the SC2 tax strategy and its sale and implementation by the Plaintiffs." Id. at 4.

In accordance with this belief, the Government subpoenaed Duncan to testify, and he was deposed by counsel for Plaintiffs and the Government on August 5, 2010. During his deposition, Duncan refused to answer 324 questions related to the subject matter of this litigation (including questions related to his work at KPMG, his knowledge of other KPMG employees, his knowledge of SCVHG, and his knowledge of involvement in the development of the SC2 strategy). See Docket No. 44, Exs. B-1 & B-2 ("Duncan Depo") at 16-129. In these instances, Duncan responded only that, "[u]pon advice of counsel, I respectfully decline to answer the question and assert my Fifth Amendment privilege." Id. Duncan did, however, answer questions involving procedural issues and basic biographical information. See Duncan Depo at 10-129.

Plaintiffs — but not the Government[3] — thereafter filed a motion to compel Duncan to answer the questions that he refused to answer. Docket No. 42 ("Motion"). Duncan timely opposed Plaintiffs' motion. Docket No. 50 ("Opp'n"). Oral argument was heard on December 7, 2010.

**LEGAL STANDARD**

Under the Fifth Amendment to the United States Constitution, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. amend. V. "[T]he Fifth Amendment's protections against self-incrimination can be asserted in any proceeding, be it civil, criminal, administrative, judicial, investigative or adjudicatory." Doe v. Glanzer, 232 F.3d 1258, 1263 (9th Cir. 2000) (citing Kastigar v. United States, 406 U.S. 441, 444 (1972)). "The

---

[3] As Plaintiffs explain, "[a]lthough it was the [Government that] noticed these depositions, the [Government] has refused to file a motion to compel, notwithstanding the fact that there is no legitimate basis for [Duncan's assertion of] the privilege. The [Government] has indicated that rather than moving to compel, it might seek to just have the finder of fact draw adverse inferences from these third-parties' assertions of the privilege." Motion at 3. The Government did, however, file a non-opposition to Plaintiffs' motion, which argues that Duncan has not articulated any basis for asserting his Fifth Amendment privilege. Gov't Non-Opp'n at 8-10.

2

privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." Hoffman v. United States, 341 U.S. 479, 486 (1951); see also Doe, 232 F.3d at 1263 (same). "Indeed, it is enough if the responses would merely 'provide a lead or clue' to evidence having a tendency to incriminate.'" United States v. Neff, 615 F.2d 1235, 1239 (9th Cir. 1980).

"[T]he 'privilege against self-incrimination does not depend upon the *likelihood*, but upon the *possibility* of prosecution.'" Doe, 232 F.3d at 1263 (quoting United Liquor Co. v. Gard (In re Seper), 705 F2d 1499, 1501 (9th Cir. 1983) (emphasis in original)). "But this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." Hoffman, 341 U.S. at 486; see also Neff, 615 F.2d at 1239. "If the threat is remote, unlikely, or speculative, the privilege does not apply . . . ." McCoy v. Comm'r., 696 F.2d 1234, 1236 (9th Cir. 1983).

In determining whether this privilege was appropriately asserted, "[t]he witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself — his say-so does not of itself establish the hazard of incrimination." Hoffman, 341 U.S. at 486; see also Davis v. Fendler, 650 F.2d 1154, 1160 (9th Cir. 1981) ("The claimant is not the final arbiter of the validity of his assertion."). Rather, "[i]t is for the court to say whether his silence is justified." Hoffman, 341 U.S. at 486; see also Davis, 650 F.2d at 1160 (same).

"It is not necessary, of course, that the person to whom the question has been put establish the precise manner in which he will incriminate himself by responding. This would make the privilege useless." Davis, 650 F.2d at 1159; see also Baker v. Limber, 647 F.2d 912, 917 (9th Cir. 1981) (same). Nevertheless, "[a] proper assertion of a Fifth Amendment privilege requires, at a minimum, a good faith effort to provide the trial judge with sufficient information from which he can make an intelligent evaluation of the claim." Davis, 650 F.2d at 1160.

"To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." Hoffman, 341

U.S. at 486-87. In determining whether the privilege has properly been invoked, the court should be guided by the facts in evidence as well as its perception of the peculiarities of the case. Id. at 487; Davis, 650 F.2d at 1159. If the court decides that no threat of self-incrimination is evident, the claimant of the privilege must then show the danger of incrimination. Davis, 650 F.2d at 1159; Neff, 615 F.2d at 1240.

**DISCUSSION**

Plaintiffs argue that Duncan does not have a valid Fifth Amendment privilege as to the questions he refused to answer because "he does not face a substantial threat of incrimination that is real and appreciable." Motion at 5. Plaintiffs say this is so because:

- there has been no public indictment targeting SC2 transactions;
- there is no indication that any criminal investigation is pending against Duncan;
- although the Government did conduct a criminal investigation of KPMG's tax shelter activities, the SC2 strategy was not a part of the indictment nor was it subject to any criminal allegations by the Government; and
- the statute of limitations has likely run on any possible criminal liability to Duncan.[4]

Motion at 6-7.

Plaintiffs cite two cases in support of their claim that any threat to Duncan is remote, unlikely, or speculative. In McCoy, the IRS issued notices of deficiency to the petitioners and assessed penalties for failure to file under certain sections of the Internal Revenue Code. McCoy, 696 F.2d at 1235-36. The petitioners, in turn, filed a petition for redetermination. Id. In it, they refused to state, partly on Fifth Amendment grounds, why they disagreed with the adjustments. Id. Although given several opportunities to do so, the petitioners failed to explain their basis for

---

[4] In their reply brief, Plaintiffs also argue that Duncan's assertion of the Fifth Amendment is not reasonable because KPMG's own Rule 30(b)(6) witness did not assert the Fifth Amendment when testifying about its opinions related to the SC2 strategy (suggesting that KPMG does not fear prosecution in this regard) and even testified that its SC2 strategy opinions were still being following (and, in light of the deferred prosecution agreement, it could not have taken such a position if the strategy was fraudulent). Docket No. 54 ("Reply") at 2-5. The Court is unpersuaded by this argument. That KPMG chose to stand by its SC2 strategy opinions and may not fear prosecution does not mean that Duncan cannot assert his Fifth Amendment privilege. As expressed above, the relevant inquiry is whether the witness asserting the Fifth Amendment privilege has reasonable cause to apprehend prosecution, not whether other witnesses choose not to assert the privilege.

4

asserting the privilege. Id. Because the petitioners "flatly refused" to justify their fear of prosecution in any way, the Ninth Circuit rejected their Fifth Amendment claim and awarded double costs because their appeal was "frivolous." Id. at 1235-36.

Next, in Baker, although the defendant explained in a motion that he had been convicted in state court, he did not describe the subject matter of the state indictment and did not demonstrate its connection to the requested discovery to which he asserted his Fifth Amendment privilege. Baker, 647 F.2d at 917. The risk of conviction also was not evident from the questions, either. Id. In concluding that the defendant failed to support his assertion of the privilege, the Ninth Circuit emphasized that a mere reference to pending criminal proceedings is not sufficient to demonstrate the necessary nexus between the risk of criminal conviction and the information requested. Id.

This case is not nearly so extreme. As will be discussed below, Duncan set forth in his opposition brief the circumstances why he believes his fear of prosecution is justified. While it remains true that such a threat must not be pure speculation, the unique facts of McCoy and Baker — cases in which the witnesses failed to offer any justification for their fear of prosecution — are not analogous to those in this case.

So, what are the bases for Duncan's assertion? He provides several reasons, including the following:

- the SC2 strategy was one of the "abusive" schemes highlighted in a 2005 report of the Permanent Subcommittee on Investigations of the Senate Committee on Homeland Security and Governmental Affairs[5];

- during the hearings on the 2005 report, Senator Levin of Michigan described the SC2 strategy a "sham"[6]; and

- in an April 26, 2004 bulletin, the IRS designated the SC2 strategy as a "listed transaction" and officially notified taxpayers that the claimed benefits of the strategy were not allowable for federal income tax purposes and that potential penalties may be imposed for participation in such transactions.[7]

---

[5] Docket No. 53 ("Clements Decl."), Ex. B.
[6] Clements Decl., Ex. C.
[7] Clements Decl., Ex. D.

5

Opp'n at 3-5. In addition, Duncan cites the indictment of several former KPMG employees and partners for conspiracy, tax fraud, and obstruction based on their alleged participation in many of KPMG's tax strategies, which the Government characterized as tax-avoidance schemes. See Clements Decl., Ex. I ("Superseding Indictment" in United States v Stein, No. 1:05-cr-00888 (LAK)).  While the SC2 strategy was not specifically included as one the alleged fraudulent tax shelters, Duncan contends that the indictment's language and two of the Government's motions suggest that the Government may have believed other tax strategies to be potentially illegal as well. Id. at ¶ 18 ("Among the fraudulent tax shelter transactions designed, marketed, and implemented by the defendants . . . and their co-conspirators were FLIP . . . , OPIS . . . , BLIPS . . . , SOS . . . , and their variants."); Clements Decl., Exs. F & G (motions of the Government seeking admission of evidence of other tax strategies). Duncan lastly points out that KPMG entered into a deferred prosecution agreement with the Government in relation to its tax shelter strategies. This agreement requires KPMG to cooperate with the Government's investigation, including in relation to the actions of its former employees. See Clements Decl., Ex. H at 19-20.

Duncan highlights that it was "[a]gainst this background" that he was deposed. And this is why, prior to the deposition, Duncan's counsel asked the Government for assurance that there was no ongoing criminal investigation related to the SC2 strategy and that Duncan was not considered to be subject or target of any criminal investigation. Opp'n at 5-6. Duncan says that the Government refused to provide any such assurances and has not offered Duncan any immunity related to this testimony.[8] Id. at 6. Instead, the Government directed Duncan to the United States Attorney's Office for the Southern District of New York, the office that brought United States v. Stein. At the same time, the Government in this action has acknowledged that it is not "aware of the full scope of

---

[8] The Government takes issue with Duncan's characterization of its position. In a response, the Government explained that it did not "refuse" to provide him with assurances but instead referred him to the United States Attorney's Office for the Southern District of New York. Docket No. 55 ("Gov't Reply") at 2. It also states that it learned that the lead prosecutor who supervised the KPMG investigation and prosecution told counsel for another former KPMG employee that his office did not have an ongoing investigation of the SC2 strategy or of that particular former employee. Id. The Government also admitted, though, that this would not foreclose an investigation in the future should circumstances warrant and the statute of limitations remain open. Id. at 2-3.

6

the criminal investigation relating to KPMG and its tax shelter products." Docket No. 52 ("Toensing Decl."), ¶ 6 & Ex. B.

Duncan also challenges Plaintiffs' argument that he has nothing to fear because the statutes of limitation have run on any charges he might face. He points out that the Government in United States v. Stein alleged a "scheme to defraud the IRS by devising, marketing, and implementing fraudulent tax shelters" which occurred "[d]uring the period from at least in or about 1996 through at least in or about 2005." Superseding Indictment, ¶ 25. Since the statute of limitations for tax evasion and conspiracy to defraud the United States is six years, the Government could conceivably charge any alleged conspirators until at least 2011.[9] Opp'n at 11. Indeed, at least one of the questions asked during Duncan's deposition related to conduct occurring in 2005. Duncan Depo at 125-26.

The Court believes that the bases for Duncan's assertion of his Fifth Amendment privilege are reasonable in light of the rule that "the 'privilege against self-incrimination does not depend upon the *likelihood*, but upon the *possibility* of prosecution.'" Doe, 232 F.3d at 1263 (emphasis in original). The Congressional report's description of the SC2 strategy as an "abusive" tax shelter and the IRS's disallowance of its tax benefits suggest that the SC2 strategy is viewed with hostility. While there may not be any ongoing criminal investigation related to the SC2 strategy, the Government has not stated that there would not be one, nor has it provided Duncan with immunity. And as Duncan has shown, the statute of limitations on charges as a result of such an investigation may not have run. In these circumstances, the Court will not compel Duncan to provide answers which might plausibly "furnish a link in the chain of evidence" needed to prosecute him for a federal crime. Hoffman v. United States, 341 U.S. 479, 486 (1951).

---

[9] For conspiracy charges, the statute of limitations is measured from the date of the last overt act made in furtherance of the conspiracy. See, e.g., United States v. Thompson, 518 F.3d 832, 856 (10th Cir. 2008); see also Clements Decl., Ex. K ("Department of Justice Criminal Tax Manual") at § 7.02[4] ("The statute of limitations in a conspiracy begins to run from the date of the last over act proved. The government is not required to prove, however, that each member of a conspiracy committed an overt act within the statute of limitations.").

7

**CONCLUSION**

Based on the foregoing, Plaintiffs' motion to compel further deposition testimony from Duncan is DENIED.

**IT IS SO ORDERED.**

Dated: December 14, 2010

HOWARD R. LLOYD
UNITED STATES MAGISTRATE JUDGE

1  **C08-05097 LHK (HRL) Notice will be electronically mailed to:**

2  Adam D Strait                           adam.d.strait@usdoj.gov, Western.Taxcivil@usdoj.gov
   Avram Salkin                            as@taxlitigator.com
3  Charles Paul Rettig                     rettig@taxlitigator.com
   Cory James Stigile                      stigile@taxlitigator.com
4  Edward Morris Robbins, Jr               Robbins@Taxlitigator.com, vb@taxlitigator.com
   Henry Charles Darmstadter, III          henry.c.darmstadter@usdoj.gov
5  James Edward Weaver                     James.E.Weaver@usdoj.gov
   Sharyn Marie Fisk                       sf@taxlitigator.com
6  Stanley Gracey Roman                    sroman@kksrr.com, tmoore@kksrr.com
   Steven Richard Toscher                  Toscher@Taxlitigator.com
7  Thomas M. Newman                        thomas.newman2@usdoj.gov

8  **Counsel are responsible for distributing copies of this document to co-counsel who have not registered for e-filing under the court's CM/ECF program.**

9