# EXHIBIT 426

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 244

| | |
|---|---|
| **To:** | Stein, Jeff (US/Vice Chairman) |
| **CC:** | |
| **BCC:** | |
| **Date:** | 02/01/2000 04:49:48 PM |
| **From:** | Rosenthal, Richard P |
| **Folder:** | 1st Quarter |
| **Subject:** | FW: S Corporation Strategy |
| **Attachments:** | S_Corp_Strategy.doc; tic-submissionform.doc |

FYI.

Rick

-----Original Message-----
**From:** Manth, Larry E
**Sent:** Tuesday, February 01, 2000 12:11 PM
**To:** DeLap, Larry; Springer, Mark A; US-Tax Innovation Center
**Cc:** Rosenthal, Richard P; O'Brien, Timothy LA J
**Subject:** S Corporation Strategy

Please find attached a memo detailing our S-corporation strategy. This strategy is quite similar to the RESOP strategy except that it does not use an ESOP, but uses other qualified tax-exempt shareholders. We believe that this is a high value strategy (minimum fee of $300,000), and would request that the distribution be limited. On the same note, we respectfully request that there be an expeditious review process. Also note that we have completed two transactions and therefore have all of the applicable documents to implement the strategy (e.g. sample stock certificates, valuation reports, board minutes, etc).

If there are any questions, please do not hesitate to call any of the following individuals:

Larry Manth -- 213-630-8101
Andrew Atkin  -- 213-955-8830
Doug Duncan -- 213-630-5376
Robert Huber -- 213-630-5378

Thank you for your consideration.

SCVHG v. USA
EXHIBIT NO. 204
1·27·10 − 23 pgs.

Page: 1 of  1

KPMG-SCVH-06-0001

Strait Decl. Supp. U.S.                                   Ex. 204
Mot. Summary Adjudication of Issues                       Page 245



To:     Tax Innovation Center (Washington National Tax)

From:   Larry E. Manth, Andrew S. Atkin, Douglas Duncan, Robert Huber (Los Angeles)

Date:   {TIME \@ "MMMM d, yyyy"}

Re:     S Corp Charitable Contribution and Estate Planning Strategy ("S-CAEPS")

## FACTS

Shareholder is the sole individual shareholder of S Corp (hereinafter "S Corp"), a subchapter S corporation.  Shareholder desires to contribute stock to a qualified tax-exempt entity as a philanthropic gesture.  Shareholder also desires greater flexibility regarding estate planning options with respect to his ownership interest in S Corp.

The facts are as follows:

- The fair market value ("FMV") of S Corp is $10 million.
- There are 100 shares of common stock outstanding (all owned by Shareholder).
- Shareholder has zero basis in his stock.
- S Corp has zero balance in its Accumulated Adjustments Account ("AAA") and also has no Accumulated Earnings and Profits ("AEP").
- S Corp has no Section 751 property.[1]
- S Corp is an accrual basis taxpayer and is on the calendar year for tax reporting purposes.
- In tax years 2000 and 2001, the taxable income of S Corp is expected to be $4 million per year.
- No distributions are expected in tax years 2000 and 2001.
- Exempt-Org (hereinafter "Exempt-Org") is an organization that is a qualified subchapter S corporation shareholder under Section 1361(c)(6).
- Exempt-Org is entitled to receive deductible charitable contributions under Section 170(c).
- Exempt-Org is desirous of accepting contributions in the form of subchapter S corporation stock because it is not concerned about unrelated business income tax ("UBIT") (e.g. it has net operating losses ("NOL's") for UBIT purposes).

---

[1] All references to Sections herein are to the Internal Revenue Code of 1986, as amended, unless otherwise stated.

1

**KPMG-SCVH-06-0002**

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 246

The following proposed transaction is being considered by Shareholder:

<u>Step One</u>:

(a) <u>Distribution of nonvoting shares</u>.  On 12/30/99, S Corp distributes 900 shares of nonvoting common stock to Shareholder.  Under the articles of incorporation and corporate by-laws, the nonvoting stock has the same distribution and liquidation rights as the voting stock.

(b) <u>Distribution of warrants</u>.  On 12/30/99, S Corp also makes a distribution of warrants to acquire 7000 shares of nonvoting S Corp stock to Shareholder, with an exercise period of ten years.  These warrants represent the right to purchase 87.5 percent of the equity value of S Corp (7000 / 8000[2]).  The total exercise price is $7.875 million, or 90 percent of the FMV of the equity that can be purchased by the warrants.[3]

<u>Fair market value of nonvoting stock.</u>  The fair market value of the nonvoting stock will be approximately $1 million.[4]

<u>Step Two</u>:

(a) <u>Donation of the stock</u>.  On 12/31/99, Shareholder donates the 900 shares of nonvoting common stock to Exempt-Org.

(b) <u>Formation of the redemption agreement</u>.  Simultaneous with the donation, Exempt-Org and S Corp enter into a redemption agreement (the "Redemption Agreement").  Under the terms of the Redemption Agreement, Exempt-Org has the power to demand that S Corp redeem its shares for the greater of the FMV at the time of the contribution or the FMV at the time of the redemption (employing the same valuation criteria).  The power is not exercisable until two years from the date of the signing of the agreement.  It is explicitly stated in the Redemption Agreement that neither Shareholder nor S Corp has the power to force a redemption on Exempt-Org.  Furthermore, the Redemption Agreement provides that Exempt-Org may not revoke the subchapter S election of S Corp and that Exempt-Org may not make any transfer of the nonvoting stock that would cause the subchapter S status of S Corp to be revoked.

---

[2] The 8000 total shares is calculated as follows: 7000 warrants plus the 100 voting shares and 900 nonvoting shares.
[3] The exercise price is determined as follows: 90 percent * ($10 million total equity value * 87.5 percent)).
[4] A third party independent valuation group ("VG") has determined the value of nonvoting stock in similar situations by determining what the total equity value of S Corp would be after the exercise of the warrants ($17.875 million ($10 million initial value plus the $7.875 million additional input of capital from an exercise of the warrants).  The VG would then multiply the $17.875 million total value by the percentage equity interest the nonvoting stock would represent after the warrants were exercised (11.25% (900 shares / 8000 total shares), for an initial equity value of the nonvoting stock of approximately $2 million (11.25% * $17.875 million total value).  Lastly, the VG would apply a discount for lack of control and marketability (50%), for a fair market value of approximately $1 million.

2

## ANALYSIS

**Step One:**

(a) The distribution of the nonvoting stock.    S Corp will be able to make a tax-free distribution of the nonvoting common stock without Shareholder recognizing any gain from the distribution.  Section 305(a) provides that gross income does not include a corporation's distribution of stock or stock rights to its shareholders.  Likewise, S Corp will not recognize gain on the distribution of the nonvoting stock under Section 311(a).

The distribution of the nonvoting stock will not trigger a second class of stock.  As mentioned above, the nonvoting stock contains identical distribution and liquidation rights as the voting stock, as required by Section 1361(b)(1)(D) and Regulation Section 1.1361-1(l)(1).  In addition, the differences in voting rights will be ignored in determining whether there is more than one class of stock.[5]

(b) The distribution of the warrants.    S Corp will also be able to make a tax-free distribution of the warrants under Section 305(a).[6]  Under Regulation Section 1.305-1(d) the term "stock" is defined to include warrants to acquire stock.  Therefore, the distribution of the warrants will not trigger any gain to Shareholder.  As with the nonvoting stock discussed above, S Corp will also not recognize gain on the distribution under Section 311(a).

The distribution of warrants will not create a second class of stock if it qualifies under Regulation Section 1.1361-1(l)(4)(iii).  This regulation provides that a corporation's call option, warrant, or similar instrument is treated as a second class of stock only if the option is substantially certain to be exercised by the holder or a potential transferee and the option has a strike price substantially below the FMV of the underlying stock.   More precisely, there is a safe harbor under Regulation Section 1.1361-1(l)(4)(iii)(C) which provides that if the strike price is at least 90 percent of the FMV of the underlying stock on the date it is issued, it is not considered a second class of stock.  In the case of the warrants S Corp issues to Shareholder, the exercise price is equal to the 90 percent of the FMV of the underlying stock, thus satisfying this safe harbor test.

Basis Issues.    The basis in the warrants and the nonvoting common stock will be determined under Section 307(a).  Under this provision, the basis in the voting stock will be allocated among all of the warrants, non-voting common stock and voting common stock based on their respective fair market values.[7]  However, since Shareholder had no

---

[5] I.R.C. Sec. 1361(c)(4) and Reg. Sec. 1.1361-1(l)(1).
[6] See I.R.C. Sec. 305(d), which includes "stock rights" in the term "stock."
[7] Reg. Sec. 1.307-1(a).

3

KPMGZE-0043-00008983

KPMG-SCVH-06-0004

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 248

basis in the voting common stock, Shareholder will be allocated no basis in the warrants or the nonvoting common stock.[8]

### Step Two

(a) The donation of the stock. Shareholder will be entitled to a charitable contribution deduction for approximately the FMV of the stock donated under Section 170(c). However, under Section 170(e)(1), the amount of the deduction may be limited. Specifically, "in the case of a charitable contribution of stock in an S corporation, rules similar to the rules of section 751 shall apply" to reduce the amount of the deduction by the amount of any ordinary income that would have been realized had the assets of the corporation been sold.[9] Thus, the charitable contribution deduction will be reduced by the portion of the FMV of the donated stock that is attributable to such ordinary income items. Here, there are none.[10]

The amount of Shareholder's deduction for the contribution of the stock will also be limited to 30 percent of Shareholder's adjusted gross income (AGI).[11] In addition, Shareholder's overall contributions for the year (including this stock contribution) may not exceed 50 percent of AGI.[12]

Gift Tax. In computing the amount of Shareholder's taxable gifts for the year, the charitable contribution will be allowed as a deduction. Under Section 2522(a), the taxpayer is allowed a deduction for all gifts made to an entity that can receive deductible charitable contributions. Shareholder will not be required to file a gift tax return for the charitable donation. Under Section 6019(3), an individual is not required to file a gift tax return for a gift which was allowed as a deduction under Section 2522, so long as the transfer was of the donor's entire interest in the property transferred and no other interest in such property is transferred for less than full consideration to a person for a use not described in Section 2522. Since Shareholder is donating his entire interest in the nonvoting stock, there should be no need to file a gift tax return.

---

[8] The basis allocation requirements under I.R.C. Sec. 307 may be a trap for the unwary in an S corporation context. Assume a shareholder has basis in his S corporation stock of $1 million at 12/31/1999 and the corporation has paid a dividend of $1 million on 2/1/00. Also assume the corporation will break-even for the 2000 tax year. If a distribution of warrants were to occur prior to the end of the year, basis would be allocated pursuant to I.R.C. Sec. 307. Since the shareholder's basis in his stock is not adjusted for distributions until the end of the year (Reg. Sec. 1.1367-1(d)), and I.R.C. Sec. 307 requires a basis allocation on the date the warrants are received by the shareholder, the distribution received by the shareholder in February will be partially taxed as capital gain or ordinary income.
[9] I.R.C. Sec. 170(e)(1).
[10] As mentioned in the facts, S Corp does not have any I.R.C. Sec. 751 property. If this were not the case, an analysis would need to be performed to determine the amount of I.R.C. Sec. 751 property. One key issue would be whether there was any unrealized accounts receivable. Unrealized accounts receivable would be applicable where the S corporation is on the cash basis of accounting and, therefore, would not have previously included these amounts in its income. Since S Corp is on the accrual method, the adjustment relating to unrealized accounts receivable is not required.
[11] See I.R.C. Sec. 170(b)(1)(C).
[12] See I.R.C. Sec. 170(b).

4

**KPMG-SCVH-06-0005**

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 249

<u>Exempt-Org is a permitted shareholder.</u>  As stated previously, Exempt-Org is a qualified subchapter S corporation shareholder under Section 1361(c)(6).  Therefore, Exempt-Org may hold this stock.  However, under Section 512(e), Exempt-Org must treat all items of income, deduction and loss as UBIT.  Furthermore, Exempt-Org must also treat any gain or loss upon the disposition of S corporation stock as UBIT.[13]

(b)  <u>Formation of redemption agreement.</u>  Under the Section 1361 regulations, redemption agreements are generally disregarded in determining whether there is more than one class of stock.[14]  Specifically, a redemption agreement does not trigger a second class of stock unless: 1) a principal purpose is to circumvent the one class of stock requirement; and 2) the agreement establishes a purchase price that, at the time of the agreement, is significantly in excess of or below FMV.[15]

1)  <u>Principal purpose test.</u>  In determining generally whether there is more than one class of stock, the Section 1361 regulations focus on whether there are different distribution rights or rights to liquidation proceeds.[16]  The purpose of the Redemption Agreement is to give Exempt-Org a market to sell its stock, not to give it additional or different rights from other shareholders.  The Redemption Agreement does not change distribution rights.  Moreover, if there was a liquidation of S Corp, Exempt-Org would have full liquidation rights.  Based on these facts, it is not a principal purpose of the Redemption Agreement to circumvent the one class of stock requirement.

2)  <u>FMV test.</u>  Under the Redemption Agreement, the price for the redemption is at least equal to the FMV at the time of the agreement.  Therefore, the second test for avoiding a second class of stock should also be met.

<u>Outstanding Stock.</u>  The warrants will not count as outstanding stock for purposes of determining the allocation of the taxable income of S Corp.[17]

<u>Section 269 Issues.</u>  Section 269 allows the Internal Revenue Service (the "Service") to disallow "benefit of a deduction, credit, or other allowance," through acquisitions made for the principal purpose of avoiding income tax.  Specifically, this section applies when

---

[13] I.R.C. Sec. 512(e).
[14] *See* Reg. Sec. 1.1361-1(l)(2)(iii).
[15] *Id.*
[16] *See* Reg. Sec. 1.1361-1(l)(1) ("[A] corporation is treated as having only one class of stock if all outstanding shares of stock of the corporation confer identical rights to distribution and liquidation proceeds.").
[17] *See* Rev. Rul. 67-269, 1967-2 C.B. 298 ("[O]ptions, warrants and debentures have none of the attributes of immediate stock ownership, such as the right to vote in the capacity of a stockholder, or the right to receive dividends."); *Hume v. Commissioner*, T.C. Memo 1988-485 (an option to acquire S stock held by an ineligible shareholder did not disqualify the S election because the option was not exercised); *see also Tax Planning for S Corporations*, §4.05 (Matthew Bender 1998) ("Stock options and restricted stock allow for special allocations in S corporations because before the exercise of the options or the vesting of the restricted stock, the option holder or restricted shareholder is not treated as a shareholder of the corporation.  Therefore, all items of income and deduction that would otherwise be attributable to the other shareholders."); *see also* Eustice & Kuntz, *Federal Income Taxation of S Corporations*, §6.04 (Warren, Gorham & Lamont 3rd ed. 1993).

5

KPMG-SCVH-06-0006

KPMGZE-0043-00008985

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 250

a corporation directly or indirectly acquires control of another corporation. For purposes of Section 269, control is defined as owning at least 50 percent of the voting power of all classes of stock or at least 50 percent of the total value of shares of all classes of stock. In the proposed transaction, this control requirement will not be met and there will be no acquisition, because Exempt-Org will never own 50 percent of the total value or 50 percent of the total voting power of the stock. Whether Exempt-Org meets the control requirement may not matter anyway, because Exempt-Org does not "secure a deduction, credit or other allowance" from S Corp. In fact, income will be attributed to Exempt-Org, not deductions, credits or other allowances. Therefore, Section 269 does not apply to the proposed transaction.

Additionally, the Service has conceded that Section 269 does not apply in the case of an S corporation formed for the purpose of allowing corporate income to be offset by shareholders' NOL carryovers,[18] or to secure the benefit of exemption from the corporate income tax.[19]

Section 384 Issues. For Section 384 to apply and thereby place a limit on pre-acquisition losses to offset built-in gains, a corporation must obtain "control" of another corporation. "Control" for purposes of Section 384 is defined in Section 384(c)(5) by reference to Section 1504(a)(2), which requires ownership of at least 80 percent of the total voting power of the stock and ownership of at least 80 percent of the total value of the stock of such corporation. In the proposed transaction, this control requirement will not be met, because Exempt-Org will never own 80 percent of the total voting power or 80 percent of the total value of the stock, let alone both. Therefore, Section 384 does not apply to the proposed transaction

**Possible Redemption of Exempt-Org's stock**

If Exempt-Org redeems the stock at the end of 2001, it will have a capital loss for UBIT purposes. As Exempt-Org is allocated taxable income from S Corp, its basis in the stock will be increased.[20] In this fact pattern, since Exempt-Org owns 90 percent of the S Corp outstanding stock, Exempt-Org will be allocated 90 percent of S Corp's taxable income per year, i.e., $3.6 million for the first two years ($4 million taxable income each year @ 90 percent). Exempt-Org has an original basis of zero in the stock (the carryover basis from Shareholder).[21] At the end of 2001, Exempt-Org's basis will be $7.2 million (assuming no distributions are made in 2000 or 2001). Therefore, if Exempt-Org redeems the stock at the end of the second year for $1 million,[22] it will recognize a capital loss for UBIT purposes of $6.2 million.

---

[18] See *Modern Home Fire & Casualty v. Commissioner*, 54 T.C. 839 (1990).
[19] *See* Rev. Rul. 76-363, 1976-2 C.B. 90.
[20] I.R.C. Sec. 1367(a).
[21] *See* I.R.C. Sec. 1015(a). The only exception to carryover basis is where the basis of the property contributed is greater than the FMV. In that situation, the basis is FMV. *Id.*
[22] Under the Redemption Agreement, the redemption amount is equal to the greater of the FMV on the date of contribution or the date of redemption. We are presuming that the FMV on the date of redemption is not greater than the FMV on the date of contribution. If it were, the redemption amount would be the greater amount.

6

**KPMG-SCVH-06-0007**

KPMGZE-0043-00008986

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 251

<u>AAA issues</u>.   Under Section 1368(e)(1)(B), S Corp's AAA will be decreased by the ratable share of S Corp's AAA attributable to the redeemed stock.  In this case, AAA will be reduced by 90 percent.  S Corp's beginning AAA was zero.  The AAA was increased for the $4 million of taxable income per year, $8 million in total.  Due to the redemption, the AAA will be reduced by Exempt-Org's share of that income, $3.6 million per year, $7.2 million in total.  The ending AAA balance thus will be $800,000.[23]

## SUMMARY OF TAX BENEFITS

We believe that if the above transaction is carried out, Shareholder will be entitled to a charitable contribution deduction in tax year 1999 for approximately the FMV of the stock donated to Exempt-Org.  Moreover, in tax years 2000 and 2001, 90 percent of S Corp's taxable income should be allocated to Exempt-Org.

## POTENTIAL IRS ARGUMENTS

In order to prevent Shareholder from recognizing the tax benefits associated with the charitable contribution of the nonvoting stock, the Service may wish to advance several, somewhat overlapping arguments.

1)  <u>**The Non-Voting Stock is a Second Class of Stock.**</u>

The Service could argue that the nonvoting stock is a second class of stock.  For example, if Exempt-Org were to present the stock for redemption, the Service could argue that the payment of the redemption amount caused the nonvoting stock to be a second class of stock.  The Service could argue that the redemption amount was in excess of the fair market value of the nonvoting stock.  Specifically, the Service could argue that the nonvoting stock has no value due to the fact that the potential tax liability from owning the stock exceeds the value of the stock before the tax liability is taken into account.  Therefore, when the nonvoting stock was redeemed, Exempt-Org received more than the true value of the nonvoting stock.  Accordingly, the Service could assert that under Regulation Section 1.1361-1(l)(2)(iii), there is a second class of stock because the redemption amount was significantly in excess of fair market value.

While it is true that the potential tax liability associated with the nonvoting stock may exceed the stock's fair market value, this does not mean that the stock has a zero value.  With respect to Exempt-Org, the value of the nonvoting stock is in fact greater than zero because Exempt-Org will not have to pay tax on its allocable share of S Corp's taxable

---

[23] Although AAA does not matter in the case of an S corporation without C corporation AEP, it should be noted that there are ordering rules with respect to the AAA in the case of a S corporation that has both distributions and redemptions in the same tax year.   If an S corporation has both AAA and AEP, the timing of distributions is extremely important.  *See generally* Reg. Sec. 1.1368.

7

KPMG-SCVH-06-0008

KPMGZE-0043-00008987

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 252

income.[24]  Therefore, with respect to Exempt-Org, the value of the nonvoting stock is greater than zero.  However, even if a court were to find that the value of the nonvoting stock was in fact zero, that would not automatically lead to a conclusion that the nonvoting stock is a second class of stock.

Under Regulation Section 1.1361-1(l)(2)(iii)(A)(2), "a good faith determination of fair market value will be respected unless it can be shown that the value was substantially in error and the determination of the value was not performed with reasonable diligence."  Therefore, in order for there to be a second class of stock, the Service would need to prove that reasonable steps were not taken to value the nonvoting stock.  Here, the nonvoting stock has been valued by a qualified appraiser.  Accordingly, the shareholder should be able to rely upon the independent valuation per Regulation Section 1.1361-1(l)(2)(iii), even if a court were to alter the valuation of the nonvoting stock.

The Service could also argue that the creation and potential exercise of the warrants cause the nonvoting stock to be a second class of stock because: 1) the creation of the warrants dilutes the value of the nonvoting stock; and 2) a potential exercise would dilute the distribution amounts and distribution rights associated with the nonvoting stock.

Even though the warrants do in fact dilute the value of the nonvoting stock, the nonvoting stock is still not a second class of stock.  In determining whether there is more than one class of stock, the Section 1361 regulations focus on whether there are different distribution rights or rights to liquidation proceeds.[25]  The value of the stock is simply not a factor in determining whether there is more than one class of stock.[26]  Moreover, it is irrelevant that if the warrants were to be exercised, it would affect the amount of distributions associated with the nonvoting stock.  Under Regulation Section 1.1361-1(l)(1), the key issue is whether distribution rights (as opposed to amounts), are altered.  Even after any potential exercise of the warrants, the nonvoting stock would still possess the same rights to distributions.  The distribution rights associated with the nonvoting stock are set by the by-laws and articles of incorporation of the company; any exercise of the warrants would not alter these rights.

---

[24] For example, if Exempt-Org is relying upon NOL carryforwards to absorb the UBIT.  However, there may be alternative minimum tax issues.  "[A]lthough not expressly stated, exempt organizations are subject to alternative minimum tax."  *See Merten's Law of Federal Income Tax*, §34.173.  The exempt organization's alternative minimum taxable income is determined by reference to the UBIT of the exempt organization.  *Id.*; *see also* I.R.C. Sec. 55(b)(2) ("[I]f the regular tax is determined by reference to an amount other than taxable income, such amount shall be treated as the taxable income of such taxpayer . . . .").  Like other taxpayers, tax-exempt organizations are only entitled to deduct an NOL up to 90% of alternative minimum taxable income.  I.R.C. Sec. 56(d).  Therefore, Exempt-Org may be subject to alternative minimum tax, notwithstanding its NOL.

[25] *See* Reg. Sec. 1.1361-1(l)(1) ("[A] corporation is treated as having only one class of stock if all outstanding shares of stock of the corporation confer identical rights to distribution and liquidation proceeds.").

[26] It should also be noted that when the nonvoting stock was valued, the existence of the warrants was accounted for in determining value.  Therefore, the existence of the warrants does not alter the nonvoting stock because the nonvoting stock, from its inception, was diluted by the warrants.

8

KPMGZE-0043-00008988

KPMG-SCVH-06-0009

An exercise of the warrants would not cause the nonvoting stock to be a second class of stock because all of the stock of the company (i.e. both voting and nonvoting stock) would be diluted.  Thus, an exercise of the warrants would not cause the nonvoting stock to have distribution or liquidation rights that differ from the voting stock.   Since both the voting and nonvoting stock would be similarly affected by any exercise of the warrants, the warrants should not cause the nonvoting stock to be a second class of stock.[27]  In fact, whenever a company has warrants, the outstanding stock of the company is potentially diluted.  If the Service's argument was accepted, it would mean that a second class of stock would exist any time that a company has warrants.  Naturally, such a result would be contrary to the Code and Regulations, which specifically permit subchapter S corporations to issue warrants.

## 2)  The Warrants are a Second Class of Stock.

The Service could also contend that the warrants are a second class of stock.  In particular, the Service could argue that: 1) the warrants are a second class of stock because the warrants give Shareholder an additional ownership interest in the corporation; and 2) the exercise price of the warrants is substantially below fair market value and therefore the warrants fall outside the safe harbor provided by the regulations.

In regards to the first argument, as explained previously, the Service has issued regulations that specifically allow for warrants to be issued without causing them to be classified as a second class of stock if certain requirements are met.  These requirements have been met by S Corp.[28]

With respect to the second argument, the Regulations state that "a good faith determination of fair market value by the corporation will be respected unless it can be shown that the value was substantially in error and the determination of the value was not performed with reasonable due diligence to obtain a fair value."[29]  Since S Corp engaged qualified valuation professionals and relied upon their expertise, it cannot be said that the valuation was performed without reasonable due diligence.

Even if the Service were to prevail regarding the safe harbor, the Regulations state that the "failure of an option to meet this safe harbor will not necessarily result in the option being treated as a second class of stock."[30]  For example, a warrant with an exercise price equal to 50 percent of the fair market value of the stock may not be treated as substantially certain to be exercised if the time to maturity is long and the value of the

---

[27] Even though an exercise of the warrants would have the effect of diluting the nonvoting stock and thus limiting the holder's profit potential, Exempt-Org still enjoys economic benefits from owning the stock. Regardless of whether the warrants are exercised, Exempt-Org will still share in a portion of the appreciation of the company.  In addition, it should also be noted that if the warrants are exercised prior to Exempt-Org having its stock redeemed, Exempt-Org will share in some of the capital contribution from the warrant exercise.
[28] *See supra*, ANALYSIS, Step One, Section (b).
[29] Reg. Sec. 1.1361-1(l)(4)(iii).
[30] Reg. Sec. 1.1361-1(l)(4)(iii).

9

KPMGZE-0043-00008989

KPMG-SCVH-06-0010

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 254

stock is volatile.[31]  Time and volatility would increase the leverage and insurance values
of the warrant and increase the incentives of the warrant holder to defer the decision to
exercise.[32]

### 3)  The Warrants are Outstanding Stock.

Another attack the Service could assert is to re-characterize the warrants as outstanding
stock under a constructive ownership theory.  In Revenue Ruling 82-150,[33] the Service
looked beyond the form of an option grant and recharacterized the grant of the option as a
current sale of the underlying property.  Specifically, the Service held that the purchase of
an option to acquire stock was in substance a purchase of the stock because exercise of
the option was considered to be a virtual certainty.[34]

It appears that under this Ruling, the key issue in determining whether the option should
be recharacterized as stock is whether the option is substantially certain to be exercised.
As discussed above, this same issue is critical in determining whether there are two
classes of stock.  Under Regulation Section 1.1361-1(l)(4)(iii)(A), a warrant is considered
a second class of stock if, "taking into account all the facts and circumstances, the call
option is substantially certain to be exercised. . . ."  In addition, as discussed above, there
is a safe harbor in Regulation Section 1.1361-1(l)(4)(iii)(C), which provides that if the
strike price is at least 90 percent of the fair market value at the time of issuance, a second
class of stock is not created.  Since the warrants issued by S Corp meet this safe harbor
provision, it would be unlikely that the Service could argue that the warrants are
substantially certain to be exercised.  Accordingly, the Service should not be able to re-
characterize the options as stock under Revenue Ruling 82-150.

Additionally, the courts have been reluctant to re-characterize options as stock.  For
example, in *Graney v. United States*,[35] a corporation granted its president an option to
purchase the corporation's stock at a price substantially below the market value of such
stock, exercisable over a five-year period, to encourage him to remain with the company
after a merger.  The option agreement specified that the stock would be placed in an
escrow account for the five-year period and that he would have the right to vote the stock
and exercise stockholder's rights with respect to the stock during the life of the option.
The president exercised the option in stages, 100 shares in each of the first three years
following the merger and the last 200 shares in the fourth year, at which point he sold his

---

[31] *See* James R. Hamill, "Options as a Second Class of Stock in an S Corporation," 5 *Journal of S Corporation Taxation* 43 (Summer 1993), at 50 .
[32] *Id.*
[33] 1982-2 C.B. 10.
[34] In Rev. Rul. 82-150, an individual contributed $ 100,000x to a foreign corporation in exchange for all the stock of the foreign corporation.  A U.S. citizen paid the individual $ 70,000x for the option to purchase all of the stock for an exercise price of $ 30,000x.  Reflecting the fact that it appeared extraordinarily unlikely that the market value of the stock would fall below $ 30,000x before the option expired, the Service concluded the option purchaser had assumed the risks of an equity investor because, in substance, it had or would furnish 100% of the funds used to capitalize the corporation that were at risk. Therefore, the Service concluded the benefits and burdens of stock ownership had been shifted to the option purchaser.
[35] 258 F. Supp. 383 (S.D. W.Va. 1996), *aff'd.*, 377 F.2d 992 (4th Cir. 1967), *cert. denied*, 389 U.S. 1022 (1967).

10

KPMG-SCVH-06-0011

KPMGZE-0043-00008990

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 255

stock.  He asserted that he became vested with ownership of all 500 shares of stock upon entering into the option contract, and upon his sale of the stock he was entitled to treat the excess of the sale proceeds over the fair market value of the stock at the time the options were granted as long-term capital gain.  The Service asserted the arrangement was an option and the excess of the fair market value of the stock over the option premium was ordinary income to the president in each of the years that a portion of the option was exercised.  The court agreed with the Service noting that although the contract vested a number of ownership rights in the president, those rights were extended by the terms of the agreement and not by virtue of ownership of the stock itself, and that the option did not impose an obligation upon the president to buy the stock.

The present situation is less extreme than *Graney*.  In *Graney*, the underlying stock was actually placed in escrow.  Moreover, the option holder had the right to exercise all shareholder rights associated with the stock.  Here, the underlying stock has not been placed in escrow and the warrant holder has no right to exercise shareholder rights associated with the underlying stock.  Accordingly, under *Graney*, the warrants should not be recharacterized as stock.

Even if the Service is successful in re-characterizing the warrants as stock, the income of the corporation should not be re-allocated.  The Tax Court has ruled that, "constructive ownership of stock in a Subchapter S corporation does not make such person a shareholder in the corporation within the meaning of section 1371(a)(2)."[36]  Therefore, even if the warrants are recharacterized, the warrants should not be allocated taxable income under the subchapter S corporation rules.

### 4)  There is no Economic Substance to the Proposed Transaction.

Another issue the Service may raise is economic substance, and attack the proposed transaction based on the recent cases of *Compaq*,[37] *Winn-Dixie*[38] and *ACM Partnership*.[39]

The economic substance analysis, as applied in the above cases, is both an objective and a subjective analysis, but focuses mainly on pre-tax profit motive.  The key issue is whether the taxpayer reasonably expects to generate a pre-tax profit.  The proposed transaction is entirely distinguishable from this line of analysis because the shareholder is making a philanthropic gesture through his charitable contribution.  Charitable contributions have never been questioned for their pre-tax profit motive because there is not a pre-tax profit motive and there could never be one.  The gift is considered charitable because the taxpayer is giving something of value to a charitable organization, without receiving anything in return.  By its very nature a charitable donation could not require pre-tax profit motive, otherwise all charitable gifts would fail the economic substance test.

---

[36] *Humer v. Commissioner*, T.C. Memo 1988-458.  Then Section 1371(a)(2) is now codified as Section 1361(b)(1)(B).
[37] *Compaq Computer v.Commissioner*, 113 T.C. 17 (1999).
[38] *Winn-Dixie Stores v. Commissioner*, 113 T.C. 21 (1999).
[39] *ACM Partnership v. Commissioner*, 157 F.3d 231 (3rd Cir. 1998).

KPMGZE-0043-00008991

KPMG-SCVH-06-0012

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 256

The Service however, could rely on *Mount Mercy Associates v. Commissioner*,[40] where the Tax Court disallowed a charitable contribution deduction, holding that the transaction lacked economic substance.  In *Mount Mercy*, a partnership purchased property from a convent.  The partnership immediately donated some of the land back to the convent. The Tax Court concluded that the donation lacked economic substance because the convent never lost possession, control, or ownership of the property.  Although this case applied an economic substance analysis, it appears that the Tax Court's conclusion was driven by the substance of the gift, i.e. whether the convent had actually given up possession, control or ownership of the property.

Based on *Mount Mercy*, the Service could argue that Shareholder never gave up possession or control of the nonvoting stock and therefore the substance of the transaction was a cash contribution to Exempt-Org as opposed to a true stock contribution.  The Service could maintain that the donation of the nonvoting stock and the redemption agreement simply represented a pledge to make a future gift.  If this argument were successful, it would mean that no income should have been allocated to Exempt-Org and that this income should be re-allocated to the shareholders.

For the purpose of determining federal income tax, "command over property or enjoyment of its economic benefits marks the real owners."[41]  That is, it is the beneficial owner of the stock that is considered the owner for federal income tax purposes.  The issue of whether a holder of legal title to S corporation stock should be considered as the beneficial owner has been addressed with respect to transfers between family members. In these cases, the courts have focused on the following factors to determine beneficial ownership:

(1) Are the transferees within the family able to effectively exercise ownership rights of their shares;
(2) Did the transferor continue to exercise complete dominion and control over the transferred stock;
(3) Did the transferor continue to enjoy economic benefits of ownership after conveyance of the stock; and
(4) Did the transferor deal at arm's length with the corporation involved?[42]

Although these factors were developed in the context of family transfers, the Service could attempt to apply them to a donation to a tax-exempt entity as well.  The Service could argue that under these factors, Exempt-Org is not the beneficial owner of the stock that it received.  Perhaps the strongest argument the Service could make is that the income earned during the period Exempt-Org was a shareholder was not actually distributed to it and that therefore Exempt-Org did not "enjoy economic benefits of ownership after conveyance of the stock."[43]

---

[40] T.C. Memo 1994-83.
[41] *Anderson v. Commissioner*, 164 F.2d 870, 873 (7th Cir. 1947), *cert. den.*, 334 U.S. 819 (1948).
[42] *Speca v. Commissioner*, 630 F.2d 554 (7th Cir. 1980).
[43] As stated previously, distributions are not expected for tax years 2000 and 2001.

12

KPMG-SCVH-06-0013

KPMGZE-0043-00008992

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 257

In *Speca v. Commissioner*,[44] the Seventh Circuit Court of Appeals analyzed a transfer of S corporation stock from a parent to his children.  In disregarding the transfer for tax purposes, the Court noted that:

> an examination of the business records of Triangle reveals that the dividends actually received were in no way commensurate to the profits being made by Triangle. Moreover, the record reflects the failure of appellants to adequately explain the retention of large amounts of corporate income in the year 1971 and thereafter.[45]

Based on this case, the Service could point to the retention of income to argue that Exempt-Org did not "enjoy economic benefits of ownership after conveyance of the stock."  The Service could also argue that the existence of the warrants also limited the ability of Exempt-Org to enjoy the economic benefits of ownership because the exercise of the warrants would severely dilute its ownership interest.

However, the shareholder has a number of counter-arguments to prove that Exempt-Org was the beneficial owner of the stock it received.  First, it should be noted Exempt-Org is free to sell or transfer the stock, so long as doing so would not revoke the company's S election.  Therefore, Exempt-Org does have dominion and control over the stock.  Moreover, the gift to Exempt-Org was clearly an arm's length transaction.  In these respects, the donation to Exempt-Org is of a much different nature than a suspect transfer between a parent and a minor child.

Additionally, with respect to charitable donations, courts have focused on the actual delivery of stock to determine beneficial ownership:

> [T]he Commissioner of Internal Revenue and the courts have been at odds in gift-and-repurchase situations such as confronts us here.  While the Commissioner has emphasized the "prearrangement," "understanding" of the parties and "common identity" of donor and repurchaser aspects relative to gifts of stock, the courts have tended to focus on the narrow circumstances surrounding actual delivery of the stock to the donee – which, without more, implies relinquishment of dominion and control by the donor over such stock .... These decisions disclose that courts will attach conclusive substance to the form chosen by the parties unless one can demonstrate rather clearly that the form chosen is not an accurate reflection of its substance.  Further, they reveal that courts are generally not concerned with what a donee does with the gift thereafter, even if the gift is repurchased shortly after it is given by the donor's controlled corporation, providing there is no agreement between the donor and donee

---

[44] *Id.*
[45] *Id.*

KPMG-SCVH-06-0014

KPMGZE-0043-00008993

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 258

such as to render the gift a sham, and **the donor risks the possibility, however small, that the donee may sell the gift elsewhere.**[46]

In the proposed transaction Exempt-Org controls the non-voting stock and can sell it, borrow against it, or pledge it.  It does not have to continue to own the stock.

With respect to the economic benefit factor, the shareholder also has some valid counter-arguments.  First, the shareholder could point out that Exempt-Org knew when it accepted the gift that it was for nonvoting stock which did not have the power to force the corporation to make distributions.  Therefore, it should not be relevant whether distributions were actually made because Exempt-Org knew when it accepted the stock that it did not have the power to force a distribution.

It should also be noted that a corporation is not required under the tax law or state corporate law to pay dividends or make distributions to its shareholders.  If anything, state corporate law limits a corporation's ability to make distributions to its shareholders; the laws of each state generally determine how and to what extent corporations can make distributions to their shareholders.[47]  The right of a stockholder to the declaration of a dividend rests in the discretion of the directors, so long as such discretion is fairly exercised.[48]  The decision, whether or not to make a distribution is one of business judgment, not law.  The courts will not interfere in the legitimate business decisions of a private corporation just to resolve a dispute between majority and minority shareholders.[49]  Stockholders have no individual or property interest in the profits of a corporation and are not entitled to any portion of the accumulated earnings until declaration of a dividend or its equivalent.[50]

In *Lawton v. Commissioner*,[51] the Sixth Circuit Court of Appeals analyzed whether a transfer of stock from a father to his children should be respected.  The Service pointed to the fact that distributions were never made.  However, the Sixth Circuit ruled that the reinvestment of non-excessive profits by a corporation was not unwarranted or even unusual.  Therefore, to the extent that S Corp needs the funds for business reasons, the failure to make distributions should not be relevant to the analysis of whether Exempt-Org is the beneficial owner of the nonvoting stock.

With respect to S corporations specifically, at least one court has held that where the individual shareholders are taxed on the retained earnings of the corporation, it is not necessarily oppressive of the corporation to fail to distribute earnings.[52]  There is no oppression because state laws protect the rights and interests of all shareholders.  If a shareholder believes that the corporation is improperly withholding legitimate

---

[46] *DeWitt v. United States*, 204 Ct. Cl. 274 (1974) (emphasis added).
[47] *See, e.g.* California Corporations Code §§ 114, 500-510.
[48] 18B Am. Jur. 2d, Corporations, §1224.
[49] *Zidell v. Zidell, Inc.*, 560 P.2d 1086 (Or. 1977).
[50] *Id.*
[51] 164 F.2d 380 (6th Cir. 1947).
[52] *Iwasaki v. Iwasaki Bros., Inc.*, 649 P.2d 598 (Or. Ct. App. 1982).

14

KPMG-SCVH-06-0015

KPMGZE-0043-00008994

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 259

distributions, it has the right to file suit and compel the corporation to make a distribution.[53]  Exempt-Org, in the proposed transaction, has this right.

Moreover, the lack of a distribution does not diminish the value of the nonvoting stock. The value of the nonvoting stock will appreciate based on the accumulation of profits in the corporation as well as the growth on investing the profits.  The appreciation of the nonvoting stock through the growth in the equity of a corporation is a benefit of ownership.  In addition, if there were to be an initial public offering at a premium price, Exempt-Org would share in that upside as well.

### 5)  The Shareholder is Assigning Income to Exempt-Org.

The Service could also assert that Shareholder is assigning income to Exempt-Org and that therefore, Shareholder should be taxed on this income.  Under the assignment of income doctrine, where a taxpayer attempts to "shift" income to another party, the taxpayer does not escape taxation on the shifted income.  The assignment of income doctrine is not codified in the Internal Revenue Code but created out of judicial precedence.  The purpose of the assignment of income doctrine is not to determine whether an item of income should be includible in gross income, but rather which taxpayer must include such item in its taxable income.  Most cases in this area relate to the transfer of either appreciated property or an ordinary income stream, i.e. personal service income, dividend income or interest income.[54]

The Service could argue that Shareholder's built-in gain in the donated nonvoting stock should be taxed to Shareholder.  In the past, the Service has recharacterized certain stock contributions followed by a redemption.  Specifically, where there was a prearranged plan to have the corporation redeem stock previously donated to a tax-exempt entity, the Service would treat the transaction as a redemption of the stock by the donor followed by a contribution of the cash to the tax-exempt entity.  Therefore, the donor would be taxed on the gain from the redemption.  However, the Service has subsequently stated in a Revenue Ruling that it will treat the proceeds of a redemption of donated stock as income to the donor only if the tax-exempt organization is legally bound, or can be compelled by the corporation, to surrender the shares.[55]

In the proposed transaction, the redemption agreement specifically states that neither Shareholder nor S Corp has the power to compel Exempt-Org to surrender its shares.  Exempt-Org will of course desire to surrender its shares since it will likely have no market in which to sell the stock.  Also, if Exempt-Org is relying on NOL's to offset the allocated income, it will likewise desire to surrender the stock when its NOL's are utilized or expired.  However, we do not believe these facts prove that S Corp can compel

[53] 18B Am Jur. 2d, Corporations, §1277.
[54] *Bagley v. Commissioner,* 85 T.C. 663 (1985); *Culver v. Commissioner,* T.C. Memo 1983-614.
[55] Rev. Rul. 78-197, 1978-1 C.B. 83.  The Service relied upon *Palmer v. Commissioner,* 62 T.C. 684 (1974), where the taxpayer had voting control of both a corporation and a tax-exempt private foundation. The Tax Court treated the transaction according to its form because the foundation was not a sham, the transfer of stock to the foundation was a valid gift, and the foundation was not bound to go through with the redemption at the time they received title to the shares.

KPMGZE-0043-00008995

KPMG-SCVH-06-0016

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 260

a redemption.  Rather, these factors simply make it more desirable for Exempt-Org to redeem the stock.  Therefore, the built-in gain in the donated nonvoting stock should not be taxed to Shareholder.

The Service could also argue that Shareholder is assigning S Corp's earnings to Exempt-Org.  The Service, on a number of occasions has successfully argued that the transfer of income from an individual to a third party was in fact earned by the individual and that therefore it should be taxable to the individual and treated as a gift or contribution to the third party.[56]  In these cases individuals or sole proprietors attempted to assign their wage income to a personal services corporation.  The Service argued that the income was taxable to the individuals and not the corporation because there were no employment contracts between the employers and the corporation.  The employment contracts were between the employers and the individuals.  The instant case can be distinguished from these cases in that Shareholder is not directly responsible for earning the income of S Corp.  Rather, S Corp is the legal entity creating the economic gain and benefit through its day to day operations.

It should be noted that there is a special provision in the Code allowing for the Service to reallocate income of an S corporation, but only with respect to certain family members described in Section 704(e)(3).[57]  That situation is not present here.  Therefore, the Service should not be permitted to reallocate the income of S Corp from Exempt-Org to Shareholder.

**6)  There is No Business Purpose for the Distribution of Non-Voting Stock and Warrants.**

Another argument the Service could assert is that there is no business purpose for the distribution of nonvoting stock and warrants.  For example, the Service could argue that Shareholder could have achieved the same economic result by distributing one share of nonvoting stock as opposed to distributing 900 shares, diluted by warrants.

Section 301, which governs the tax treatment of corporate distributions, is very broad in specifying the types of permissible corporate distributions.  By its terms, the statute does not contain any business purpose requirement.  It also does not appear that there is any case law imposing a business purpose for corporate distributions, except when the distributions form a part of a corporate organization or reorganization.[58]  With regard to distributions of stock specifically, the applicable provision, Section 305, also does not contain any business purpose requirement.  As such, it appears that corporations are permitted to structure distributions in any manner they see fit.

Although there does not appear to be any case law requiring a business purpose for distributions that do not form a part of a corporate organization or reorganization, courts

---

[56] *Bagley, supra; Culver, supra.*
[57] I.R.C. Sec. 1366(e).
[58] *See* Reg. Sec. 1.355-2(b) and *Gregory v. Helvering*, 293 U.S. 465 (1934).

16

KPMG-SCVH-06-0017

KPMGZE-0043-00008996

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 261

have on occasion, invoked a business purpose where none has been required before.[59] However, tax-free corporate distributions of stock have been permitted for over 80 years without a business purpose.[60]  If the courts or Congress was of the view that a business purpose was required for stock distributions, the issue clearly would have been settled by now.

In other areas of tax law, a business purpose doctrine has been specifically imposed.  For example, there must be a valid business purpose for corporate organizations and reorganizations (Sections 351 though 368), including those that contain a corporate distribution as a necessary element.[61]  The fact that no court has yet to specifically delineate a business purpose requirement for corporate distributions that fall outside of the organization and reorganizations provisions is telling.

In private letter rulings, the Service has given corporations a great deal of discretion with respect to stock distributions.  For example, in Private Letter Ruling 7908044, the Service permitted a tax-free distribution of 99 shares of common stock for each share of common stock outstanding under Section 305(a).[62]

It should also be noted that with regard to the number of shares involved in a distribution or other transaction, the Service stated in GCM 390888 that: "[a]s Congress noted when it stated that a common stock on common stock dividend would not be taxable because it did not change the proportionate interests of the shareholders, **the actual numbers of shares involved are relevant only insofar as they determine the proportionate interests of the shareholders**."[63]

In the unlikely event that the Service is successful in imposing a business purpose requirement for the distributions, there are several business purposes for the issuance of nonvoting common stock and warrants. For example, the warrants could be used for estate planning and gifting such as a contribution to a Family Limited Partnership ("FLP"), a contribution to a charitable remainder unitrust, and other charitable bailouts, such as pooled income funds to allow for future diversification.  Additionally, the warrants could also be used for financing or obtaining liquidity with ineligible S corporation shareholders such as public companies, venture/private equity funds, and

---

[59] See, e.g. US v. Wexler, 31 F3d 117 (3rd Cir., 1994).

[60] Distributions of stock with respect to a corporation's stock have not been included in gross income since Congress exempted stock dividends from tax in the Revenue Act of 1921, enacted in response to the Supreme Court decision of Eisner v. Macomber, 252 U.S. 189 (1920).  See Shiff, 765 T.M., Stock Rights and Stock Dividends: Sections 305 and 306, at A-4.

[61] See Reg. Sec. 1.355-2(b) and Gregory v. Helvering, supra.

[62] Similarly, in General Counsel Memorandum ("GCM") 37197 (July 15, 1977), the corporation made a distribution of ten shares of nonvoting, nonconvertible preferred stock for each share of common stock outstanding as part of a Section 303(a) redemption in order to maintain the remaining shareholders proportionate voting control.  A portion of the distributed stock was redeemed before the expiration of time in Section 303(b)(1)(A), for cash and the amount received by the estate equaled the maximum amount permitted under Section 303(a). The corporation distributed the appropriate vote and value to achieve its shareholders' objectives, specifically to retain voting control and shift the appropriate value to the estate. The GCM held that Section 305(a) applied to the distributed stock.

[63] GCM 39088 (December 7, 1983) (citing H.R. Rep. No. 91-413, 1969-3 C.B. at 217) (emphasis added).

17

KPMG-SCVH-06-0018

KPMGZE-0043-00008997

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 262

capital for transactions with other companies, e.g. mergers or acquisitions. The warrants could also be sold to an ineligible shareholder (by existing shareholders) who could then exercise them if desired.

### 7)  There is no Charitable Intent.

The Service may also attempt to argue that there is no valid charitable contribution because the shareholder obtains an ancillary tax benefit from the contribution. The Service could rely on *Hernandez v. Commissioner*[64] where the Supreme Court denied a charitable contribution deduction because the taxpayer received consideration in return for the donation.

A contribution or gift requires a transfer of ownership of money or property without any expectation of a *quid pro quo* to be received from the donee.[65] The Court in *Hernandez* stated that the external features of the transaction, and not the motivations of individual taxpayers need to be examined to determine whether such an expectation existed.[66] The Court stressed that a donation is not deductible where it is part of an exchange for an identifiable benefit. In *Hernandez*, the taxpayers' deductions were disallowed because the contributions were in reality payments to a church for certain hourly training services. With regard to the proposed transaction, there is no expectation of receiving a benefit from Exempt-Org. Exempt-Org does not exchange goods or services for the nonvoting stock. For example, if Shareholder donates the nonvoting stock to a hospital, he does not expect to receive, nor will he receive free or discounted medical services or drug prescriptions in exchange for the stock.

The Service could also claim that there was no charitable intent,[67] and that the donation was motivated solely by tax benefits. However, in at least one case, the taxpayer's deduction was allowed even though the charitable contribution was solely motivated by a tax benefit. In *Weitz v. Commissioner,*[68] the Tax Court stated, "[a] charitable contribution may be motivated by the basest and the most selfish of purposes as long as the donor does not reasonably anticipate benefit from the donee in return." In *Weitz,* the donee's agent bought medical equipment and supplies chosen by the donee hospital for the donor to later contribute to the hospital. The supplies were purchased at a bankruptcy auction for below fair market value and a deduction was claimed for the full fair market of the equipment and supplies upon contribution to the hospital.

Although the deduction amount was reduced to reflect the price of the equipment and supplies, the Tax Court allowed a deduction for the charitable contribution to the hospital stating, "[p]etitioners' actions have been planned and executed to assure that their

---

[64] 490 U.S. 680 (1989).
[65] *Id.*
[66] *Id.*
[67] The definition of a gift is different for charitable contribution deductions under I.R.C. Sec. 170, than it is for the exclusion from income of amounts received as a gift. For the income exclusion, the test is whether there was "a detached and disinterested generosity." *Commissioner v. Duberstein*, 363 U.S. 278 (1960). For a charitable contribution deduction, a generous and altruistic donative intent is not required.
[68] T.C. Memo 1989-99.

18

KPMG-SCVH-06-0019

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 263

donation of medical equipment to West Hudson would come within the definition of a deductible charitable contribution and all of the steps necessary to accomplish that goal have been effectuated.  Petitioners cannot be penalized for being too careful."[69]  The Tax Court went so far as to state that a charitable contribution may be accomplished through the efforts of an agent acting for the donee.[70]

In addition, the courts have stated that when the "primary motivation for conveying the property was to secure a tax deduction . . . it does not result in the disallowance of the deduction."[71]  Also, in *Waller v. Commissioner*,[72] the taxpayers were allowed deductions for contributions of appreciated securities with unrealized appreciation which thereby avoided payment of capital gains tax on such appreciation while claiming a charitable contribution deduction for such appreciation.  In *Waller*, although the taxpayers were the creators and trustees of the donee-trust, the Tax Court held that avoiding the tax on the gain by selling to this particular trust, does not negate the tax-exempt status of the trust or the deductibility of the contributions made.

## 8)  The Proposed Transaction is a Tax Shelter.

As a last resort, the Service could attempt to invoke the tax shelter provisions to the transaction.  We do not believe that the provisions are applicable here since the structure of the transaction does not meet the statutory definition of a tax shelter.[73]

The definition of a tax shelter requires an investment for sale. The proposed transaction involves a charitable donation of stock by a shareholder to a tax-exempt organization.  It is not an investment by either the shareholder or the S corporation, but a charitable donation.  In the broadest sense of the word investment, Shareholder and S Corp never have an investment in Exempt-Org.  Likewise, they do not expect, nor will they receive any type of investment return from Exempt-Org, which might be indicative of an investment.  In fact, Shareholder surrenders something of value, Shareholder's own investment in S Corp, which Exempt-Org now owns.

---

[69] *Id.*
[70] *Id.* (citing *Greer v. Commissioner*, 70 T.C. 294, 304 (1978)).
[71] *Mount Mercy, supra* (citing *Weitz, supra*).
[72] 39 T.C. 665 (1963).
[73] Provisions under I.R.C. Sec. 6707 apply penalties to persons who fail to meet registration requirements for tax shelters.  These penalties only apply if a structure meets the definition of a tax shelter under I.R.C. Sec. 6111(c). That definition provides that a tax shelter is:

> any investment--
> (A) with respect to which any person could reasonably infer from the representations made, or to be made, in connection with the offering for sale of interests in the investment that the tax shelter ratio for any investor as of the close of any of the first 5 years ending after the date on which such investment is offered for sale may be greater than 2 to 1, and
> (B) which is--
> (i) required to be registered under a Federal or State law regulating securities,
> (ii) sold pursuant to an exemption from registration requiring the filing of a notice with a Federal or State agency regulating the offering or sale of securities, or
> (iii) a substantial investment.

19

KPMG-SCVH-06-0020

KPMGZE-0043-00008999

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 264

## CONCLUSION

Based on the above analysis and discussion, we believe that it is more likely than not that, Shareholder will be entitled to a charitable contribution deduction in tax year 1999 for approximately the FMV of the stock donated to Exempt-Org.  Moreover, in tax years 2000 and 2001, 90 percent of S Corp's taxable income should be allocated to Exempt-Org.

20

KPMGZE-0043-00009000

KPMG-SCVH-06-0021

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 265



# Tax Innovation Center
## Product Idea Submission Form

**Submit to:** "US TAXHOT PRODUCTS" Outlook mailbox.

**From (Idea Submitter):** Larry Manth, Andrew Atkin, Douglas Duncan, and Robert Huber
**Office:** Los Angeles
**Suggested idea name/brief description:** S-Corporation Charitable Contribution and Estate Planning Strategy ("S-CAEPS")
**Date submitted:** January 31, 2000
**Check primary product group: XXX Federal** ☐ **PFP** ☐ **SALT** ☐ **IES** ☐ **IS**
**Identify other affected product groups:** PFP

---

This Product Idea Submission Form is designed to assist in technical and market screening and prioritizing the development of new product ideas. The submitter may need to spend 3 to 8 hours of due diligence on a new idea before submitting this form.

---

**1. Please explain the idea in detail, including how client savings are achieved:**
See Attached Memo

**2. What do you believe are the tax, business, and financial statement benefits of the idea (please list using bullets):**
- Tax Elimination, conversion, and deferral
- Enhanced cash flow
- Philanthropic benefits

**3. Please list the transaction steps (if applicable):**
See Attached Memo

**4. Please include/attach a schematic of the idea (if applicable):**
N/A

**5. To which tax jurisdictions (countries, states) do you believe the idea applies?**
Federal and all states (this is an S-corporation idea)

**6. Please summarize any federal, state, and foreign tax technical support.** (If possible, list the applicable cites that support the idea's technical premise. Please attach related technical memoranda already produced.)
See Attached Memo

**7. Please list any unresolved tax issues of which you are aware:**
See Attached Memo

*For Internal Use Only*
{FILENAME \p \* }

KPMGZE-0043-00009001

**KPMG-SCVH-06-0022**

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 266



## Tax Innovation Center - Product Idea Submission Form

**8.  If the strategy has been delivered to a client, please attach copies of client deliverables (memos, excel spreadsheet, etc.).**
We completed two transactions by 12/31/99 and have not yet finalized the deliverables

**9.  Please help us determine whether this idea will meet the Tax Product Development Revenue Threshold by providing the following, to the extent you can:**

    **a.  List the optimal target characteristics:**
    S corporations with taxable income > $2 million and less than 5 shareholders

    **b.  List the key target markets:**
    All large cities

    **c.  Identify the typical buyer (e.g., CEO, CFO, Tax Director):**
    Owner/CEO

    **d.  Estimate an average tax fee per engagement for this idea:**
    Minimum fee of $300,000  (the projects we completed had an average fee of approximately $600,000).

*THANK YOU for taking the time to submit your idea.*
{FILENAME \* }

*For Internal Use Only*        Page 2
{FILENAME \p \* }

KPMGZE-0043-00009002

KPMG-SCVH-06-0023

Strait Decl. Supp. U.S.
Mot. Summary Adjudication of Issues

Ex. 204
Page 267