1  MELINDA HAAG
   United States Attorney
2  THOMAS NEWMAN
   Assistant United States Attorney
3
   HENRY C. DARMSTADTER
4  JAMES E. WEAVER
   ADAM D. STRAIT
5  Trial Attorneys, Tax Division
   U.S. Department of Justice
6  P.O. Box 683, Ben Franklin Station
   Washington, D.C.  20044-0683
7  Telephone: (202) 307-6481
   henry.c.darmstadter@usdoj.gov
8  james.e.weaver@usdoj.gov
   adam.d.strait@usdoj.gov
9  *Attorneys for the United States of America*

10              IN THE UNITED STATES DISTRICT COURT FOR THE

11                   NORTHERN DISTRICT OF CALIFORNIA

12                          SAN JOSE DIVISION

13  SANTA CLARA VALLEY HOUSING          )   Case No. 5:08-cv-5097-JF-HRL
    GROUP, INC., and KRISTEN M. BOWES,  )
14                                      )   **UNITED STATES' OPPOSITION TO**
                                        )   **PLAINTIFF KRISTEN BOWES'S**
15        Plaintiffs,                   )   **MOTION FOR SUMMARY**
                                        )   **JUDGMENT**
16            v.                        )
                                        )
17  UNITED STATES OF AMERICA,           )   Date:       June 10, 2011
                                        )   Time:       9:00 a.m.
18        Defendant.                    )   Courtroom:  3
                                        )
    _____)

19
20        The United States opposes the motion for summary judgment filed by Kristen Bowes

21  ("Bowes").  Bowes's motion describes a series of events that served no economic or charitable

22  purpose.  This scripted series of events, collectively known by the acronym SC2, had only one

23  real purpose: income tax avoidance.  Bowes claims to have donated nonvoting shares of Santa

24  Clara Valley Housing Group, Inc. ("SCVHG") to the City of Los Angeles Safety Members

25  Pension Plan ("LAPF"), a tax exempt entity.  But the detailed facts of the case tell a far different

26  story than the one created and scripted by tax shelter promoter KPMG LLP, and now retold by

27  Bowes.  In reality, the tax exempt entity was never a shareholder, and Bowes never intended to

28  donate stock to the LAPF.  The SC2 script was a fiction, and its implementation was a sham.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **iii**

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**I.**   **Introduction and Statement of Issues.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**II.**  **Statement of Additional Material Facts.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

   A.  The LA Pension Fund performed the role of an accommodation party. . . . . . . . . . . . . 3

   B.  The Schott family created SCVHG and then "donated" nonvoting shares of SCVHG in
       order to avoid income taxes and not for charitable or business purposes. . . . . . . . . . . 11

      1.  *The marketing and sale of SC2 to the Schott Organization.* . . . . . . . . . . . . . . 12

      2.  *SCVHG was a shell corporation, without employees or purposes other than to
          serve as a vehicle through which to implement SC2.* . . . . . . . . . . . . . . . . . . . 14

      3.  *The promise of funds to the LAPF was made to obtain tax benefits* . . . . . . . . . 17

      4.  *Post "donation" events provide further evidence that the LAPF was not a
          shareholder of SCVHG.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

      5.  *Kristen Bowes had no knowledge that she was donating shares of SCVHG
          to the LAPF.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**III.**  **Legal Analysis.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

   A.  The LAPF was not a shareholder in SCVHG for tax purposes. . . . . . . . . . . . . . . . . . 20

      1.  *The LAPF did not enjoy the economic benefits and burdens of ownership.* . . . . . 23

      2.  *The LAPF did not take actions consistent with those of a shareholder.* . . . . . . . 25

      3.  *The Schotts retained dominion and control over SCVHG and the ownership
          interest purportedly transferred to the LAPF.* . . . . . . . . . . . . . . . . . . . . . . . 26

      4.  *The LAPF did not have any meaningful ability to exercise ownership rights in
          SCVHG.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

      5.  *The Schott family did not deal with SCVHG on an "arm's length" basis.* . . . . . . 27

      6.  *Bowes's analysis of stock ownership ignores the substance of the parties'
          arrangement* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

   B.  The form of the SC2 transaction should be disregarded for tax purposes. . . . . . . . . . . 28

      1.  *The SC2 transaction was a sham, it lacked economic substance and served
          no nontax purpose.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

      2.  *Collapsed into an integrated whole, the SC2 transaction reveals that the LAPF
          was simply an accommodation party to a transaction without substance.* . . . . . . 35

   D.  The *Palmer* line of cases and the *Gitlitz* case cited by Bowes are inapposite to
       this case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

   E.  Bowes did not donate shares of SCVHG to the LAPF. . . . . . . . . . . . . . . . . . . . . . . 39

**IV.**   **CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **40**

**TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Commissioner v. Clark*, 489 U.S. 726 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>35</u>

*Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945).. . . . . . . . . . . . . . . . . . . . . . . . . . . <u>28</u>

*Commissioner v. Gordon*, 391 U.S. 83 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>35</u>

*Commissioner v. Tower*, 327 U.S. 280 (1946).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>28</u>

*Frank Lyon Co. v. United States*, 435 U.S. 561 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>28</u>

*Gitlitz v. Commissioner*, 531 U.S. 206 (2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>29</u>, <u>38</u>

*Knetsch v. United States,* 364 U.S. 361 (1960). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>31</u>

*Addis v. Commissioner*, 374 F.3d 881 (9th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>30</u>

*Allen v. Commissioner*, 925 F.2d 348 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>36</u>

*Bail Bonds by Marvin Nelson, Inc. v. Commissioner,* 820 F.2d 1543 (9th Cir. 1987). . . . . . . . <u>31</u>

*Behrend v. United States*, 73-1 U.S.T.C. ¶ 9123 (4th Cir. 1972).. . . . . . . . . . . . . . . . . . . . . . . <u>37</u>

*Brown v. United States*, 329 F.3d 664 (9th Cir. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>35</u>

*Carrington v. Commissioner*, 476 F.2d 704 (5th Cir. 1973). . . . . . . . . . . . . . . . . . . . . . . . . . . <u>37</u>

*Casebeer v. Commissioner,* 909 F.2d 1360 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . <u>30</u>, <u>31</u>

*Coltec Indus., Inc., v. United States,* 454 F.3d 1340 (Fed. Cir. 2006). . . . . . . . . . . . . . . . . . . . <u>30</u>

*EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d 991 (9th Cir. 2010).. . . . . . . . . . . . . . . . . . . <u>20</u>

*Estate of Kluener v. Commissioner*, 154 F.3d 630 (6th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . <u>28</u>

*Grove v. Commissioner*, 490 F.2d 241 (2nd Cir. 1973).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>37</u>

*Horphag Research Ltd. v. Garcia*, 475 F.3d 1029 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . <u>20</u>

*Jacobs v. Commissioner*, 224 F.2d 412 (9th Cir. 1955). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>35</u>

*Lee v. Commissioner*, 115 F.3d 584 (2d Cir. 1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>30</u>

*Linton v. United States,* 630 F.3d 1211 (9th Cir. 2011).. . . . . . . . . . . . . . . . . . . . . . . . . . <u>35</u>, <u>36</u>

*Pahl v. Commissioner*, 150 F.3d 1124 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . <u>21</u>, <u>22</u>, <u>28</u>

*Robino, Inc. Pension Trust v. Commissioner*, 894 F.2d 342 (9th Cir. 1990).. . . . . . . . . . . . <u>28</u>, <u>35</u>

*Sheppard v. United States*, 361 F.2d  972 (Ct. Cl. 1966).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>36</u>

1   *Sochin v. Commissioner*, 843 F.2d 351 (9th Cir. 1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 30

2   *Speca v. Commissioner*, 630 F.2d 554 (7th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . 21, 22, 24, 39

3   *Stewart v. Commissioner*, 714 F.2d 977 (9th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

4   *TIFD III-E Inc. v. United States*, 459 F.3d 220 (2d Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . 23

5   *True v. United States*, 190 F.3d 1165 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

6   *United States v. Alcaraz-Garcia*, 79 F.3d 769 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . 39

7   *Wilson v. Commissioner*, 560 F.2d 687 (5th Cir. 1977).. . . . . . . . . . . . . . . . . . . . . 21, 22, 25, 28

8

9   *Jade Trading, LLC v. United States*, 65 Fed. Cl. 188 (2005). . . . . . . . . . . . . . . . . . . . . . . . . 26

10  *Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122 (D. Conn. 2004),

11      *aff'd*, 150 Fed. Appx. 40 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

12  *Maguire Partners-Master Investments, LLC v. United States*, No. 06-cv-07371-JFW,

13      2009 WL 4907033 (C.D. Cal. Dec. 11, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

14

15  *Bierne v. Commissioner*, 52 T.C. 210 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

16  *Duarte v. Commissioner*, 44 T.C. 193 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

17  *Dunne v. Commissioner*, 95 T.C.M. (CCH) 1236, 2008 WL 656496 (2008). . . . . . . . . 21, 22, 28

18  *Esmark, Inc. & Affil. Cos. v. Commissioner*, 90 T.C. 171 (1988). . . . . . . . . . . . . . . . . . . . . . 35

19  *Feraco v. Commissioner*, 80 T.C.M. (CCH) 463, 2000 WL 1466111 (2000).. . . . . . . . . 21, 22, 28

20  *Hoffman v. Commissioner*, 47 T.C. 218 (1966), *aff'd*, 391 F.2d 930 (5th Cir. 1968). . . . . . . . . 21

21  *Mount Mercy Associates v. Commissioner*, T.C. Memo. 1994-83, 67 T.C.M. (CCH) 2267,

22      1994 WL 53665 (1994), *aff'd*, 50 F.3d 2 (2d Cir. 1995) (table decision). . . . . . . . . . . . 31, 32

23  *Palmer v. Commissioner*, 62 T.C. 684 (1974), *acq. in* Rev. Rul. 78-197, 1978-1 C.B. 83,

24      *aff'd* 523 F.2d 1308 (8th Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

25  *Ragghianti v. Commissioner*, 71 T.C. 346 (1978), *aff'd*, 652 F.2d 65 (9th Cir. 1981). . . . . . . . 21

26  *Rauenhorst v. Commissioner*, 119 T.C. 157 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

27  *Viralam v. Commissioner*,136 T.C. No. 8 (February 14, 2011).. . . . . . . . . . . . . . . . . . . . . 32, 40

28

*Jaffe v. Carroll*, 35 Cal. App. 3d 53, 110 Cal. Rptr. 435 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . 39

**Statutes**

26 U.S.C. § 1366. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 38

26 U.S.C. § 1377. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 38

26 U.S.C. § 170. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**Other Authorities**

Rev. Rul. 78-197, 1978-1 C.B. 83. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Rev. Rul. 81-282, 1981-2 C.B. 78. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

S. Rep. No. 104-281 (June 18, 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**ARGUMENT**

**I. Introduction and Statement of Issues**

During the time period running from July 11, 2000, through December 31, 2004, SCVHG earned over $114 million of ordinary income. During the same period, the shareholders of SCVHG avoided payment of income tax on 90% of this income through participation in a tax shelter known as SC2. The strategy involved the misallocation of this income, for tax purposes, to a temporary nominee not subject to taxation. For Bowes alone, the income taxes, penalties and interest arising out of the SC2 misallocation scheme total over $4.5 million.

Bowes claims to have "donated" 144 shares of nonvoting stock of SCVHG to the LAPF on July 10, 2000. She claims that she is entitled to a charitable contribution deduction of $7,657 for this purported donation. The first twenty-four pages of Bowes's Motion discuss the purported validity of this "donation." Bowes does not get around to addressing the primary matter at issue (misallocation of income) until the final pages of her Motion. The approach taken by Bowes can be summarized as follows: if Plaintiff can persuade the Court that her donation of stock was valid, then she reasons that the allocation of 90% of SCVHG income to the LAPF for tax purposes, no matter how divorced from economic reality, must follow by mechanical operation of Subchapter S of the Internal Revenue Code.

The Court, however, is not constrained to respect the form of an abusive tax scheme. The issue of whether income should be reallocated from the LAPF to Bowes requires a fact-intensive examination of the subjective motivation behind the steps comprising an SC2 transaction and the objective substance of the transaction. Nor can examination of this matter be limited to "undisputed" facts contained in the form documents created by promoter KPMG. A full review of the facts (both disputed and undisputed) surrounding the creation of SC2, the agreement of the LAPF to participate in the scheme, the sale of the transaction to the Schott family, the purported "donation," and the conduct of the parties after implementation of the scheme, reveals the lack of any subjective purpose or objective benefit associated with the scheme, aside from tax avoidance.

For example, the LAPF understood that it was merely playing the role of an accommodation party to the SC2 program by serving as a temporary "parking lot" for stock certificates in

exchange for a future cash payment. Its treatment of SCVHG stock bore little relationship to an equity interest: it did not treat SCVHG stock certificates as investments, did not play any role that one would associate with that of a shareholder in a close corporation, and did not benefit economically from the income allocated to it for tax purposes. The Government contends that the LAPF's role as an accommodation party was based on tacit understandings between the parties to the transaction that the LAPF would not disrupt the circular sequence of events that moved purported ownership of SCVHG stock from taxpayers to the LAPF and back again.

In fact, SCVHG and its owners did not treat the LAPF as a shareholder, much less a 90% shareholder. The SCVHG owners engaged in self-dealing transactions involving other family companies without consultation of, or consideration for, its nominal 90% "shareholder." Ms. Bowes herself had no inkling that she even owned shares of SCVHG until after the start of this litigation. In July 2000, she did not understand that she was giving away shares of SCVHG to the LAPF; she was simply told by her father that she "would be giving money" to the LAPF. She didn't know how much money.

Because the LAPF was never a shareholder in SCVHG for tax purposes, and because the components of the SC2 transaction, taken both separately and as an integrated whole, lacked substance, Bowes's motion should be denied. In addition, Bowes's motion overlooks fundamental disputes of material fact that cannot be resolved short of trial.

## II.      Statement of Additional Material Facts

Undisputed facts surrounding the genesis of the SC2 scheme and its implementation with respect to SCVHG are set forth in the Government's Memorandum in Support of its Motion for Summary Adjudication of Issues ("U.S. Mem. Supp. Mot. SAI"). (ECF No. 67.) That Memorandum addresses the question of whether the issuance by SCVHG of synthetic equity instruments (styled as warrants) violated the single class of stock requirement for S corporations, thereby terminating its S status. The statement of facts contained in that Memorandum addressed the creation, deployment and sale of SC2 by KPMG (*id.* at 4-7), the sale of SC2 to the Schott family (*id.* at 7-8), the steps involved in the implementation of the SC2 strategy with respect to SCVHG (*id.* at 8-15), and the setting of the strike price for SCVHG "warrants" and the valuation

of SCVHG nonvoting stock (*id.* at 15-19). That statement of facts is incorporated herein by reference and, to the greatest extent possible (without disrupting the flow of this Memorandum), will not be repeated here.

### A.   The LA Pension Fund performed the role of an accommodation party

KPMG designed the SC2 scheme to shift the burden of paying taxes on pass-through income from S corporation shareholders to a tax-exempt entity for a defined time period, typically two to three years.  (Dep. of Diane D. Fuller, Designated Repr. of KPMG ("Fuller Dep."), Ex. A to Darmstadter Decl. Supp. Opps. to Mots. Summ. J. ("Darmstadter Decl."), at 24:24-26:22; *id.* at 100:4-101:11; Memo from L. Manth (Mar. 31, 2000) ("White Paper"), Ex. 181, Strait Decl. Supp. Opps. to Mots. Summ. J. ("Strait Decl.") at 134).  In order to sell SC2 to potential clients around the country, KPMG needed to find tax-exempt organizations willing to hold nominal title to stock certificates of a company for the defined time period; to absorb pass-through income for tax purposes – without receiving corresponding distributions of the allocated income; to "not participate in the affairs of the corporation" and, after the defined time period, to return the stock certificates for a "relatively modest" price determined by KPMG and agents for the corporation. (Mem. from Max Gray to Dan Ikeda (Apr. 10, 2000) ("Gray Memo"), Ex. 276, Strait Decl. at 303 ¶ 5, 304 ¶ 7.  *See also* Fuller Dep. 135:22-137:6, 175:23-176:7; SC2 – Appropriate Answers for Frequently Asked Shareholder Questions ("SC2 FAQs"), Ex. 552, Strait Decl. at 682-684.)

Finding such a tax-exempt organization was no small task.  Most charitable institutions are subject to Unrelated Business Income Taxes ("UBIT") and would thus be reluctant to hold S corporation stock absent dividend distributions to cover taxes. (*See* U.S. Mem. Supp. Mot. SAI 5-6 (ECF No. 67).)  KPMG therefore solicited municipal pension funds, which it believed were not subject to UBIT, to participate in SC2.  Only four municipal pension funds contacted by KPMG consented to be accommodation parties in SC2 transactions.  (*See* Fuller Dep. 313:3-14.)

KPMG made an initial presentation to the Board of Commissioners for the LAPF in December 1999.  (*See* Dep. of Tom Lopez, Ex. C to Darmstadter Decl. ("Lopez Dep."), at 145:8-146:18; Mtg. of Bd. of Fire & Police Comm'rs (Dec. 16, 1999), Ex. 7, Strait Decl. at 17-25.)  KPMG followed up by meeting with the Commissioners in May and July 2000 to ratify the first of

several SC2 transactions.  (Lopez Dep. 185:5-189:6, 201:10-203:4; Mtg. of Bd. of Fire & Police

Comm'rs (May 11, 2000), Ex. 10, Strait Decl. at 61-69; Mtg. of Bd. of Fire & Police Comm'rs

(July 27, 2000), Ex. 12, Strait Decl. at 84-97.)  The role of the LAPF in SC2 transactions was

aptly captured in an exchange between the Board President and KPMG partner Larry Manth

during a July meeting:

> PRESIDENT HARWIN: What happens at the end of the transaction, we are basically a
>     parking lot.
>
> MR. MANTH: You got it.
>
> PRESIDENT HARWIN: We take a stock and we park it for these guys.
>
> MR. MANTH: Yes.

(Jul 27, 2000 Tr., Ex. 12, Strait Decl. at 86-87.)  In the same meeting, the in-house counsel for

the LAPF, Donna Weisz Jones, summarized her understanding of the nature of the role of the

LAPF as follows:

> MS. JONES: No.  You really sort of hold it at zero right now because it's -- you can't put
>     it as any thing. When you get the money, you now have a certain amount of money that
>     comes in, but right now it's -- as Gay says, you are a parking lot right now. You are just
>     holding something with a guarantee of money coming in.

(*Id.*, Strait Decl. at 90.)

One critical piece of information was intentionally omitted from KPMG's initial discussions

with the LAPF Commissioners and subsequent conversations between KPMG and the LAPF's

Chief Investment Officer, Tom Lopez ("Lopez").[1]  Manth and his KPMG team did not explain

that the stock certificates "parked" in the LAPF's name would represent nominal title to 90% of

the outstanding shares of an S corporation participating in SC2.[2]  Lopez operated under the

mistaken impression that SC2 involved a charitable donation, not the absorption of 90% of a

company's income for tax purposes. (Lopez Dep. 310:12-25, 412:15-25.)

---

[1]As Chief Investment Officer, Lopez was responsible for managing all of the LAPF's investments and assets.  (Lopez Dep. 25:24-26:14.)  Lopez oversaw and was responsible for all aspects of the LAPF's participation in the SC2 stock program. He had direct contact with KPMG and the authority on behalf of the LAPF to negotiate and finalize redemptions.  (*Id.* at 547:14-549:16.)

[2]Before the Senate investigation, Lopez assumed that the LAPF's ownership interest in the SC2 corporations was low – ten percent or less – and was surprised to later discover that the S corporations claimed that the LAPF was a 90% owner.  (*See* Lopez Dep. 292:4-293:14.)

1    Since Lopez initially believed that the tax benefit to the donors would be a charitable

2    contribution deduction, he requested that KPMG ensure that the LAPF receive a minimum

3    payment for each donation.  (*See* Lopez Dep. 402:19-403:9, 995:13-996:4.)  This concern was

4    addressed by KPMG providing either directly in redemption agreements or in a separate pledges

5    that the LAPF was entitled to a minimum payment at the time of redemption. (*Id.* at 995:13-

6    996:4; *see also id.* at 402:19-403:9 (discussing draft of Redemption Agreement).)[3]

7    Following KPMG's solicitation of the LAPF and its Commissioners' consent to participate,[4]

8    the LAPF served as an accommodation party to 28 separate SC2 transactions, including the

9    transaction at issue in this case.  (*See* Lopez Dep. 840:14-841:20; Ex. 103, Strait Decl. at 132.)

10   As a precondition to receiving SC2 stock certificates and the promise of later monetary

11   payments, the LAPF had to agree in each instance to accept the SC2 transaction as structured by

12   KPMG and to abide by the terms dictated by KPMG, as an "accommodation" to the original

13   shareholders. (Lopez Dep. 630:7-23.)  Each SC2 transaction was structured with similar sets of

14   documents, including a redemption agreement.  There could be no "donation" absent agreement

15   by the LAPF to the terms of the these documents.  (*See id.* at 675:18-676:3.)

16   In addition to the written agreements between KPMG clients and the LAPF, there was also an

17   implicit understanding between the SC2 participants that defined the relationship and the LAPF's

18   role.  The LAPF would act as a "parking lot" for SC2 certificates, not interfere with the activities

19

20   _____

21   [3]KPMG had recommended that the minimum price be set forth in separate pledges rather than directly in
     the redemption agreement to give the appearance that pension plan had some downside risk, a major attribute of

22   equity ownership.  (Fuller Dep. 142:5-144:10; Email Chain, Ex. 550, Strait Decl. at 673-76 (expressing concern over
     lack of "downside risk" for the tax-exempt organization).)  In this case, a minimum redemption price was ultimately

23   guaranteed by individual Pledges from the Schott family.  Initially, the SCVHG minimum payment to the LAPF had
     been an express provision in the Redemption Agreement.  (*See* Dep. of Robert Weaver, Ex. D to Darmstadter Decl.
     ("Weaver Dep.") at  488:7-491:14; Draft Redemption Agreement, Ex. 529, Strait Decl. at 617-18.)

24
     [4]The Commissioners' consent was subject to the LAPF obtaining a legal opinion as to the SC2 transaction.

25   (Minutes of Dec. 16, 1999 Meeting, Ex. 7, Strait Decl. at 11.) Although the LAPF's outside counsel, Seyfarth, Shaw,
     provided an opinion that accepting non-voting stock in an S corporation would most likely not adversely affect the

26   LAPF's tax-exempt status, Seyfarth expressly declined to render any opinion as to the tax ramifications of the
     transaction on either the S corporation or its original shareholders. Seyfarth also did not consider whether the LAPF

27   should be treated as a beneficial shareholder of SC2 stock for income allocation purposes.  (*See* Letter from Mitchel
     D. Whitehead to Tom Lopez, Ex. 9, Strait Decl. at 29; Dep. of Mitchel D. Whitehead, Ex. E to Darmstadter Decl., at

28   118:13-119:1, 137:4-25.)  If Bowes is relying on this opinion letter for the proposition that LAPF was a true
     shareholder in SC2 companies, her reliance is misplaced.

of the corporation, not expect cash distributions,[5] and would passively acquiesce at the time of redemption by accepting the amount offered by the corporation.  (*See id.*; *see also* Gray Memo, Ex. 276, Strait Decl. at 304 ("This whole arrangement will be discussed with the charity before the gift.").)  As KPMG stated, the tax exempt "knows the deal [regarding redemption] prior to accepting the stock."  (SC2 FAQs, Ex. 552, Strait Decl. at 682.)

The parties understood that the LAPF would not receive or demand detailed financial information from an SC2 corporation.   (*See* Lopez Dep. 249:2-250:4, 849:11-15.)  As stated by Lopez, the financial information received by the LAPF from SC2 corporations was "almost nonexistent."  (*Id.* at 994:7-11.)   In particular, with respect to SCVHG, the LAPF was not provided with copies of financial statements.  (*Id.* at 367:17-368:2, 382:11-16; *cf. id.* at 1014:19-1016:15 (explaining that LAPF threw away K-1 forms because it was not required to pay tax).)

The parties understood that the LAPF would not receive corporate organizational documents or related information.  In fact, representatives of KPMG, who generally acted as  intermediaries between KPMG SC2 clients and the LAPF, did not explain to the LAPF the capital structure of the various S corporations or the purpose or highly dilutive economic effect of warrants issued prior to "donation."  (*See id.* at 250:5-251:4.)  In particular, the LAPF did not receive organizational documents associated with SCVHG.  (*Id.* at 311:18-25.)

The parties understood that the LAPF would "not participate in the affairs of the corporation" or attend Board meetings.  (Gray Memo, Ex. 276, Strait Decl. at 303 ¶ 5.)  Nor would the LAPF demand input into dividend policies set by the directors of SC2 corporations.  (*See id.* at 303-04.) The LAPF did not, in fact, attend shareholder meetings of SCVHG.  (*See* Lopez Dep. 354:19-360:10.)  As to dividend policy, the LAPF routinely signed form "Acknowledgments," including one for the purported donations of SCVHG shares, that made it clear to the LAPF that any meaningful dividends would not be forthcoming during the specified period.  (*See* Dep. of Daniel M. Ikeda, Ex. I to Darmstadter Decl. ("Ikeda Dep."), at 77:6-78:6; Acknowledgment, Ex. 274, Strait Decl. at 264-65.)

---

[5]In implementing SC2, KPMG ensured that the organizational documents did not require the corporation to distribute any income to its shareholders; cash was to be retained until the tax exempt redeemed.  (*See* Weaver Dep. 90:24-91:18, 420:19-421:16; Minutes, Ex. 274, Strait Decl. at 218; *see also* Weaver Dep. 336:15-337:13.)

1    The parties understood that the terms of the redemption agreements controlled the timing and

2    amount of any payment to be realized the LAPF.  Lopez was advised by KPMG that the LAPF

3    would be able to monetize the donation only after a mandatory year or two holding period

4    through the redemption process.[6]  (Lopez Dep. 115:8-116:25, 142:6-143:1.)  As part of the

5    transaction, Lopez clearly understood that the LAPF was expected to request redemption at the

6    end of the holding period.[7]  (*Id.* at 165:9-166:16.)  Indeed, Lopez believed that the only way the

7    LAPF would receive any money for the SC2 transactions was through the prescribed redemption

8    process.  (*See id.*; at 165:9-166:16, 1050:13-23, 455:24-456:15.)  Lopez stated that "there wasn't

9    any way of realizing any proceeds from the donations until [the LAPF] actually sold them back to

10   the original owners."  (*Id.* at 700:17-701:11.)  Lopez never considered requesting an extension of

11   the holding period for any of the SC2 stock.  (*See id.* at 286:16-289:19.)

12   Under the SCVHG Redemption Agreement, payment for the non-voting stock was expressly

13   reduced because of lack of controlling interest, lack of marketability, issuance of dilutive

14   warrants, and no obligation to pay dividends.  (Redemption Agreement, Ex. 274, Strait Decl. at

15   244 ¶ 3.)  Moreover, the parties understood that the redemption price was to be determined by an

16   appraiser unilaterally selected and controlled by the S corporation. (*See* Lopez Dep. 294:6-

17   296:4.)  The LAPF had no ability to offer an alternate appraiser on its behalf or veto the appraiser

18   chosen by the corporation.  (*Id.* at 294:9-295:5.)  This provision conflicted with LAFP policies

19   which expressly require that the LAPF have input in the selection of an appraiser for purposes of

20   valuing an asset.  (*Id.* at 307:11-308:25.)

21

22

23   [6]Manth had advised the Board that the SC2 stock had zero value until redemption.  "You can't sell it to anyone. There is no value to it."  (Jul 27, 2000 Tr., Ex. 12, Strait Decl. at 91.)  The tax benefit from SC2 through the

24   disproportionate allocation of income to the pension plan would be defeated by an immediate redemption of the nonvoting stock.  (*See* Fuller Dep. 170:3-171:23.)

25   [7]Some redemption agreements, such as the one for SCVHG, expressly provided that the redemption period

26   could be extended for a year or more. (Redemption Agreement, Ex. 274, Strait Decl. at 244 ¶ 2.)  In other cases, where there was no built-in extension clause, after donation, corporations requested that the LAPF agree to amend

27   the redemption agreement to extend the redemption period.  (*See* Lopez Dep. at 760:7-763:21.)  The LAPF would agree to extend the redemption in consideration of a payment in a sum certain.  In determining the amount of this payment, Lopez did not focus on the potential financial performance of the corporation but merely considered the

28   payment for extension as nothing more than compensation to the LAPF for the time value of money (i.e., the LAPF had to wait an extra year before it received its redemption payment).  (*See id.*)

Prior to learning of an investigation by the Senate in 2003,[8] the LAPF did not seek to maximize its purported interest in the SC2 certificates either before or during the redemption process. (*See id.* at 274:1-25.)  Although Lopez, as Chief Investment Officer, had a duty to maximize the value of LAPF investments, he did not believe he had any responsibility or obligation to maximize the value of the SC2 certificates. (*Id.* at 277:6-15.)  Lopez did not even consider these certificates to be "investments" over which he had any fiduciary duty. (*See id.* at 275:24-276:10.)  Suffice it to say that the LAPF never considered or made any attempts to sell to a third party or otherwise maximize the benefit of their SC2 holdings. (*See id.* at 274:1-277:15.)

For accounting purposes, the LAPF treated the SC2 certificates differently than all other non-publically traded assets.[9]  For example, real estate assets held by the LAPF were periodically appraised and reflected on LAPF books at the appraised value. (*Id.* at 567:20-570:9.)  In contrast, the LAPF never made any attempts to either independently value SC2 certificates or to determine their market value. (*Id.* at 309:6-11.)  SC2 certificates were carried at a zero valuation until such time as the LAPF received an actual cash payment from the SC2 corporation. (*Id.* at 574:4-577:2.)  The LAPF did not consider the "gifts" realized, or recognize them for accounting purposes, until cash was received upon redemption. (*Id.* at 577:11-579:21, 657:17-24.)

By all accounts, Lopez was cooperative and accommodating in dealing with KPMG and the corporations. (*See, e.g.*, Weaver Dep. 461:6-24.)  It is therefore hardly a surprise that out of 48 SC2 transactions arranged for and sold by KPMG to its clients, the LAPF and Lopez served as an accommodation party for 28. (*See* Donated Stock, Ex. 103, Strait Decl. at 132.)

Prior to the Senate investigation, the LAPF approached the redemption process in an extremely passive manner. (*See* Lopez Dep. 425:4-426:8.)  At the time of redemption, the LAPF "accepted whatever KPMG or the donor was proposing." (*Id.* at 428:14-430:15.)  The LAPF did not demand to see supporting financial information; the redemption was "almost an automatic

---

[8]The LAPF was first contacted by staff persons for the Permanent Subcommittee in the early fall of 2003. (Lopez Dep. at 444:19-445:10.)  Investigators apprised the LAPF that they were examining KPMG tax shelters, including the SC2 transaction. (*Id.* at 443:25-444:14; Letter to Gary Mattingly, Ex. 36, Strait Decl. at 106.)

[9]Its publically traded assets were reflected at a market valuation.  (Lopez Dep. 567:14-568:15.)

type of thing." (*See id.* at 855:1-856:8.)  Although the "redemption" price was purportedly derived from an appraisal obtained by the company, Lopez never questioned the appraisal or attempted to negotiate a higher price prior to the Senate investigation.  (*See id.* at 410:6-411:19, 425:4-426:8.)  In fact, for some early redemptions, the LAPF was only provided with "fragments of an appraisal" that would only contain a "bottom-line valuation."  (*Id.* at 807:19-808:9.)[10]

> A lot of the earlier redemptions were -- were not carried out according to the redemption guidelines. So there were early buy-backs or people who, you know, in one case, turned their shares into -- or asked for their shares back. And in other cases, KPMG facilitated the process. And so they might have just come in with one page of the appraisal, something like that. . . .

( Lopez Dep. 808:23-809:6.)  In short, Lopez characterized his role in the redemption process, prior to the Senate's investigation of SC2, as being an "automatic type of thing." (*See id.* at 856:1-8.)  The Schott family entered into the SC2 transaction with the clear understanding that the "redemption price [would] be relatively modest."  (Gray Memo, Ex. 276, Strait Decl. at 304.)

After the Senate began its investigation and the LAPF started to receive unfavorable press in local and national newspapers, the Commissioners and the City Controller's Office became concerned about bad publicity and directed Lopez to wind down the SC2 program.  (*See* Lopez Dep. 557:25-560:11, 621:12-624:2; Mtg. at Controller's Office, Ex. 62, Strait Decl. at 129-30.)  After the Senate investigation, Lopez's goals were to "close out as many [SC2s] as possible, and to achieve higher sales prices than what the donors [had] expected to get." (*Id.* at 556:23-557:9.)  The LAPF appears to have accomplished the winding down process in two different ways.  On the one hand, if Lopez was asked by an SC2 participant to simply return SC2 certificates, Lopez did so – without any demand for funds.  His sole demand was that the SC2 company and shareholders hold the LAPF harmless from liability.  (*See id.* at 723:2-733:8, 1021:11-19.)  On

---

[10]In one SC2 transaction, the original shareholders requested that the LAPF agree to redeem the stock early so that corporate assets could be sold to a third party.  Although the third party was offering $50 million to the original shareholders, the original shareholders sought to only offer the LAPF the stated amount of the donation ($369,000) for its supposed 90% interest in the corporation held by the LAPF.  KPMG intervened and the actual payment amount was increased to a still-paltry $900,000 – less than 2% of the sale price. (Lopez Dep. 418:9-419:18, 425:9-426:8, 928:18-940:13.)  The original shareholders subsequently brought a state court action to recover the payment to the LAPF based upon the IRS's disallowance of the tax benefits associated with SC2.  The suit was later dismissed for procedural reasons.  *See Shih v. City of Los Angeles Safety Members Pension Fund*, No. B200526 (Cal. App. 2d Dist. Oct. 31, 2008), 2008 WL 4757020.

1    the other hand, if original shareholders did not ask for the return of their stock and continued on

2    with the SC2 fiction, Lopez began to position the LAPF as more of an arm's-length player.  He

3    began requesting that the corporations provide full written appraisals justifying the redemption

4    price (*id.* at 432:21-433:7, 808:10-810:8), and he began to review the assumptions and valuation

5    methodologies relied upon by the appraiser (*id.* at 432:18-433:7).  Realizing that SC2 was not

6    about charitable donations but about income tax avoidance through misallocation of income,

7    Lopez began "experimenting" with negotiations at redemption.  (*Id.* at 430:12-15.)  Lopez began

8    negotiating "from the seat of [his] pants," simply "throwing things at the wall" in an effort to

9    increase the redemption price.  (*Id.* at 506:8-507:2, 533:20-534:14.)

10       The original shareholders of SCVHG apparently elected to continue on with the SC2 fiction

11   subsequent to the Senate's investigation.  The return of the SCVHG certificates held by the

12   LAPF closed on March 30, 2005, with an effective date of December 31, 2004.  (*See* Lopez Dep.

13   560:12-566:11; Ex. 50, Strait Decl. at 123.)  In support of the price offered by SCVHG, the

14   company proffered an appraisal that substantially reduced the value of the nonvoting stock, even

15   beyond an already heavily discounted value pursuant to the redemption agreement – on the

16   theory that the IRS (now aware of and examining SC2 transactions) might prevail on its

17   argument that SCVHG terminated its S corporation status and should be taxed a C corporation.

18   (*See* U.S. Mem. Opp. SCVHG MSJ 5-6 (discussing appraisal).)  In that event, SCVHG would

19   owe a very sizeable income tax of its own.  Lopez, noting that the SCVHG and its shareholders

20   disagreed with the IRS position, asserted that the full discount for the C corporation tax liability

21   was unjustified.  (Lopez Dep. 491:23-493:19, 502:15-20.)  The two parties eventually

22   compromised on this point, but Lopez failed to address other major shortcomings in the

23   appraisal.  He ended up agreeing to return SCVHG certificates for $1,645,002 (*id.* at 562:10-

24   566:11; Ex. 50, Strait Decl. at 123), a pittance of the $114 million earned by SCVHG over a four

25   and a half year period and a tiny fraction of the excess cash SCVHG held in reserve.  As Thomas

26   Lys, an expert retained by the Government, will opine at trial, a rational shareholder standing in

27   the shoes of the LAPF would have demanded at least $10 million – even after adjusting for the

28   potential dilutive effect of unexercised SCVHG warrants.  (*See* Dep. of Thomas Z. Lys, Ex. G to

Darmstadter Decl. ("Lys Dep."), at 887:12-891:5, 908:7-19.)

**B.  The Schott family created SCVHG and then "donated" nonvoting shares of SCVHG in order to avoid income taxes and not for charitable or business purposes**

During the first half of early 2000, the residential real estate market in the greater San Francisco Bay Area was rapidly appreciating.  (Dep. Stephen E. Schott, Ex. K to Darmstadter Decl., at 29:5-31:2, 66:14-67:1.)  The Schott Organization built and sold houses in the San Francisco Bay area, primarily through a flagship company, SCS Development Co.  (Dep. of Stephen C. Schott, Ex. H to Darmstadter Decl. ("Schott Dep."), at 24:11-33:23.)  They also built and sold houses in more rural areas through another company, Awards Homes, Inc.  (*See* Schott Dep. 60:15-61:25.)   Both companies produced large profits for the Schotts.  (*See, e.g.*, Ikeda Dep. 174:18-175:22 (income margin of roughly 35.5% for SCVHG).)

Contrary to assertions in Bowes's Motion, prior to 2000, the Schott Organization did not routinely set up separate corporate or partnership entities for each new development. Unless there was a particular concern over litigation, projects in the Bay Area, which were subject to union contract arrangements, were generally owned and developed by SCS Development.  Projects outside of the Bay Area, which used nonunion labor, were generally owned by Award.  (*See* Schott Dep. 62:1-63:21; Ikeda Dep. 29:22-30:24; Dep. of Frank Nicoletti, Ex. J to Darmstadter Decl. ("Nicoletti Dep."), at 48:12-50:6.)  At the time of the SC2 transaction, there was no particular concern over construction defect or other liability that would have caused projects in the Bay Area to be placed into an entity other than SCS.  (Nicoletti Dep. 186:5-189:21.)

In fact, in early 2000, SCS held three promising Bay Area projects in its development pipeline:  Stowell, Costa and Esperanca II.  (Schott Dep. 295:9-24.)  Internal projections made SCS employee Peter Au during the Spring of 2000 suggested that these three projects would generate substantial profits for SCS and for the Schott family over the next several years.  (*See* Au Dep. 118:6-119:8, 141:20-142:13; Pro Formas, Ex. 319, Strait Decl. at 398-407; Stephen E. Schott Dep. 145:1-150:15; Pro Forma, Ex. 408, Strait Decl. at 577.)  Indeed, one of the three projects, the Stowell project, was within weeks of being offered for sale to potential new home

1   buyers.  (*See* Stephen E. Schott Dep. 75:17-80:17; *see also* Ikeda Dep. 285:18-22.)  In addition,

2   Schott had purchased a company known as San Leandro Investors, LLC ("SLI") that held a

3   substantial real estate development project in the greater Oakland area that would soon be

4   coming to market.  The SLI project was also projected to yield substantial profits.  (*See* Pro

5   Formas, Ex. 319, Strait Decl. at 406-07.)

6        In April 2000, KPMG, and former KPMG partner Max Gray, presented the SC2 scheme first

7   to SCS Chief Financial Officer, Daniel Ikeda and later to Schott.  (*See* Gray Dep. 38:9-13, 87:22-

8   88:6.)  The SC2 scheme was tailor-made for a successful real estate developer, where initial cash

9   outflows were followed by profits over the multi-year life cycle of a project.  Schott, an astute

10  businessman, would have certainly grasped that SC2 was an especially effective tax strategy for a

11  real estate builder who develops properties over a multi-year cycle.  (*See* Schott Dep. 299:8-20.)

12  Within a few weeks, Schott and his advisors, with the aid of KPMG, had created a new S

13  corporation, SCVHG for purposes of the SC2 scheme.  (Ikeda Dep. 79:7-21, 85:3-10; *see also*

14  Articles of Incorporation, Ex. 274, Strait Decl. at 183.)  Schott and Ikeda then transferred the

15  promising Bay Area projects (Stowell, Costa, and Esperanca II), as well as Schott's interest in

16  SLI, into SCVHG.[11]  (Schott Dep. 295:9-300:5; Ikeda Dep. 226:18-227:17.)  In addition to

17  sheltering income from these projects through SCVHG (*see* Schott Dep. 299:12-20), Schott also

18  implemented an additional SC2 transaction through Award to shelter income earned from

19  nonunion development projects outside of the Bay Area (*see* Schott Dep. 217:19-218:8).  Schott

20  and Ikeda were so interested in sheltering their real estate income from tax that they inquired if

21  the normal two-to-three year time frame could be expanded by an additional year.  At their

22  request, this was done.  (*See* Ikeda Dep. 239:25-241:18; Email from Larry Manth to Dan Ikeda

23  (May 9, 2000), Ex. 294, Strait Decl. at 317; *see also* Schott Dep. 344:9-345:9; Redemption

24  Agreement, Ex. 274, Strait Decl. at 244 ¶ 2.)

25

26  _____

27  [11]The projects eventually acquired different marketing names.  The Stowell project was renamed Las
    Palmas; Esperanca became known as Robins Run; and the SLI project was renamed Cherrywood.

28

1

### 1.    The marketing and sale of SC2 to the Schott Organization

2

Gray described SC2 as a tax planning opportunity that was being offered by KPMG to closely

3

held S-corporations. (*See* Gray Dep. 69:9-70:6, 84:6-19; Ikeda Dep. 119:6-122:25).  In the initial

4

presentation to the Schott Organization, Gray emphasized several key points:

5

(1) At the end of a predetermined holding period, the tax-exempt entity would offer the

6

nonvoting stock for redemption (*see* Gray Memo, Ex. 276, Strait Decl. at 303-04 ¶¶ 3, 8; Gray

7

Dep. 128:8-15, 146:11-22);

8

(2) Although 90% of the income for tax purposes would be allocated to the tax-exempt, little

9

or no cash would be distributed to the tax exempt (*see* Gray Memo, Ex. 276, Strait Decl. at 303

10

¶ 5; Gray Dep. 134:3-135:20, 138:24-141:1);

11

(3) Because almost all of the equity would be stored in the warrants, the redemption price

12

would be very low (*see* Gray Memo, Ex. 276, Strait Decl. at 304 ¶ 7; Gray Dep. 144:12-145:20;

13

*see also, e.g.*, SC2 FAQs, Ex. 552, Strait Decl. at 686);

14

(4) By allocating 90% of the income to the tax-exempt entity, the expected tax saving to the

15

original shareholders should substantially exceed all expenses incidental to the strategy (*see* Gray

16

Memo, Ex. 276, Strait Decl. at 303-04 ¶¶ 3, 6, 7, 8);

17

(5) The major tax benefit from SC2 would be derived not from a charitable deduction but

18

from the income allocation to the tax-exempt (Gray Dep. 125:13-126:16); and

19

(6) Unlike other tax shelters, SC2 was "almost invisible and would be very difficult for the

20

IRS to find" (Gray Memo, Ex. 276, Strait Decl. at 304 ¶ 9; Gray Dep. 126:17-127:10, 152:5-

21

154:14; *see also, e.g.*, SC2 FAQs, Ex. 552, Strait Decl. at 685).

22

Schott and Ikeda evaluated SC2 in the same manner as they would evaluate any other business

23

decision.  (*See* Schott Dep. 253:12-256:8, 260:16-261:12.)  Schott and Ikeda decided to

24

participate in the scheme on the likelihood that SC2 would result in a positive economic return

25

(after taking the tax benefits into account) for the Schott Organization.  (*See* Ikeda Dep. 205:6-

26

206:13; *see also* Schott Dep. 207:3-208:8.)  Both Ikeda and Schott understood that the projected

27

28

tax saving from the allocation of income to the LAPF would be far greater than the fees associated with the strategy – including any payments to the LAPF.  (*See* Gray Dep. 123:20-124:4; Ikeda Dep. 205:6-209:3, 215:3-216:22.)  Because Schott understood that SC2 was a novel, untested and high risk tax strategy, he insisted on obtaining a $25 million fiscal event insurance policy to protect against an unfavorable tax audit before deciding to implement the strategy.  (Ikeda Dep. 149:1-150:1, 207:13-17, 228:9-20; Schott Dep. 216:3-217:20.)

Since the Schott Organization was interested in implementing SC2 quickly in order to shelter income from impending home sales, the LAPF was the only plausible recipient for SC2 stock.[12] The Schott Organization would purchase two SC2 transactions.  One SC2 transaction would involve Award for nonunion projects, and the other would involve a new S corporation for union projects in the Bay Area which would become Plaintiff SCVHG.  (Schott Dep. 217:19-218:8, 220:19-222:6.) On or about May 8, 2000, SCVHG and Award, through an outside counsel, Robert Weaver, entered into SC2 engagements with KPMG for Award and SCVHG.[13] (Ex. 400, Strait Decl. at 546; Ex. 401, Strait Decl. at 561.)

### 2.   SCVHG was a shell corporation, without employees or purposes other than to serve as a vehicle through which to implement SC2

SCVHG was incorporated on May 10, 2000. (Ikeda Dep. 78:16-79:12.) The capital structure was dictated by KPMG's script for SC2.  (*See* U.S. Mem. Supp. Mot. SAI 5-6 (ECF No. 67).) SCVHG would not have been created if Schott had not implemented SC2.  (Schott Dep. 271:21-

---

[12]Schott initially suggested his alma mater, the University of Santa Clara, as a possible "donee" but was advised that only municipal pension plans were suitable for the strategy because of UBIT.  (*See* Schott Dep. 185:8-186:15; Ikeda Dep. 126:20-127:13, 634:2-635:9.)  Although a couple of other pension plans might have been mentioned by KPMG to the Schott Organization, it appears that the LAPF was the only one that had formally agreed to participate in the strategy as of April 2000.  (*See* Ikeda Dep. 634:2-635:9; Fuller Dep. 426:15-427:2.)  Schott was advised that it would take additional time for KPMG to "locate and educate" other pension plans as to the SC2 strategy and get them to participate as accommodation parties.  (Weaver Dep. 133:13-25.)  Given that sales from the Stowell project were to begin in June 2000 (*see* Stephen E. Schott Dep. 75:17-80:17; Ex. 319, Strait Decl. at 402-04), there was incentive to close quickly on the SC2 transactions.

[13]In connection with SC2, KPMG referred some SC2 clients to Robert Weaver ("Weaver"), an attorney in San Francisco.  Weaver had experience implementing the SC2 strategy and would enter into separate legal service agreements for each transaction.  (*See* IDR Resp., Ex. 520, Strait Decl. at 583; Weaver Dep. 81:22-84:10.)  Schott did not have a preexisting relationship with Weaver.  (*See* Weaver Dep. 87:15-19; Schott Dep. 228:8-20.)

272:16.)  Prior to SC2, there was no discussion about creating SCVHG.[14]  (*See* Ikeda Dep. 85:3-

86:6.)  SCVHG was apparently created to shelter income from Bay Area union projects because

the capital structure for SCS Development was too complicated.[15]  (*See* Schott Dep. 220:19-

221:17.)  The only rationale for the creation of SCVHG was to facilitate the implementation of

the SC2 strategy.

   The SC2 transaction for SCVHG was implemented in accordance with the generic template

prescribed by KPMG.  The capital structure for SCVHG (i.e., issuance and ratio of voting stock,

non-voting stock and warrant) was established by KPMG.  (*See* Ikeda Dep. 98:21-106:5.)  The

duration and exercise price for the warrants were set by KPMG.  (*See id.* at 106:6-109:10.)  The

terms of the Redemption Agreement, as with the other SC2 transaction documents, were

provided by KPMG, with Schott, as noted above, requesting an additional year extension in

return for a small payment to the LAPF.[16]  (*See id.* at 116:21-118:24; Schott Dep. 340:10-

341:9.)  In implementing SC2, KPMG ensured that SCVHG was not required to distribute

income prior to redemption.  (Weaver Dep. 91:7-25, 420:19-421:16; *see* Minutes, Ex. 274,

Strait Decl. at 218.)  SCVHG's organizational documents follow suit, providing that the

corporation was not obligated to make dividend distributions or provide annual reports to

shareholders.  (SCVHG SC2 Docs, Ex. 274, Strait Decl. at 247.)  The Schotts had a financial

interest in obtaining a "low" redemption price since this was an amount that would ultimately be

---

[14]Ikeda speculated that SCVHG may have also been established for estate planning or liability purposes. (*See* Ikeda Dep. 79:13-21.)  He was, however, unable to articulate how these objectives were furthered by the creation of SCVHG.  With respect to estate planning, the Schott children supposedly paid fair market value for their interests in SCVHG.  Therefore, no wealth was transferred from Schott to the children.  (*See* Ikeda Dep. 79:25-82:3.) Ikeda does not remember discussing estate planning with Schott.  (*See id.* at 80:13-82:3.)  As to liability, the Schotts had a general liability policy covering all of their projects, and SCVHG was not created out of a need to insulate particular assets.  (*See* Nicoletti Dep. 186:5-189:21; Ikeda Dep. 48:3-20.)  Furthermore, since SCVHG was significantly undercapitalized and a "shell" corporation, entirely relying upon the resources of SCS Development, it is very unlikely that it would serve as an entity to limit the liability of the Schotts.

[15]Outside counsel Weaver was also unaware of any business reason for the Schott Organization to create SCVHG other then to take advantage of SC2.  (Weaver Dep. 178:10-15.)

[16]The small payment to extend was apparently based upon based upon a rough estimate of the time value of money.  (*See* Weaver Dep. 453:20-455:4.)

1    paid to the LAPF.  (Weaver Dep. 124:21-125:23, 318:22-319:7.)  Ikeda expressly requested that

2    the appraiser, Wendy Sharon, formulate a "low value" for SCVHG shares, ensuring that the

3    potential costs of "redemption" would be minimal.[17]  (*See* Dep. of Wendy Sharon, Ex. F to

4    Darmstadter Decl., at 126:15-127:11.)

5        The SCVHG Redemption Agreement provided that the LAPF could sell all 900 shares of

6    nonvoting stock back to SCVHG during a six-month redemption period starting on July 15,

7    2003.  (Ex. 274, Strait Decl. at 243-44.)  The commencement of this period could be extended at

8    the option of SCVHG for one year to July 15, 2004 upon payment of the sum of $199,999 to the

9    LAPF.  (*Id.* at 244 ¶ 2.)  Although the Redemption Agreement provided that the purchase price

10   upon redemption was to be for "fair market value," the determination of fair market value was

11   to be made by an appraiser selected exclusively by SCVHG.  (*Id.*)  Moreover, the purchase price

12   of the nonvoting stock was to be expressly reduced based upon the following factors: (1) the

13   stock is nonvoting; (2) the stock does not represent a controlling interest in SCVHG; (3) there is

14   a lack of marketability in the stock; (4) the existence of outstanding warrants; and (5) SCVHG is

15   not obligated to pay any dividends.  (*Id.*)  The pledge agreements established a floor amount to

16   be paid to the LAPF.  (*See* Pledges, Ex. 274, Strait Decl. at 266-67.)

17       As noted above, SCS Development transferred to SCVHG three separate real estate projects

18   that it owned debt-free and that were then under development.  Schott made the business

19   decision to transfer these projects into SCVHG to take advantage of the tax benefits associated

20   with the SC2 strategy.  (*See* Schott Dep. 295:9-299:20, 303:20-25; Ikeda Dep. 226:18-227:17.)

21   The total purchase price for each project was established by an historical "plug-in" cost figure –

22   for Esperanca II, SCVHG paid $22,067,419.32; for Stowell, $14,600,000; and for Costa,

23   $2,400,000.[18]  (*See* Ikeda Dep. 493:1-494:7; *id.* at 479:2-16 (Esperanca), 488:17-25 (Stowell),

24   

---

25       [17]The appraisal was utilized not only to value nonvoting shares, but also to peg the dilutive warrants issued
     in the transaction with a low exercise price.  (*See, e.g.*, Sharon Dep. 222:10-224:8.)

26   
27       [18]Schott made the decision to transfer these projects to SCVHG, and there was no negotiation or appraisal
     to establish a fair market value. (*See* Schott Dep. 422:25-426:7.)

28   Case No. 5:08-cv-5097-JF
     U.S. Opp. to Bowes's Mot. Summ. J.                16

496:11-21 (Costa).)  These purchases were 100% financed, with SCVHG providing SCS

Development with three unsecured promissory notes.  (Ikeda Dep. 478:19-488:5, 496:4-497:8;

Ex. 325, Strait Decl. at 427; Ex. 326, Strait Decl. at 436; Ex. 329, Strait Decl. at 445.)  Schott

anticipated that the projects transferred into SCVHG would be complete by the time of

redemption by LAPF.  (*See* Schott Dep. 455:6-456:7.)

In connection with these transfers, since SCVHG lacked sufficient funds to develop the

transferred projects, SCS Development provided SCVHG with a $15 million unsecured line of

credit. (Ikeda Dep. 503:21-504:7; Line of Credit Loan Agreement, Ex. 332, Strait Decl. at 454.)

SCVHG did not consult with its purported 90% shareholder about self-dealing financing

arrangements between SCVHG and SCS.  In addition, since SCVHG never had any employees,

SCS Development entered into a service agreement to provide SCVHG with "executive,

managerial, accounting, administrative supervision and sales services necessary to assist and

enable [SCVHG] to develop, construct and sell the homes in the projects."  (Ikeda Dep. 510:5-

511:11; Agreement for Services, Ex. 333, Strait Decl. at 459-60.)  In consideration of these

services, SCVHG agreed to pay SCS Development a flat fee of $7,500 for general and

administrative expenses plus a $3,000 warranty reserve for each home sold.  (Schott Dep.

444:13-445:15, 441:16-443:13.)  The profit on the homes sold by SCVHG would be realized by

SCVHG, sheltering as much income as possible through SC2.  (*See id.* at 443:19-444:12.)

### 3.     The promise of funds to the LAPF was made to obtain tax benefits

Before becoming introduced to the SC2 strategy, none of the Schott family had a detailed

understanding of the LAPF or any pre-existing intention of making any donation to the LAPF.

(*See* Schott Dep. 187:5-190:20, 196:1-5.)  Schott viewed the LAPF as being a necessary

"partner" in the SC2 strategy.[19]  (*Id.* at 189:22-191:10, 391:1-10.)  Schott and the other members

of his family had only a hazy understanding of the mission and function of the LAPF or how

---

[19]If Schott didn't work with them, the LAPF wouldn't work with him.  (Schott Dep. 190:9-191:1.)  Schott
himself viewed SC2 as being dissimilar from his other philanthropic activities.  As opposed to SC2, Schott did not
expect to make a profit on his other charitable donations.  (*Id.* at 259:18-261:9.)

their "contributions" served to aid any beneficiaries of the Plan.  (*See* Dep. of Kristen Bowes, Ex. L to Darmstadter Decl. ("Bowes Dep."), at 7:15-22, 56:1-57:20; Dep. of Patricia Schott, Ex. M to Darmstadter Decl., at 90:17-91:21; Dep. of Lisa Treadwell, Ex. N to Darmstadter Decl., at 12:23-13:5, 44:17-46:4; Stephen E. Schott Dep. 173:17-175:22; Schott Dep. 187:5-193:7; *see also* Ikeda Dep. 648:3-649:16.)  During the weeks leading up to implementation of SC2, it was necessary to create a pretextual rationale for contributing to the LAPF – one of the implementation team members was tasked with the job of figuring out just "[w]hy is Steve giving to LAPD?" (*See* Timeline, Ex. 216, Strait Decl. at 171.)  This purported charitable intent was memorialized in two self-serving letters drafted by Ikeda for Schott to send to the LAFP. (Ltr. from Schott to Lopez (July 1, 2000), Ex. 19, Strait Decl. at 100 (SCVHG); Ltr. from Schott to Lopez (July 1, 2000), Ex. 20, Strait Decl. at 103 (Award).)

This purported donation was in fact entirely inconsistent and out of character with the Schotts' prior philanthropic activities.[20]  (*See* Patricia Schott Dep. 61:2-13, 98:3-25; Ex. 503 ("Donation Synopsis"), Strait Decl. at 579.)  In 1993, the Schotts had established a private foundation, to efficiently and tax effectively facilitate their charitable giving.  (*See* Ikeda Dep. 606:4-608:19; Schott Dep. 121:10-123:22.)  Most of the Schotts' prior significant donations had been directed to educational and/or Catholic oriented charities, including Schott's alma maters, the University of Santa Clara and Bellarmine High School. (*See* Patricia Schott Dep. 90:7-13, 98:3-25; Donation Synopsis, Ex. 503, Strait Decl. at 579-81.)  The Schott family did not inform any outside third-parties of the donation to the LAPF, and only a select few at the Schott Organization had any idea that SCVHG and Award were supposedly 90% owned by a distant municipal pension plan.  (*See* Schott Dep. 411:3-412:19.).  The Schott Organization even failed to inform its lender, the Bank of America, that SCVHG and Award were supposedly majority-

---

[20]A detailed synopsis of the Schott family donations, individually and through the foundation, is set forth in Exhibit 503.  (*See* Patricia Schott Dep. 61:2-63:11.)

owed by the LAPF.[21]  (*See* Weaver Dep. 143:22-146:1.)

The lack of any true philanthropic motive for the SC2 transaction is evident by comparing the purported donation amount of about $163,500 with the costs associated with the SC2 transaction for SCVHG.  These costs included the following:  KPMG: $1,012,400.05; Max Gray: $187,000; Mesirow Financial (appraisal): $25,459.95; Less & Weaver: $25,000.  (IDR Resp., Ex. 520, Strait Decl. at 595; Weaver Dep. 92:8-93:12.).

In addition, Schott insisted on insuring against his risk of incurring a tax liability through participation in SC2.  The premium for that fiscal events policy, which covered both the SCVHG transaction and the related transaction for Award Homes, totaled $2,113,615.  (Ins. Policy, Ex. 315, Strait Decl. at 351.)  These fees were not paid to structure a gift, but were instead viewed as outlays necessary to shelter millions of dollars of income.  (*See, e.g.*, Schott Dep. 247:11-250:18.)

### 4.   Post "donation" events provide further evidence that the LAPF was not a shareholder of SCVHG

After July 10, 2000, SCVHG did not involve the LAPF in management of SCVHG.  As noted above, SCVHG did not confer with the LAPF before engaging in self-dealing transactions.  Although the LAPF was "invited" to these shareholder meetings, Lopez never intended to go.  (*See* Lopez Dep. 358:11-360:10.)  The meetings were never actually held.  (*See* Nicoletti Dep. 212:9-216:9; *see also* Bowes Dep. 45:1-24.)  In fact, no other shareholders even received notice of these purported "meetings" designed only to paper the transaction files.  (*See* Nicoletti Dep. 216:2-9.)  No appreciable dividends were paid to the LAPF over and above the amount needed to extend the term of the Redemption Agreement.  (*See infra* p. 24 (table).)

### 5.   Kristen Bowes had no knowledge that she was donating shares of SCVHG to the LAPF

Plaintiff Kristen Bowes had no inkling that she owned shares of SCVHG until after the start

---

[21]Ikeda acknowledged that the Schott Organization had an affirmative duty to disclose the LAPF's interest in Award to the Bank of America and its failure to do so was a violation of the line of credit agreement.  (*See* Dep. of Daniel Ikeda (as Rep. of SCS Dev. Co.), Ex. O to Darmstadter Decl. ("SCS Dev. Co. Dep."), at 55:10-58:9.)

of this litigation. "I didn't even know there was stock, to be honest with you." (Bowes Dep. 70:21-71:4). In July 2000, as was her custom, she signed some papers at the request of her father and/or his advisors. (*Id.* at 66:21-70:8; *cf.* Assignment of Nonvoting Common Stock, Ex. 274, Strait Decl. at 297.) At the time, Bowes did not understand that she was "giving away" stock; she was simply told by her father that she "[would] be giving money" to the LAPF. (Bowes Dep. 56:1-19; 62:13-15.) She didn't know how much money. (*Id.*)

During the years that followed, Bowes was part of family gatherings and informal meetings that were periodically held in lieu of more formal shareholder meetings for Schott family businesses, including SCVHG. (*Id.* at 45:1-24, 64:15-18.) She could not recall any mention of the LAPF in those meetings. (Bowes Dep. 64:15-18; 65:19-22.) The LAPF never attended such meetings. (*See* Nicoletti Dep. 212:15-219:9.) Nor did Ms. Bowes itemize her "donation" to the LAPF on her tax return for the year 2000, only adding the "donation" on an amended return filed several years later. (*See, e.g.*, Dep. of Gary Krutilla, Ex. P to Darmstadter Decl., at 126:23-127:17; Claim for Refund, Ex. 922, Strait Decl. at 729.)

## III.   Legal Analysis

To prevail on her motion, Plaintiff Bowes bears the burden of showing that there is no genuine issue as to any material fact and that she is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56.. To defeat Bowes's motion, the United States need only set forth specific facts showing that there is a genuine issue for trial. *See Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007). In ruling on this matter, the Court must view the evidence submitted in the light most favorable to the United States as non-moving party, drawing all reasonable inferences in favor of the United States. *See, e.g.*, *EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 996-97 (9th Cir. 2010).

### A.   The LAPF was not a shareholder in SCVHG for tax purposes

The primary consequence to shareholders of making a Subchapter S election is that, "as the price of receiving dividends undiminished by corporate taxes, [shareholders] must pay tax at personal income tax rates on corporate income which they [may] have not yet received." *See*

*Hoffman v. Commissioner*, 47 T.C. 218, 234 (1966), *aff'd*, 391 F.2d 930 (5th Cir. 1968).  It is a "basic congressional purpose" of the Internal Revenue Code to ensure that income, for tax purposes, is allocable only to the persons who are the economic beneficiaries of the dividends or distributions that ultimately flow from the corporation on account of that income, "and those persons are the real owners of the stock whether or not they are the shareholders 'of record.'" *See id*. at 235.  Historically, some taxpayers have attempted to take advantage of the pro-rata approach to income allocation employed under Subchapter S of the Code to shift income from high tax bracket shareholders to lower tax bracket shareholders by reallocating ownership interests as a matter "of record," without undertaking a reallocation of actual ownership, in substance.  *See e.g.*, *Speca v. Commissioner*, 630 F.2d 554 (7th Cir. 1980); *Bierne v. Commissioner*, 52 T.C. 210 (1969); *Duarte v. Commissioner*, 44 T.C. 193 (1965).  Such attempts at tax evasion have largely been unsuccessful.  The SC2 tax scheme is the ultimate in income shifting because it purports to shift income to a zero bracket "shareholder."

It is a well-settled principle of law that the questions of shareholder status with respect to Subchapter S corporations turn on an analysis of the beneficial ownership of the corporation, and not mere to legal title or ownership of record.  *See Pahl v. Commissioner*, 150 F.3d 1124, 1128-29 (9th Cir. 1998); *Ragghianti v. Commissioner*, 71 T.C. 346, 349 (1978), *aff'd*, 652 F.2d 65 (9th Cir. 1981).  Beneficial ownership, not legal title, governs proper allocation of income under Subchapter S.  *Feraco v. Commissioner*, 80 T.C.M. (CCH) 463, 2000 WL 1466111 (2000); *see also Dunne v. Commissioner*, 95 T.C.M. (CCH) 1236, 2008 WL 656496 (2008).

The determination of beneficial ownership is a question of fact.  *See Wilson v. Commissioner*, 560 F.2d 687, 690 (5th Cir. 1977); *see also Dunne*, 2008 WL 656496 at *11.  In the context of a close corporation such as SCVHG, "[d]etermining who is a beneficial shareholder requires analysis of the actual role the shareholder has played in corporate governance."  *Pahl*, 150 F.3d at 1129.  A number of factors may go into this inquiry, but it is clear that a fact-based understanding of the relationships between various stakeholders and parties is predicate to this determination in a close corporation setting:

> Shareholders in close corporations generally have some role (however formal or minor) in corporate governance, bear a risk of corporate failure, and stand to share in corporate successes. The extent to which the individual in question exhibits these characteristics helps determine whether he is a beneficial shareholder. These characteristics are generally evidenced by the parties' understanding of their relationship to the corporation and by their behavior both before and after the challenged transaction. *That understanding and behavior provide a much more reliable guide than the formal rights that may exist between the parties.*

*Id.* (*quoting Wilson*, 560 F.2d at 690) (emphasis added).

Various factors have been employed to ascertain beneficial ownership of corporate stock. *See Dunne*, 2008 WL 656496 at *11 (citing twelve factors); *Speca*, 630 F.2d at 556 (citing four factors); *see also Wilson*, 560 F.2d at 691-92 (fact-specific analysis); *Feraco*, 2000 WL 1466111 at *5-7 (same). These factors can be grouped into six general categories:

(1)  does the transferor continue to enjoy the economic benefits and burdens of ownership after a purported transfer of stock, *see Speca,* 630 F.2d at 556 (factor # 3); *Dunne*, 2008 WL 656496, at *11 (factor # 3);

(2)  does the transferee show, by overt acts, that the transferee believes himself or herself to be a corporate stockholder, *see Dunne*, 2008 WL 656496, at *11 (factor # 12) (citing *Pahl*, 150 F.3d 1124); *Wilson*, 560 F.2d at 691 (discussing purported owner who "took no part in corporate activities and exhibited no interest in them");

(3)  does the transferor retain dominion and control over the company and over the transferred stock, *see Speca*, 630 F.2d at 556 (factor # 2); *Dunne*, 2008 WL 656496, at *11 (factor # 4);

(4)  does the transferee have an ability to exercise ownership rights associated with being a shareholder, *see Speca*, 630 F.2d at 556 (factor # 1); *Dunne*, 2008 WL 656496 (factor ##s 5, 6 & 11);

(5)  does the transferor deal with the corporation at "arm's length," or, instead, does the transferor engage in self-dealing with the corporation, *see Speca*, 630 F.2d at 556 (factor #4);

(6)  does the paper trail reflect, on a formal basis, transfer of ownership, *see Dunne*, 630 F.2d at 556 (factor ##s 1, 7, 8, & 9).

KPMG's script for implementing SC2 ensured that the Schott family would create a formal paper trail that is reflective of ownership of shares by the LAPF. The first five categories, however, merit careful attention and will be analyzed, below. This analysis reveals that the LAPF was not a beneficial owner of SCVHG.

1    **1.   The LAPF did not enjoy the economic benefits and burdens of ownership**

2    The *sine quibus non* of equity ownership, from an economic perspective, are the unlimited

3    potential for upside reward and the corresponding potential for loss of invested capital on the

4    downside.  *See TIFD III-E Inc. v. United States*, 459 F.3d 220, 230-40 (2d Cir. 2006).  In

5    contrast, the holder of a debt instrument – a promise to pay a sum certain to the holder of that

6    instrument – is not considered an equity owner of a corporation, for tax purposes.  *See id*. If a

7    purported "shareholder" has unlimited "upside" on paper, but, in reality, only has a very limited

8    potential for a small share of upside returns, then the interest held by that "shareholder" should

9    not be characterized as equity.  *See id.* at 233-37.

10   The promises of payments made to the LAPF by SC2 "donors" were more akin to debt

11   instruments than residual claims associated with equity ownership.  This is reflected in the

12   manner in which the LAPF treated these promises.  Lopez was primarily concerned that the

13   LAPF would eventually receive a payment equivalent in size to the charitable deductions that he

14   thought SC2 "donors" were taking.  (*See* Lopez Dep. 132:20-134:22 (discussing meeting with

15   KPMG).)  This was the motivation for his original insistence that a floor redemption price be

16   included in redemption agreements and the last-minute substitution of pledges from Schott and

17   his son, Stephen E. Schott.  (*See* Lopez Dep. 162:7-163:23.)  The Schott pledges guaranteed the

18   LAPF a minimum fixed payment.  (*See* Pledges, Ex. 274, Strait Decl. at 266-67.)  It was this

19   future fixed payment that interested Lopez.  Even the small "dividend" payments required to

20   extend the redemption period for a year, although characterized as dividends, were, in reality,

21   interest payments to compensate the LAPF for the time value of money associated with deferral

22   of its promised payment.  (Lopez Dep. 282:9-24; Weaver Dep. 453:6-456:9.)

23   There was very little upside potential associated with the certificates "donated" to the LAPF

24   when contrasted to 90% of income earned by SC2 companies over the duration of the strategy.

25   The disparity between the value placed on SCVHG (as a whole) by the Schott family's appraiser

26   of $1.6 million, and the actual equity value of SCVHG in July 2000 of $40 million, flowed from

27   the terms of the one-sided Redemption Agreement, which was drafted to ensure that the value of

28

SCVHG would remain in the hands of the Schott family.  The same appraisal methodology was to be employed at the time of redemption, by an appraiser hand-picked by the Schotts.

During the time in which the LAPF constituted a 90% shareholder on paper, no material distributions of earnings were made by the company.  The earnings were accumulated for eventual distribution to Schott family members after the LAPF exited the scene.  The following table contrasts the ordinary income earned by SCVHG for the full years 2001-2004 (row 1) and the amounts allocated to the LAPF for tax purposes (row 2) with the paltry amounts paid to the LAPF as a dividend during those years (row 3):

| Year | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|
| SCVHG Income | $ 328,471 | $ 15,337,276 | $ 18,819,290 | $ 32,084,545 | $ 48,167,744 |
| K-1 (LAPF) | $ 216,707 | $ 13,803,548 | $ 16,937,361 | $ 28,876,091 | $ 43,350,970 |
| Dividends to LAPF | $ 0 | $ 67,500 | $ 0 | $ 135,000 | $ 0 |

(Dep. of Daniel Ikeda as Designated Representative of SCVHG, Ex. T to Darmstadter Decl., at 106:22-107:6, 112:11-112:20, 115:20-116:7, 118:13-20, 120:7-20; Tax Files, Exs. 632, 633, 634, 635, & 636, Strait Decl. at 688-722; Lopez Dep. 381:13-84:383:16, 395:5-396:17.)

The paltry payout shown on the third row of the table was no accident.  It was part of the SC2 scheme.  As was the case in *Speca*, where shares of a company were, on paper, transferred to children of the owners for tax purposes, "the dividends received were in no way commensurate to the profits being made by [the company]."  630 F.2d at 559.

The disparity between the LAPF's 90% ownership interest and economic interests was more than a matter of informal cooperation between the parties.  The very capital structure of SCVHG guaranteed that the LAPF would not be a beneficial owner of 90% of the equity of SCVHG.  Plaintiffs' own valuation expert, Daniel McConaughy described the issuance of the warrants as "transfer[ring] value from the common shareholders to the warrant holders."  (Expert Report of Daniel L. McConaughy 26, Ex. W to Darmstadter Decl.) This dilutive effect, combined with the steep discounts and techniques employed by the SCVHG-selected appraiser pursuant to the Redemption Agreement, ensured that the payment to LAPF upon "redemption" would be a mere

pittance relative to the income earned by the company.

The final $1,645,002 payment to the LAPF in 1995, when compared against the income earned by SCVHG, is reflective of a mere accommodation fee rather than an equity return commensurate with the 90% equity stake supposedly owned by the LAPF.

### 2.    The LAPF did not take actions consistent with those of a shareholder

In *Wilson*, the brother of an owner of an S corporation agreed to become a shareholder of record to accommodate the owner's wishes, but the brother "never sought or received any of the incidents of ownership that would give the transaction economic substance." 560 F.2d at 691. The brother took no part in corporate activities and exhibited no interest in them. *Id*. He earned no return on his proportionate share of corporate earnings and surrendered the shares without consideration. *Id*. The court in that case concluded that the brother was not a beneficial owner of the corporation, notwithstanding the fact that he was a shareholder of record. *Id*. at 692.

As was the case in *Wilson*, the LAPF took no part in corporate activities and, indeed, exhibited no interest in them. The LAPF played no role in corporate governance of SCVHG. (*See, e.g.*, Lopez Dep. 250:5-251:11.) Indeed, SCVHG "forgot" to notify the LAPF of any annual meeting in 2001. (Nicoletti Dep. 214:22-215:10.) In later years, the LAPF consistently declined to attend any such meetings. (*See id.* at 212:24-213:21.) In fact, such meetings were never even formally held at designated times and places. (*See id.* at 218:8-19.) The LAPF did not treat shares of SCVHG as an investment, nor carry the shares at a value on its books.

Prior to the Senate investigation, Lopez showed no interest in maximizing or even verifying the reasonableness of redemption amounts tendered in exchange for return of SC2 company certificates. Lopez was cooperative and accommodating in dealing with KPMG and the corporations. (*See* Weaver Dep. 461:6-24.) As noted above, it is hardly a surprise that out of 48 SC2 transactions arranged for and sold by KPMG to its clients, the LAPF and Lopez served as

an accommodation party for 28 of those transactions.[22]   Even after the Senate investigation, Lopez surrendered shares, without consideration, if requested.

### 3. The Schotts retained dominion and control over SCVHG and the ownership interest purportedly transferred to the LAPF

In *Speca*, the president of a beer distributorship operating as an S corporation transferred his shares to his children for tax purposes.  630 F.2d at 555-56.  When the Schlitz brewing company found out that the president was no longer a shareholder, Schlitz became concerned and demanded that the president enter into an employment agreement.  *Id.* at 558.  The court concluded from a review of the facts that the president exerted far more control over the distributorship than a mere executive.  As a matter of reality, Schlitz considered the president himself to be the company; the president's children were in no position to challenge his judgment; and the president effectively exercised complete dominion and control over the transferred stock as well as the corporation.  *Id.*

In this case, Schott exercised complete dominion and control over the affairs of SCVHG, its dividend policies, is business operations, and its corporate governance, notwithstanding the fact that the LAPF was, on paper, a super-majority shareholder.  There is no evidence that Schott ever consulted the LAPF about borrowing arrangements that it made with another Schott-family entity (SCS Development) in which the LAPF did not hold any interest, nor is there any evidence showing that he conferred with the LAPF about other intra-family transactions involving SCVHG and sister corporations.  (*See, e.g.*, Schott Dep. 459:3-460:3 (stating that prior to "redemption," he had no dealings with the LAPF).)  Plaintiff Bowes cannot even remember mention being made of the LAPF during informal family business meetings after July

---

[22]The Ninth Circuit has held that in determining whether a generic tax shelter is bona fide or a sham, the Court can consider pattern evidence of other transactions involving the same strategy: "A consideration of the entire investment program directly relates to the analysis of Taxpayers probable economic benefits. It is also directly relevant to the court's assessment of Taxpayers' credibility with respect to their assertions of a non-tax based motive."  *Sochin v. Comm'r*, 843 F.2d 351, 355 & n.8 (9th Cir. 1988); *see also Jade Trading, LLC v. United States*, 65 Fed. Cl. 188, 191-192 (2005). Here, the Court should consider the entire SC2 program to determine whether the LAPF was the beneficial owner of stock in SCVHG and whether the purported transaction lacks substance.

of 2000. (Bowes Dep. 63:19-66:7.)

Complete dominion and control of SCVHG and the LAPF "shares" was also maintained on account of the SC2 structure, as implemented by the Schotts. Any significant economic value and governance powers were stripped away from the shares "donated" to the LAPF through the issuance of highly dilutive warrants that could be exercised by Schott family members, the creation of a nonvoting class of shares, and by restrictive terms contained in transactional documents, including corporate bylaws and the Redemption Agreement. The collective effect of these restrictions left nothing akin to equity in the hands of the LAPF.

### 4. The LAPF did not have any meaningful ability to exercise ownership rights in SCVHG

By definition, the LAPF could not vote on matters involving corporate governance. Although this is certainly permissible under Subchapter S, the collective effect of the SC2-imposed restrictions on the shares, left the LAPF with absolutely no ability to exercise ownership rights associated with an equity stake in a close corporation. Moreover, even though Ikeda attempted to paper the files with invitations to the LAPF to attend annual meetings, the LAPF did not (and never intended to) accept such invitations, and indeed, these meetings were not even held. (*See* Nicoletti Dep. 212:24-215:10; Lopez Dep. 358:11-360:10.)

### 5. The Schott family did not deal with SCVHG on an "arm's length" basis

Tellingly, the Schott family did not even act to safeguard the interests of SCVHG's largest "shareholder" during the course of their business practices. When it became evident that the Costa project (one of the three projects originally transferred to SCVHG from SCS Development) was not going to generate income to shelter during the duration of the SC2 scheme, SCVHG simply transferred the project back to SCS Development, without ever informing the LAPF of this intra-family transaction. (*See, e.g.*, Schott Dep. 449:25-456:8; Ikeda Dep. 472:18-474:21; Ex. 322, Strait Decl. at 411.) Similarly, SCS afforded SCVHG with a line of credit. Notwithstanding the very high leverage employed by SCVHG (at least on paper), this intra-family extension of credit was not revealed to the LAPF. SCHVG had no employees of its

own.  Instead, it contracted for services with SCS Development.  Again, this self-dealing transaction was not disclosed to the LAPF.

> ### 6.    Bowes's analysis of stock ownership ignores the substance of the parties' arrangement

Bowes's motion does not even reference the beneficial ownership test set forth in *Pahl*, a case which constitutes controlling authority in the Ninth Circuit.  Instead, Bowes's motion applies a "benefits and burdens" test associated with determining whether sales of stock are complete for tax purposes.  (*See* Bowes Mem. Supp. MSJ 21-24 (ECF No. 71-1).)  The "benefits and burdens" test applied by Bowes is just one subset of the various areas of inquiry that should be taken into account.  *See Pahl*, 150 F.3d at 1129; *Wilson*, 560 F.2d at 690; *Feraco*, 2000 WL 1466111, at *5-*6; *Dunne*, 2008 WL 656496, at *11.  In addition to utilizing the wrong test, Bowes's motion applies the "benefits and burdens" factors in an overly formalistic fashion.  Bowes's motion points out that the LAPF could have, at least on paper, held on to its "shares" in perpetuity or demanded a higher purchase price from SCVHG or other third parties.  As a practical matter, however, it is clear that Lopez never even contemplated these options.  At least prior to the Senate investigation in 2003, there was an understanding that the LAPF would play ball and cash out during the redemption period.

### B.    The form of the SC2 transaction should be disregarded for tax purposes

"The tax consequences of a transaction depend on its substance, not its form."  *Robino, Inc. Pension Trust v. Commissioner*, 894 F.2d 342, 344 (9th Cir. 1990) (citing *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945)).  In other words, the Internal Revenue Code "assesses taxes based on a transaction's true purpose, not its purely formal or ostensible purposes."  *Estate of Kluener v. Commissioner*, 154 F.3d 630, 634 (6th Cir. 1998).  For this reason, courts have never regarded "the simple expedient of drawing up papers" as controlling for tax purposes where, as here, a transaction's economic realities do not comport with the form in which the deal has been cast.  *See Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978); *Commissioner v. Tower*, 327 U.S. 280, 291 (1946).

Various formulations of the substance-over-form principle have been applied by courts in tax cases. Two formulations, the economic substance and step transaction doctrines, are particularly apt to the facts of this case. The key to proper application of these doctrines is to ascertain if the transaction at issue falls within or without the intended scope of the Internal Revenue Code and the purposes behind the provisions at issue. *See Stewart v. Commissioner*, 714 F.2d 977, 988 (9th Cir. 1983); *see also Maguire Partners-Master Investments, LLC v. United States*, No. 06-cv-07371-JFW, 2009 WL 4907033, at *15 (C.D. Cal. Dec. 11, 2009). Here, the express intention of the SC2 strategy, as designed and implemented, was to circumvent the purpose behind I.R.C. §§ 1366 and 1377 by divorcing the allocation of economic profits from the allocation of profits for tax purposes.

On paper, Schott family members "donated" shares of SCVHG to the LAPF, making it a titular holder of 90% of the outstanding shares during the tax periods at issue. The Plaintiffs would have the Court examine this aspect of the SC2 transaction in a vacuum and then mechanically apply the income allocation rules set forth in 26 U.S.C. §§ 1366 and 1377. (Bowes Mem. Supp. MSJ 29 (ECF No. 71-1) (citing *Gitlitz v. Comm'r*, 531 U.S. 206 (2001)).) But in substance, the SC2 transaction was not donative in nature. The parties to the transaction entered into a business arrangement with each expecting something in return from the other.

Schott expected the LAPF's accommodation arrangement to facilitate his ability to shelter millions of dollars in income from tax in exchange for the promises by his family to pay the LAPF money in the future. The magnitude of fees paid to KPMG, Gray, Weaver, Mesirow and an insurance company reveal his true intent. (*See* IDR Resp., Ex. 520, Strait Decl. at 595.) This was no donative transaction. Schott even described the promise to pay the LAPF as a "fee." (Schott Dep. 258:13-259:17.) The LAPF agreed to accommodate Schott in return for the promise of a future payment.

Bowes argues that an anticipated tax benefit to Schott was not "consideration" from the LAPF in exchange for the "donation." (Bowes Mem. Supp. MSJ 13 (ECF No. 71-1).) She misses the point. The promise of a future payment to the LAPF was inducement for the LAPF

to enter into an accommodation arrangement with the Schott family and SCVHG.  *See Addis v. Commissioner*, 374 F.3d 881, 886 (9th Cir. 2004).

In *Addis*, a charity served as an accommodation party in an arrangement that enabled a purported donor to claim large charitable deductions.  Under the arrangement, the donor paid cash to the charity, which used the cash to purchase life insurance that was to benefit the charity but also partly benefitted the donor.  The purported donations were found to be "inducements" for the charity to enter into the arrangement.  Because the donor's receipt from the charity did not reflect the charity's participation in the arrangement, the deductions were disallowed under 26 U.S.C. § 170(f)(8).  374 F.3d at 881-886.  Similarly, in this case the evidence clearly shows that the LAPF was induced to enter into serial SC2 arrangements, including the arrangement involving the Schott family and SCVHG, by an expectation of future monetary benefits.

### 1.     The SC2 transaction was a sham, it lacked economic substance and served no nontax purpose

A taxpayer is not permitted to "reap tax benefits from a transaction that lacks economic reality."  *Coltec Indus., Inc., v. United States,* 454 F.3d 1340, 1355 (Fed. Cir. 2006).  To determine whether a transaction is a sham, the court determines whether the transaction had any practical economic effect other than the creation of tax benefits.  *Sochin,* 843 F.2d at 354.  This inquiry is informed by examination of both the objective substance of the transaction and the subjective motivation of the taxpayer. *See Casebeer v. Commissioner,* 909 F.2d 1360, 1363 (9th Cir. 1990); *see also Sochin,* 843 F.2d at 354.  These inquiries, however, are not "discrete prongs of a 'rigid two-step analysis.'"  Rather, they "are simply more precise factors to consider in the application of [the Ninth Circuit's] traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of income tax losses."  *Sochin,* 843 F.2d at 354; *see also Casebeer,* 909 F.2d at 1363.  Whether a transaction lacks economic substance is a question of fact.  *Lee v. Commissioner*, 155 F.3d 584, 586 (2d Cir. 1998).

### a.     The objective substance of the transaction

An examination of the objective substance of a transaction entails ascertaining "whether the

transaction had economic substance beyond the creation of tax benefits." *Casebeer,* 909 F.2d at 1365 (*citing Bail Bonds by Marvin Nelson, Inc. v. Commissioner,* 820 F.2d 1543, 1549 (9th Cir. 1987)).  The Court analyzes whether, objectively, "the transaction was likely to produce economic benefits aside from a tax deduction." *Id.*  A transaction lacks objective economic substance where it does not *appreciably* affect a taxpayer's beneficial interest except to reduce his taxes.  *Knetsch v. United States,* 364 U.S. 361, 366 (1960).

> **b.**   **The subjective business purpose inquiry**

When analyzing the taxpayer's subjective purpose behind a transaction, the court "determines whether the taxpayers have shown that they had a business purpose for engaging in the transaction other than tax avoidance."  *Casebeer,* 909 F.2d at 1363-64 (*citing Bail Bonds*, 820 F.2d at 1549). This aspect of the analysis "often involves an examination of the subjective factors which motivated a taxpayer to make the transaction at issue." *Bail Bonds*, 820 F.2d at 1549.  Acting contrary to rational business interests – that is, not acting like a prudent economic actor – is one factor that may be analyzed when considering the taxpayer's subjective business purpose.  *See Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 185-86 (D. Conn. 2004), *aff'd*, 150 Fed. Appx. 40 (2d Cir. 2005).  Where a taxpayer is sophisticated, entering a bad deal may shed light on the taxpayer's true tax-avoidance motivation.  *See id*.

> **c.**   **The SC2 transaction implemented by the Schotts through SCVHG was a sham and lacked substance**

Schott entered into this transaction for tax benefits under the pretext of making a purported donation to the LAPF.  Schott himself characterized payment of the redemption proceeds to the LAPF as a fee, and he concedes that he would not have done the SC2 transaction but for the tax benefits that he sought.  In reality, the LAPF was simply an accommodation party, and Schott and SCVHG purchased the "parking lot" services of the LAPF in exchange for the inducement of a "redemption" payment.

Moreover, it is clear that the economic substance doctrine reaches purportedly charitable transactions.  *See Mount Mercy Associates v. Commissioner*, T.C. Memo. 1994-83, 67 T.C.M.

(CCH) 2267, 1994 WL 53665 (1994), *aff'd*, 50 F.3d 2 (2d Cir. 1995) (table decision).  In *Mount Mercy*, a taxpayer sought to purchase acreage from a charity.  As a condition of the purchase, the charity required that it be allowed to continue to use a small portion of the acreage, which housed a convent and nursing home (the convent parcel). *Id.*, 1994 WL 53665 at *1.  The taxpayer, who was only interested in developing the larger unimproved portion of the acreage (the development parcel), structured the transaction whereby it paid for both parcels, leased back the convent to the charity for $1 per year, and donated 50% of the convent parcel to the charity. *See id.* at *1-2.  The taxpayer took a charitable deduction for the donation.  In the following year, the taxpayer donated an additional 48% of the convent parcel to the charity, claiming an additional charitable deduction. *Id.* at *3.  The IRS disallowed the charitable deductions.

The Tax Court concluded in *Mount Mercy* that the transfers of the convent parcel from the charity to the taxpayer, and its reconveyance back to the charity, were without economic substance. *See id.* at *5-6.  In form the taxpayer may have purchased both parcels, but in substance, the taxpayer had only purchased the development parcel. *Id.* at *6.  The reality of the situation was that the charity enjoyed the benefits and burdens of the convent parcel.  The Tax Court found that the taxpayer never intended to take possession of the convent parcel. *Id.*; *see also Viralam v. Commissioner*, 136 T.C. No. 8 (Feb. 14, 2011), 2011 WL 597993 (taxpayer's appeal period not yet expired).[23]

From an objective economic standpoint, the SC2 transaction in this case generated sizeable tax benefits and nothing else of any substance.  SCVHG was a shell company without employees or an independent business purpose.  Properties were transferred into SCVHG in order to save taxes, not for legitimate business reasons.  As noted above, when unanticipated delays arose for one of the projects that initially funded SCVHG, the Costa project, Schott simply transferred that development back to SCS because there was no immediate income to

---

[23]In *Viralam*, a taxpayer who transferred legal title of stocks to a charity was not entitled to a deduction under 26 U.S.C. § 170 because he retained dominion and control over the property he purportedly transferred. *See* 2011 WL 597993, at *8-*13.

shelter.  (*See supra* Part III.A.5).  During the time when the LAPF was a purported shareholder, Schott carried on the SCVHG business as though the LAPF did not exist.  With respect to sister corporation Award Homes, Schott failed to notify its lender of dramatic changes in ownership for Award and SCVHG.  (*See supra* Part II.B.3 & n.21.)

In addition, the capital structure of the company served no business purpose.  There was no business reason for creating nine nonvoting shares for each voting share, especially when each child of Schott held the same proportion of nonvoting shares to total nonvoting shares as he or she did with respect to voting shares.  No estate planning goal was furthered by this two-class arrangement.  There was no business purpose served by creating highly dilutive warrants and, again, providing each Schott child with the same ratio of warrants to total warrants as they held with respect to voting and nonvoting shares.  In fact, the lack of any dilution protection feature in the warrants made them absolutely worthless to any holder other than someone who also held voting shares.  The sole purpose for creation of this capital structure was to carry out the SC2 transaction and obtain the tax benefits associated with misallocation of income to the LAPF.  Taken in tandem with the pledge and redemption agreements, both of which further stripped the nonvoting shares of significant upside or downside potential, the "donated" shares were nothing more than a future promise of a modest payment to the LAPF in exchange for its services.

Bowes argues that SC2 resulted in "material changes to Bowes's, Santa Clara's and the LA Pension Plan's economic positions" as a result of the purported donation.  (*See* Bowes Mem. Supp. MSJ 27 (ECF No. 71-1).)  This conclusory statement is unsupported by facts.  The "material changes" were illusory.  The economic benefit paid to the LAPF was a mere accommodation fee.  Although the LAPF was supposedly entitled to 90% of corporate distributions, the Schotts were not planning on making any sizeable distributions during the pendency of the SC2 transaction.  Bowes also refers to a potential for losses, which would have been, on paper, passed through to the LAPF.  (*Id.*)  This is a red herring.  If a project had trouble (such as Costa), the Schotts could simply move it out of SCVHG into another entity.  If the entire market encountered a serious slowdown, the Schotts could have timed a realization of

losses to coincide with the exit of the LAPF.  More generally, the Schott had rigged SCVHG to generate income to shelter, and risks of generating tax losses were negligible.  Otherwise, Schott would not have sunk over $2 million in transaction costs in pursuit of tax benefits associated with the income allocation scheme.

Finally, Bowes refers to the idea that the tax basis of her family's shares would be less than otherwise on account of allocation of income to the LAPF as a material change.  (*See id*.)  But this is a tax result – it is simply reflective of the "back end" of the SC2 transaction.  The day of reckoning for misallocating present income to the LAPF arrives at some point in the future (after the LAPF has exited), when the Schotts elect to distribute some of the income amassed inside of SCVHG.  At the point when these distributions exceed the small initial tax bases of the Schott family owners, the Schotts would owe tax.  SC2 purports to allow deferral of tax on current income and its possible conversion into future capital gain.  This deferral and conversion was worth millions of dollars in tax benefits to the Schott family.  And in the case of majority holders Stephen and Patricia Schott, should large distributions from SCVHG not have occurred until after their deaths, then tax on the majority of the income would have been evaded completely, on account of a step-up in tax basis at their respective dates of death.

Turning to the subjective aspect of the analysis, the parties' motives were clear.[24]  The purpose was succinctly set forth in the Max Gray memorandum: tax benefits.  (Gray Mem., Ex. 276, Strait Decl. at 303 ¶ 6 ("If we assume the charity owns the stock for three years and the income allocated to the charity [is] $50 million, the tax savings should amount to approximately $25 million assuming a 50% tax rate.").)  The other purported objectives of the transaction, charitable largesse and estate planning, were mere fig leaves created to provide the transaction with ostensibly legitimate motives.  Schott showed no charitable inclinations toward the LAPF prior to the SC2 transaction, and he spent over $2 million dollars in fees payable to KPMG, AIG

---

[24]Although Plaintiff attempts to downplay subjective intent by analyzing the transaction through the lens of charitable donation cases, subjective intent is highly relevant to a determination as to whether the income allocation scheme should be disregarded.

and other persons for the purported purpose of making a charitable contribution that he valued at $163,500.  Schott himself characterized the promise to pay a "redemption" amount to LAPF as a fee.  Tellingly, the tax savings ultimately sought by members of the Schott family (the deferral of, and possible elimination of, federal and state income taxes on 90% of $114 million in income generated by SCVHG that would have otherwise passed through to Schott family members) dwarfs the microscopic value of their charitable donations in 2000.

> ### 2. Collapsed into an integrated whole, the SC2 transaction reveals that the LAPF was simply an accommodation party to a transaction without substance

The step-transaction doctrine is a particular application of the substance over-form doctrine.  *See, e.g.*, *Brown v. United States*, 329 F.3d 664, 671 (9th Cir. 2003).  The doctrine has been described as "combin[ing] a series of individually meaningless steps into a single transaction."  *See Linton v. United States,* 630 F.3d 1211, 1223 (9th Cir. 2011) (citing *Esmark, Inc. & Affil. Cos. v. Commissioner*, 90 T.C. 171, 195 (1988)).  According to the Supreme Court, for federal income-tax purposes, "interrelated yet formally distinct steps in an integrated transaction *may not be* considered independently of the overall transaction."  *Commissioner v. Clark,* 489 U.S. 726, 738 (1989) (emphasis added).  In this way, federal tax liability is based on a realistic view of the entire transaction.  *Id*.  Courts have used three tests to determine whether to apply the step transaction doctrine: (1) the end-result test; (2) the interdependence test; and (3) the binding commitment test.  *See Linton*, 630 F.3d at 1224 (citing *True v. United States*, 190 F.3d 1165, 1174-75 (10th Cir. 1999)).  Here, the end-result test and the interdependence test apply.[25] Whether or not several actions constitute integrated steps in a single transaction is a question of fact.  *Robino*, 894 F.2d at 344 (citing *Jacobs v. Commissioner*, 224 F.2d 412, 413 (9th Cir.

---

[25] The binding commitment test inquires as to whether, at the time the first step of a transaction was entered, there was a binding commitment to take the later steps. *Linton*, 630 F.3d at 1225 (citing *Commissioner v. Gordon*, 391 U.S. 83, 96 (1968)). The test only applies to transactions spanning several years. *Id*. The United States argues that this test also applies to this case in that the eventual "redemption" payment in 2005 collapses down to the accommodation arrangement between the LAPF and the Schotts and SCVHG. For purposes of opposing Bowes's motion, however, the Government need only collapse down the series of steps taken in April-July 2000 to a mutual promissory *quid pro quo* arrangement by virtue of applying the end-result or interdependence tests.

1955)).  The doctrine has been applied in the case of a purportedly donative transaction.  *See*

*Allen v. Commissioner*, 925 F.2d 348, 352 (9th Cir. 1991).

The end-result test "asks whether a series of steps was undertaken to reach a particular result, and, if so, treats the steps as one."  *Linton*, 630 F.3d at 1244. Subjective intent is especially relevant to this test.  *Id.*  In this case, the series of steps taken by SCVHG and the Schotts were all taken for the sole purpose of obtaining tax benefits through misallocation of income to the LAPF in exchange for a future payment to the LAPF.

"The interdependence test asks 'whether on a reasonable interpretation of objective facts the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series.'"  *Id.*  Under the interdependence test, it can be "'useful to compare the transactions in question with those we might usually expect to occur in otherwise bona fide business settings.'" *Id.* (quoting *True*, 190 F.3d at 1176)).  Here, the capital structure, (consisting of highly dilutive warrants with an artificially low strike price), the pledges, redemption agreement (with terms contrary to LAPF guidelines), and the transfer, on paper, of 90% of purported outstanding shares in a family company to an outsider are *anything but* the type of transactions that one might expect to occur in a bona fide business setting.  SC2 was a highly structured transaction created by KPMG.  None of the parts make sense absent their integration as a whole into a tax strategy designed to misallocate income to a tax exempt entity. The SC2 transaction collapses down to nothing more than a promise of a future payment in exchange for the promisee agreeing to serve as a nominee or "parking lot" for the promisor.

D.  **The *Palmer* line of cases and the *Gitlitz* case cited by Bowes are inapposite to this case**

Bowes relies heavily in her Memorandum on a line of cases that involve donations of common shares[26] of close corporations to a charities followed by redemptions of recently-donated shares, at the request of the respective donees.  (Bowes Mem. Supp. Mot. Summ. J. 17-21, 25 (ECF No. 71-1) (discussing *Sheppard v. United States*, 361 F.2d  972 (Ct. Cl. 1966);

---

[26]In *Rauenhorst*, the donation consisted of warrants.

*Behrend v. United States*, 73-1 U.S.T.C. ¶ 9123 (4th Cir. 1972); *Grove v. Commissioner*, 490 F.2d 241 (2nd Cir. 1973); *Carrington v. Commissioner*, 476 F.2d 704 (5th Cir. 1973); *Palmer v. Commissioner*, 62 T.C. 684 (1974), *acq. in* Rev. Rul. 78-197, 1978-1 C.B. 83, *aff'd* 523 F.2d 1308 (8th Cir. 1975), and *Rauenhorst v. Commissioner*, 119 T.C. 157 (2002)) (collectively, the *Palmer* line of cases)).   In these cases, the IRS sought to recharacterize the two-step sequence of a donation and ensuing redemption into a three-step sequence that would entail constructive receipt of a taxable dividend from the company to the donor.   *See Palmer*, 62 T.C. at 690.   In taking this position, the IRS was swimming against the long-established principle reflected in the tax law that donors may contribute appreciated stock to a charity without realizing gains on the transfer.   *See e.g., Carrington*, 476 F.2d at 708 ("The law with respect to gifts of appreciated property is well established. A gift of appreciated property does not result in income to the donor so long as he gives the property away absolutely and parts with title thereto before the property gives rise to income by way of sale.").   Eventually, the IRS acquiesced to the *Palmer* sequence, provided that the donee is not required to redeem the shares.   Rev. Rul. 78-197.

The *Palmer* line of cases, although superficially similar to the facts of this case, is inapposite for three fundamental reasons.  First, the *Palmer* cases are all predicated on a bona fide and complete donation of property to a charitable institution in a transaction that had substance.   *See, e.g.*, *Palmer*, 62 T.C. at 694 ("The only question is whether [Palmer] really made a gift, thereby transferring ownership of the stock prior to the redemption").   In contrast, Bowes did not donate stock to the LAPF.

Second, Bowes's "donation" to the LAPF is fundamentally different that the charitable donations in the *Palmer* line of cases.  The donations in those cases were motivated by bona fide charitable purposes, and the tax advantages were, by definition, of a lesser value than the donation, since the income tax rates involved were always less than 100%.  There was, in short, a real, substantive donation.  Here, SC2 lacks economic substance.  The Schotts collectively "donated" $163,500 in 2000 in order to obtain tax benefits running into several millions of dollars. Moreover, there was no intention in the *Palmer* cases to strip down the donated stock to

pennies on the dollar relative to the stock's allocable share of income for tax purposes, as is the case here. The outcomes of the *Palmer* cases would have been far different had the donated securities at issue themselves been fictitious or stripped of most of their economic value. *See, e.g.*, *Palmer*, 62 T.C. at 694 ("[Palmer's] control of the affairs of the college was akin to the manager of a business, but he had no right to share in its profits.").

Third, as noted above, the *Palmer* line of cases addressed a well-settled area of law regarding the donation of appreciated property. The cases did not address whether an S corporation can shift the incidence of taxation onto a tax exempt entity without any corresponding shift in economic ownership through a donative scheme.

If the *Palmer* line of cases is far afield from the issues of this case, the *Gitlitz* case is off the proverbial map. The issue in *Gitlitz* was how to construe two portions of the Internal Revenue Code that governed how the discharge of indebtedness would be treated at the shareholder and the corporate level. 531 U.S. at 208-12. This has nothing to do with either the primary issue (misallocation of income) or secondary issue (charitable deduction) raised by Bowes. It would appear that Bowes is citing *Gitlitz* for the proposition that the Court should mechanically apply the pro-rata allocation scheme to the shareholders of SCVHG as they appear on paper. This is nonsense. It assumes the very issues to be decided. The Government is not asking the Court to modify or disregard the plain language of §§ 1366(a) and 1377 of the Tax Code. Rather, the Government contends that the LAPF was not a beneficial owner to whom income should be allocated under Subchapter S and/or that the entire sequence of events comprising the SC2 scheme should be disregarded because there was no substance to the scheme aside from tax consequences. More generally, *Gitlitz* cannot stand for the proposition that form must prevail over substance when it comes to Subchapter S, when it is abundantly clear that case law and Congressional intent require just the opposite result.[27]

---

[27]Bowes implies that the SC2 scheme was "contemplated by the Code." (Bowes Mem. Supp. MSJ 28 (ECF No. 71-1).) In support of this contention, Bowes cites to a treatise for the proposition that allowing tax-exempt entities to be shareholders in S corporations "encourage[d] employee ownership . . . [and] encourage[d] charitable

Case No. 5:08-cv-5097-JF
U.S. Opp. to Bowes's Mot. Summ. J.                    38

**E.   Bowes did not donate shares of SCVHG to the LAPF**

The Plaintiff claims to have donated shares of SCVHG to the LAPF.  In support of her claim, Bowes's motion engages in an extended legal analysis of the steps under California law involved in making a completed gift.  The elements require (1) a competent donor; (2) intention to make a voluntary transfer to the donee; (3) delivery; (4) acceptance by the donee; (5) complete divestment of control by the donor; and (6) lack of consideration for the gift.  *United States v. Alcaraz-Garcia*, 79 F.3d 769, 775 (9th Cir. 1996) (citing *Jaffe v. Carroll*, 35 Cal. App. 3d 53, 59, 110 Cal. Rptr. 435 (1973)).

Although Bowes claims that she meets these six elements with respect to the shares that she purports to have donated to the LAPF, the facts suggest otherwise.  As to the first two elements (competency and intention), Bowes's deposition could not be clearer: she had no inkling that she owned shares of Santa Clara Valley Housing Group, Inc. (SCVHG) until after the start of this litigation.  (Bowes Dep. 70:21-71:4).  At the time of the purported donation, Bowes did not understand that she was giving away shares of SCVHG to the LAPF; she was simply told by her father that she "[would] be giving money" to the LAPF.  (Bowes Dep. 56:1-19; 62:13-15).  She didn't know how much money was to be donated.  (*Id*.)  When taken in tandem with the testimony of Schott that he was paying the LAPF a "fee" to implement the SC2 transaction, it is clear that Bowes had no intention or ability to donate something she did not even know existed.  At a minimum, these are matters of disputed fact for trial.

Similarly, elements five and six (divestment of control and lack of consideration) are very

giving. . . ." *Id*. (citation omitted). Congress, however, never intended for taxpayers to reprise the same type of income shifting abuse addressed in numerous cases involving family corporations where the economics of equity ownership was divorced from formal ownership.  *See, e.g.*, *Speca*, 630 F.2d 554.  Moreover, legislative history makes clear that Congress did not anticipate tax-exempt entities serving as "parking lots" for S corporation owners – Congress anticipated tax-exempt shareholders having to pay unrelated business taxable income.  *See* S. Rep. No. 104-281, at 61 (June 18, 1996) ("Items of income or loss of an S corporation will flow-through to qualified tax-exempt shareholders as UBTI, regardless of the source or nature of such income . . . ."). No tax exempt entity subject to UBTI would have agreed to participate in an SC2 transaction because the entity would have owed tax on income without the benefit of corporate distributions to cover those taxes.

much in factual dispute.[28]  In this case, the Government contends that the Schott family retained, as a factual matter, dominion and control over the interest in SCVHG purportedly transferred to the LAPF. Moreover, the Government contends that the LAPF served as an accommodation party in consideration for a promise by the Schott to pay money to the LAPF.

Alternatively, Bowes is not entitled to a charitable deduction in connection with her "donation" because it consisted of a nondeductible partial interest in property by virtue of the intentional stripping away of all incidents of equity ownership associated with the shares transferred to the LAPF.  *See* 26 U.S.C. § 170(f)(3); Rev. Rul. 81-282, 1981-2 C.B. 78.

## IV.   CONCLUSION

For the reasons set forth above, Bowes's motion for summary judgment should be denied.


Respectfully submitted this 22d day of April, 2011.


MELINDA HAAG
United States Attorney
THOMAS NEWMAN
Assistant United States Attorney

 /s/ Henry C. Darmstadter
HENRY C. DARMSTADTER
JAMES E. WEAVER
ADAM D. STRAIT
Trial Attorneys, Tax Division
U.S. Department of Justice

---

[28]In one recent case, taxpayers transferred assets to a charitable foundation that was structured so that the foundation could loan money to the taxpayers' children for educational expenses and/or pay out funds to the taxpayers in exchange for "good works." *Viralam*, 136 T.C. 8, 2011 WL 597993.  Even though the taxpayers purported to fully relinquish control over their transferred property on paper, as a matter of reality, the taxpayers "never intended to, nor in fact did, relinquish dominion and control over the property transferred to the Foundation." 2011 WL 597993 at *12.  Accordingly, the charitable deduction was disallowed. *Id.*