MELINDA HAAG
United States Attorney
THOMAS NEWMAN
Assistant United States Attorney

HENRY C. DARMSTADTER
JAMES E. WEAVER
ADAM D. STRAIT
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 683, Ben Franklin Station
Washington, D.C.  20044-0683
Telephone: (202) 307-6481
Facsimile: (202) 307-0054
henry.c.darmstadter@usdoj.gov
james.e.weaver@usdoj.gov
adam.d.strait@usdoj.gov
Western.Taxcivil@usdoj.gov

Attorneys for the United States of America

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SANTA CLARA VALLEY HOUSING GROUP, INC., and KRISTEN M. BOWES, | Case No. 5:08-cv-5097-JF-HRL |
| Plaintiffs, | **UNITED STATES' OPPOSITION TO SANTA CLARA VALLEY HOUSING GROUP'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| UNITED STATES OF AMERICA, | Date:        June 10, 2011 |
| Defendant. | Time:        9:00 a.m. |
| | Courtroom:    3 |

The United States respectfully opposes the Motion for Summary Judgment (ECF No. 70) filed by Plaintiff Santa Clara Valley Housing Group, Inc. ("SCVHG").  The Motion is limited to a single issue: whether the synthetic equity instruments, or "warrants," SCVHG issued were "substantially certain to be exercised," a prerequisite to the warrants' being considered a second class of stock under 26 C.F.R § 1.1361-1($l$)(4)(iii)(A).  For the reasons stated below, the warrants were substantially certain to be exercised, either by the Schott family or by the "potential transferee" the regulation contemplates.  The Motion should be denied, and the United States' Motion for Summary Adjudication of Issues (ECF No. 66) should be granted.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.   Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  Statement of Material Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A. The Court Should Look to the Objective Economic Realities of the SC2 Transaction,
       Which Show that the Schott Family Was Substantially Certain To Exercise the Warrants
       Unless the LAPF Was an Accommodation Party. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.  *Objectively, the Warrants Would Be Exercised Unless They Went Out of the
            Money.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        2.  *The Warrants Were So Deep In the Money When They Were Issued that They
            Were Substantially Certain To Remain In the Money.* . . . . . . . . . . . . . . . . . . . . 9

        3.  *The Schott Family's Subjective Expectation that the LAPF Would Redeem Its
            Shares Only Arose Because the LAPF Was an Accommodation Party.* . . . . . . . . 14

    B. The Schott Family and the LAPF Acted Throughout the SC2 Transaction As If the
       Warrants Were Certain To Be Exercised. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    C. A Third-Party Transferee of the Warrants Would Be Substantially Certain To
       Exercise. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IV.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Frank Lyon Co. v. United States*, 435 U.S. 561 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d 991 (9th Cir. 2010).. . . . . . . . . . . . . . . . 7, 13

*Progressive Corp. v. United States*, 970 F.2d 188 (6th Cir. 1992). . . . . . . . . . . . . . . . . . . . 8-10

*United States v. Tuff*, 469 F.3d 1249 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Regulations**

26 C.F.R. § 1.1361-1(*l*)(4)(ii)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

26 C.F.R. § 1.1361-1(*l*)(4)(iii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

26 C.F.R. § 1.361-1(*l*)(4)(iii)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 8, 14

**Other Authorities**

David Hasen, *Financial Options in the Real World: An Economic and Tax Analysis*,

    37 Fla. St. U. L. Rev. 789. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Notice of Proposed Rulemaking, One Class of Stock Requirement, 1991-2 C.B. 1092

    (Aug. 13, 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Notice of Proposed Rulemaking, One Class of Stock Requirement, 1990-2 C.B. 864

    (Oct. 5, 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

One Class of Stock Requirement, T.D. 8419, 1992-2 C.B. 217 (May 29, 1992). . . . . . . . . . . 10

Revenue Ruling 80-238, 1980-2 C.B. 96.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

## I. Introduction

SCVHG's Motion for Summary Judgment addresses a single issue: whether the synthetic equity instruments, styled "warrants," issued in connection with the SC2 transaction were substantially certain to be exercised. SCVHG argues that exercise was not substantially certain, so the warrants could not have constituted a second class of stock under the test set forth in the applicable Treasury Regulation, 26 C.F.R. § 1.1361-1(*l*)(4)(iii).[1] It proffers two broad reasons in support of its Motion. First, it contends, the parties to the SC2 transaction never expected the warrants to be exercised, and they were not in fact exercised. Second, SCVHG claims that the warrants were not substantially certain to be exercised because SCVHG might have declined so greatly in value that exercise of the warrants would be "overpaying" for shares. The regulatory test, however, requires the Court to consider whether the holder "or a potential transferee" would exercise the warrants, and to take into account "all the facts and circumstances" surrounding the warrants. § 1.361-1(*l*)(4)(iii)(A). Rather than relying on the expectations of the parties to the tax shelter that the transaction would proceed smoothly, or SCVHG's speculation as to what might have happened to the value of its stock, the Court should give controlling weight to the objective economic realities of the transaction. And objective economic reality shows that exercise of the warrants was substantially certain – either by the Schott family or by the potential transferee.

## II. Statement of Material Facts

In the first half of 2000, Stephen C. Schott, Patricia Schott, Stephen E. Schott, Lisa Treadwell, and Plaintiff Kristen Bowes (collectively, "the Schott family"), with the assistance of KPMG, LLP ("KPMG"), took the first steps to implement a tax shelter known as the S-Corporation Charitable Contribution Strategy," or SC2. (*See* U.S. Mem. Points & Authorities 7-15 (ECF No. 67) (stating undisputed material facts regarding the sale of the strategy to the Schott family and its implementation).) One step was the creation and capitalization of Plaintiff

---

[1] In fact, SCVHG's motion should be treated as a motion for summary adjudication of this single issue. As the United States argues in its Motion for Summary Adjudication of Issues, the SCVHG warrants also constituted a second class of stock under a separate test set forth in 26 C.F.R. § 1.1361-1(*l*)(4)(ii)(A). (U.S. Mot. Summ. J. 32-35 (ECF No. 66).) SCVHG did not address this portion of the regulation in its Motion for Summary Judgment. (*See generally* MSJ (ECF No. 70).) Since its brief fails to provide any argument as to that test, SCVHG is not entitled to a summary determination that the warrants were not a second class of stock.

SCVHG, so that it had 100 shares of voting stock and 900 shares of non-voting stock. (*See* Minutes of Org. Meeting, Ex. 274, Strait Decl. Supp. Opps. Mots. Summ. J. ("Strait Decl.") at 212.) Stephen C. and Patricia Schott made a joint capital contribution of $715 in cash and an interest in San Leandro Investors, LLC, valued at $260,657. (*See id.*) Stephen E. Schott, Treadwell, and Bowes each contributed $80,422 in cash. (*See id.*) All told, the capital contributions to SCVHG totaled a little over $500,000.

After SCVHG was created, another entity wholly owned by the Schott family, SCS Development Co., transferred several real estate development projects to SCVHG. (Dep. of Stephen C. Schott ("Schott Dep."), Ex. H to Darmstadter Decl. Supp. Opps. Mot. Summ. J. ("Darmstadter Decl."), at 295:9-299:20). The transferred projects were expected to be profitable ones with union contractors. (*See id.* at 298:2-300:5. *See also id.* at 258:24-259:23; Dep. of Daniel M. Ikeda, Ex. I to Darmstadter Decl. ("Ikeda Dep."), at 83:8-11 (stating that the Schott family was "hopeful" that the projects would be very profitable); Dep. of Peter N. Au, Ex. Q to Darmstadter Decl. ("Au Dep."), at 105:22-106:2 (stating that most years, the Schott family entities were profitable).) When it became clear that one of the projects, Costa, would not be profitable within the time horizon of the SC2 transaction, SCVHG simply transferred it back to SCS Development. (*See* Schott Dep. 449:25-456:7; Agreement for Sale and Purchase, Ex. 322, Strait Decl. at 411.)

Prior to the transfer, SCS Development owned the projects outright. (Schott Dep. at 303:20-25.) SCVHG paid for the projects with an unsecured, low-interest note with no principal immediately due. (Ikeda Dep. 478:19-488:5, 496:4-497:8; Promissory Note (June 5, 2000), Ex. 325, Strait Decl. at 427; Agreement for Sale and Purchase, Ex. 326, Strait Decl. at 436; Agreement for Sale and Purchase, Ex. 329, Strait Decl. at 445.) SCS Development also supplied all of the employees and contractors for SCVHG. Indeed, SCVHG did not employ a single person between 2000 and 2004. Instead, the work was performed by SCS Development employees and contractors, and SCS Development "would book a receivable from Santa Clara for the work performed." (Ikeda Dep. 36:17-39:1; *see also* Agreement for Services, Ex. 333, Strait Decl. at 459; Ikeda Dep. 510:5-24.)

The next step in implementing the SC2 transaction was SCVHG's issuance of warrants permitting the Schott family to purchase up to 9,000 further shares of non-voting stock at $165.13 per share. (*See* Warrants, Ex. 274, Strait Decl. at 252-63.) The warrants would not lapse for 35 years after the date they were created. (*See id.* at 253.) The warrants do not contain any restrictions on when they can be exercised. (*See id.* at 252-53.) Nor do the warrants contain any provisions regarding their treatment in the event of a stock split or the issue of further warrants. (*See id.*)

On or about July 10, 2000, Stephen C. Schott, Patricia Schott, Stephen E. Schott, Lisa Treadwell, and Plaintiff Kristen Bowes (collectively, "the Schott family") allegedly donated 900 shares of non-voting stock in SCVHG to the LAPF, or 90% of the outstanding shares. (*See* Ex. 274, Strait Decl. at 285, 289, 293, 297.) That is what occurred on paper. In reality, the "donation" took place with at least the tacit understanding that the LAPF would eventually redeem its stock for a "relatively modest" price. (Mem. from Max Gray to Dan Ikeda (Apr. 10, 2000) ("Gray Memo"), Ex. 276, Strait Decl. at 304 ¶ 8; Dep. of Max Gray, Ex. B to Darmstadter Decl. ("Gray Dep.") at 142:13-18.) For the reasons set out in detail in the United States' Memorandum in Opposition to Plaintiff Kristen Bowes's Motion for Summary Judgment, the Court should disregard the superficial form of the transaction and look to its substance.

Later in 2000, the Schott family hired Mesirow Financial to appraise the stock its members purportedly donated to the company. (Dep. of Wendy E. Sharon, Ex. F to Darmstadter Decl. ("Sharon Dep."), at 66:24-67:20; *see generally* Valuation Report re: SCVHG (Oct. 17, 2000) ("2000 Mesirow Appraisal"), Ex. 313, Strait Decl. at 319.) Wendy Sharon performed the appraisal. (Sharon Dep. 66:19-67:12.) Sharon calculated a non-marketable minority equity value of SCVHG of $1,720,056. (2000 Mesirow Appraisal, Ex. 313, Strait Decl. at 348.) That figure represents her opinion as to the fully discounted equity value of SCVHG prior to taking the warrant proceeds into account. (*See id.*; Sharon Dep. 243:5-10. *See also* U.S. Mem. Supp. Mot. SAI 15-18 (ECF No. 67) (setting out undisputed facts regarding Sharon's methodology).) Next, Sharon assumed that all the warrants would be exercised at the end of their 35-year life. (2000 Mesirow Appraisal, Ex. 313, Strait Decl. at 330-32; Sharon Dep. 119:25-120:10.) She

added the net present value of the proceeds from exercise to her $1.7 million equity figure, then divided by 10,000 – the number of shares after exercise – to arrive at a value of $181.96 per share. (*See* 2000 Mesirow Appraisal, Ex. 313, Strait Decl. at 331-32, 348.) Each member of the Schott family relied on that figure when taking a deduction from income for a charitable contribution to the LAPF. (*See, e.g.* Dep. of Gary Krutilla, Ex. P to Darmstadter Decl., at 126:23-127:17; Claim for Refund, Ex. 922, Strait Decl. at 729 (discussing claim for refund based on purported charitable donation of 468 shares at $181.96 per share).)

Sharon's 2000 valuation, however, suffered from a number of serious flaws tending to depress the value she calculated for SCVHG. She improperly assumed that the purchaser of SCVHG would be a C corporation. (Expert Report of Thomas Z. Lys, Ex. U to Darmstadter Decl. ("Lys Report"), at 60-65; *see also* Sharon Dep. 108:11-114:16 (discussing decision to assume that purchaser of SCVHG would necessarily be a C corporation).) She double-counted a discount for lack of marketability applied against shares of another Schott organization in which SCVHG held a 27% ownership stake. (Lys Report 65-66.) She took too large a discount for lack of marketability. (Lys Report 67-73; *see also* Expert Report of Daniel L. McConaughy, Ex. W to Darmstadter Decl. ("McConaughy Report"), at 42 (using smaller discount for lack of marketability).) She understated revenue projections, in part because she relied on outdated information given to her by SCVHG. (Lys Report 73-74; Expert Report of Ronald Hendricks, Ex. V to Darmstadter Decl. ("Hendricks Report"), at 4-8; *see also* Dep. of Daniel L. McConaughy, Ex. X to Darmstadter Decl., at 368:11-369:17 (agreeing that higher revenue lines were more accurate).) If all of the flaws are corrected, a more accurate valuation of SCVHG emerges: it was worth about $40,000,000 as of July 11, 2000. (Lys Report 79; Dep. of Thomas Z. Lys, Ex. G to Darmstadter Decl. ("Lys Dep."), at 686:13-17.)

Over the following four years, SCVHG earned more than $114,000,000 in ordinary income. About 90% of that income was allocated to the LAPF. (*See* U.S. Mem. Supp. Mot. SAI 13 (ECF No. 67) (setting out undisputed facts regarding SCVHG's income).) Of that sum, only $202,500 was distributed to the LAPF. (*See* Lopez Dep. 381:13-84:383:16, 395:5-396:17.) During that

time, the LAPF supposedly owned 90% of the outstanding stock in SCVHG.[2]  Even if the warrants had been exercised in full, the LAPF's nominal holding would only have decreased to 9% of the outstanding stock.  It did not, however, act like an equity owner, betraying its role as an accommodation party.

When the LAPF indicated it wanted to redeem the 900 shares of non-voting stock it nominally owned according to the parties' pre-donation Redemption Agreement, Wendy Sharon was again called upon to perform an appraisal.  (Valuation of Common Stock of Santa Clara Valley Housing Group, Inc. (Feb. 2005) ("2005 Duff & Phelps Appraisal"), Ex. 340, Strait Decl. at 463; Ikeda Dep. 540:21-541:20.)  Sharon found that SCVHG had a business enterprise value of $14,721,000.  (2005 Duff & Phelps Appraisal, Ex. 340, Strait Decl. at 525.)  She also found it had excess cash reserves of $39,000,000 – that is to say, $39,000,000 in accumulated cash beyond what was needed to operate the business.  (*Id.*; Sharon Dep. 493:22-494:21.)  Sharon subtracted several liabilities from those assets.  Most significantly, she subtracted accrued interest payable on a loan to SCS Development Co., another entity owned by the Schott family, and a "Potential C Corp Tax Liability" of $35,566,000.  (*See* 2005 Duff & Phelps Appraisal, Ex. 340, Strait Decl. at 525.)  The "Potential C Corp Tax Liability" line reflected the taxes, interest, and penalty SCVHG would owe if the Internal Revenue Service determined that its status as an S corporation had been terminated by issuance of the warrants.  (*See id.* at 476-77.)  Finally, she discounted the remaining figure by 45% to reflect a lack of marketability.  (*See id.* at 525.)  This yielded a fully discounted equity value of $5,172,522.  (*See id.* at 505, 525.)

Sharon again assumed that all of the warrants would be exercised.  (*See id.* at 505.)  Therefore, she added the warrants' net present value and divided by 10,000 to derive a per-share price of $534.21.  (*See id.*)  That share price formed the basis of the amount offered to the LAPF under the redemption agreement.  (*See id.*; Email from Frank Nicoletti to Tom Lopez (Dec. 22, 2004) ("Nicoletti Email"), Ex. 40, Strait Decl. at 110; Lopez Dep. 476:10-477:13, 484:11-485:5.)  Tom Lopez ("Lopez"), Chief Investment Officer for the LAPF, negotiated the per-share price

---

[2]For the reasons explained in detail in the United States' Opposition to Kristen Bowes's Motion for Summary Judgment, the LAPF was not a beneficial owner of SCVHG stock.

upward to $1,827.78 by arguing that the Schott family did not actually believe that SCVHG lost

its status as an S corporation. (*See* Lopez Dep. 491:23-493:19.) If the liability had not applied at

all, Sharon's calculations would have given a per-share price of $2,473.40. (*See* 2005 Duff &

Phelps Appraisal, Ex. 340, Strait Decl. at 525.)

Lopez, however, did not pursue the LAPF's optimal strategy, which would have been to

refuse to redeem the stock, at least unless a much higher price was offered. (Lys Dep. 887:16-

891:5, 894:10-897:8, 909:4-911:7.) Instead, it settled for $1,645,002 for its supposed 90%

interest. (*See* Lopez Dep. 560:12-566:11; Ex. 50, Strait Decl. at 123.)

Schott aptly characterized this small payment to the LAPF as a "fee." (Schott Dep. 258:24-

259:17.) Consider $1,645,002 in the context of SCVHG's financial situation as of the effective

date of the redemption, December 31, 2004, and the LAPF's purported 90% ownership. Wendy

Sharon determined that SCVHG had more than $35,000,000 in excess cash beyond what was

needed to operate the business. (*See* 2005 Duff & Phelps Appraisal, Ex. 340, Strait Decl. at

525.) The LAPF received less than 5% of that figure. Indeed, SCVHG had on hand $63,698,000

in cash and cash equivalents and only $8,374,000 in liabilities. (Ikeda Dep. 182:18-183:3; 2003

and 2004 Financial Statements, Ex. 284, Strait Decl. at 309.) Even if all of the liabilities were

paid in full, SCVHG would still have had more than $55 million in cash and cash equivalents.

The LAPF received less than 3% of that figure. And the sum the LAPF received for acting as an

accommodation party was less than 2% of SCVHG's ordinary income during the period of time

the LAPF nominally owned the stock. (*See* Lys Report 26, 53.) If Lopez had pursued the

LAPF's optimal negotiation strategy, he would have been able to obtain a much higher price for

the LAPF's stock – more than $10,000,000. (*See* Lys Dep. 887:12-891:5, 908:7-19.[3])

---

[3]Dr. Lys explained that the LAPF could have obtained nine percent of SCVHG's earnings through the end of 2004, plus nine percent of the warrant proceeds, plus nine percent of all future earnings. (Lys Dep. 887:16-888:16.) Santa Clara earned more than $114,000,000 while the SC2 transaction was in place. (*See* U.S. Mem. Supp. Mot. SAI 13 (ECF No. 67); Lys Dep. 908:7-19; *cf.* Lys Dep. 890:10-17.) Likewise, SCVHG's balance sheet as of December 31, 2004, the effective date of the redemption, listed stockholders' equity at more than $114,000,000. (2003 and 2004 Financial Statements, Ex. 284, Strait Decl. at 309.) Nine percent of $114,000,000 exceeds $10,000,000, so the LAPF could have obtained more than $10,000,000 for its shares if it had not merely been acting as an accommodation party.

# III.    Argument

On SCVHG's motion for summary judgment, the Court should draw every reasonable inference from the evidence in the United States' favor. *See, e.g.*, *EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 996-97 (9th Cir. 2010).  If a reasonable fact-finder could conclude that the warrants were substantially certain to be exercised, SCVHG's motion should be denied.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The regulatory test at issue is whether the warrants "substantially certain to be exercised (by the holder or a potential transferee)." 26 C.F.R. § 1.1361-1(*l*)(4)(iii)(A).  The test is a holistic one, to be evaluated "taking into account all the facts and circumstances." *Id.*

SCVHG advances two broad arguments in support of its proposition that as a matter of law, the warrants were not substantially certain to be exercised.  First, it cites the expectation that the LAPF would redeem its shares.  Second, it advances the entirely speculative possibility that SCVHG might have lost money while the LAPF nominally owned the non-voting stock. (*See* SCVHG Mem. Supp. MSJ 7-9 (ECF No. 70).)  For three reasons, however, those arguments must fail.  First, the regulatory test requires the fact-finder to "tak[e] into account all the facts and circumstances." § 1.1361-1(*l*)(4)(iii)(A).  The Court should interpret that test to require an examination of the objective economic realities of the SC2 transaction.  Those objective economic realities clearly show that the Schott family was substantially certain to exercise the warrants.  If the Schotts never planned to exercise the warrants, it is only because the LAPF was an accommodation party to a transaction lacking substance, not an arm's-length counterparty.

Second, and relatedly, SCVHG's argument is belied by the parties' behavior throughout the SC2 transaction.  The Schott family and the LAPF consistently acted as if the warrants would be exercised.  Indeed, they memorialized and relied on that assumption.

Finally, the regulatory test does not just look to whether the Schott family, the original holders of the warrants, were substantially certain to exercise them.  It also asks whether a putative third-party transferee who acquired the warrants would be substantially certain to exercise them.  *See* 26 C.F.R. § 1.1361-1(*l*)(4)(iii)(A) (examining whether warrants are "substantially certain to be exercised (by the holder *or a potential transferee*)" (emphasis

1   added)).  Given the circumstances surrounding the warrants in this case, a third-party transferee

2   of the warrants would have been substantially certain to exercise them.

    **A. The Court Should Look to the Objective Economic Realities of the SC2 Transaction,**
3   **Which Show that the Schott Family Was Substantially Certain To Exercise the**
4   **Warrants Unless the LAPF Was an Accommodation Party**

5       In considering, under 26 C.F.R. § 1.1361-1(*l*)(4)(iii)(A), whether a warrant is substantially

6   certain to be exercised, the fact-finder must "tak[e] into account all the facts and circumstances."

7   The Court should look beyond the subjective intent of the parties to the transaction.  The Court

8   should also look past the way the parties chose to characterize the transaction on paper.  Instead,

9   the Court should get to the transaction's "objective economic realities."  *See, e.g.*, *Frank Lyon*

10  *Co. v. United States*, 435 U.S. 561, 572-73 (1978).

11      Those objective economic realities clearly show that the Schott family was substantially

12  certain to exercise the warrants.  Objectively, the Schott family would have exercised the

13  warrants if doing so would have been profitable.  And it is substantially certain that exercise of

14  the warrants would have been profitable.  SCVHG could have lost 99% of the value it had as of

15  July 11, 2000, and exercise of the warrants would *still* have been profitable.  While the Schott

16  family might have subjectively believed that attempting to negotiate a redemption with the LAPF

17  would have been more profitable than exercise, that is only because the LAPF was an

18  accommodation party to a transaction lacking in substance.  The warrants were substantially

19  certain to be exercised.

20      *1.  Objectively, the Warrants Would Be Exercised Unless They Went Out of the Money*

21      If the exercise price of a warrant is less than the value of the stock received through exercise

22  of the warrant, exercising the warrant represents a profit.  Such a warrant is said to be "in the

23  money."[4]  Not all warrants are substantially certain to be exercised, however, even if they are in

24  the money.  The warrant may contain an unrelated restriction on exercise.  For example, a

25  warrant might not be substantially certain to be exercised if the holder's ability to exercise was

26  contingent on performing future services for the corporation.  *See United States v. Tuff*, 469 F.3d

27
28  _____
        [4]Similarly, a warrant is "at the money" if the exercise price is equal to the value of the stock received, so
    that exercise represents neither a profit nor a loss.  It is "out of the money" if the exercise price is greater, so that
    exercise would represent a loss.  *See, e.g.*, *Progressive Corp. v. United States*, 970 F.2d 188, 192-93 (6th Cir. 1992).

1249, 1251-53 (9th Cir. 2006) (discussing employee stock options and 26 C.F.R. § 1.83-3).  In this case, though, no such restrictions existed.  The warrants simply entitled their holder to exercise at any time before the warrants' expiration in 2035.  (*See* Warrants, Ex. 274, Strait Decl. at 252-53.)  Objectively speaking, the warrants would be exercised if doing so would be profitable.  Therefore, the warrants were substantially certain to be exercised as long as they were substantially certain to be in the money.

### 2. The Warrants Were So Deep In the Money When They Were Issued that They Were Substantially Certain To Remain In the Money

The warrants at issue here were in the money when they were issued, and they were substantially certain to remain that way.  To be sure, the amount by which a warrant is in the money changes as the value of the stock fluctuates.  But a warrant that is deep in the money may be so unlikely to go out of the money that it is effectively corporate equity.  In that circumstance, issuance of the warrant may properly be treated as a forward sale of the corporate equity.  If the paper form of the SC2 transaction is accepted – and it should not be, since it was a sham lacking in substance – the warrants were effectively a forward sale of SCVHG's equity.

In *Progressive Corporation v. United States*, 970 F.2d 188 (6th Cir. 1992), the Sixth Circuit addressed a closely analogous situation.  In that case, the taxpayer, Progressive, used a strategy in which it simultaneously purchased stock and sold a deep-in-the-money call option on the same stock.  Progressive received dividends through the stock and claimed dividends-received deductions.  The IRS disallowed the deductions because the call options were so deep in the money that they were effectively contractual obligations to sell the stock.  *Id.* at 190; *see also id.* at 193.  The Sixth Circuit agreed that under Revenue Ruling 80-238, 1980-2 C.B. 96,[5] the government could properly treat deep-in-the-money call options as contractual obligations.  *See id.* at 193-94.  Indeed, "in such a situation the exercise of options may be virtually guaranteed

---

[5]While Revenue Ruling 80-238, by its terms, addresses the dividends received deduction, the Treasury Department expressly referred to it for guidance in promulgating the regulations at issue in this case.  *See* Notice of Proposed Rulemaking, One Class of Stock Requirement, 1990-2 C.B. 864 (Oct. 5, 1990) (citing Revenue Ruling 80-238 as an "exampl[e] of the application of general principles [of federal tax law] to treat an option to acquire stock of a corporation as a present stock interest").  Although the final regulations added other requirements, the "substantially certain to be exercised" language, to which the Revenue Ruling was analogized, remained essentially the same.  The Court should treat Revenue Ruling 80-238 as persuasive authority in interpreting § 1.1361-1(*l*).

and the element of risk is either greatly reduced or eliminated." *Id.* at 193 (quoting Rev. Rul. 80-238, 1980-2 C.B. at 96) (internal quotation marks omitted). *See also, e.g.*, David Hasen, *Financial Options in the Real World: An Economic and Tax Analysis*, 37 Fla. St. U. L. Rev. 789 (explaining that in-the-money options are equivalent to a forward sale of part of the property underlying the option).

KPMG acknowledged this principle in analyzing the SC2 transaction. Discussing the final single class of stock regulations, T.D. 8419, it wrote, "the purpose of the Safe Harbor is to provide a standard as to how 'in-the-money' a call option can be without being considered to be an equity instrument. Essentially, the call option can be no more than 10% 'in-the-money' under the Safe Harbor." (Memorandum from Larry Manth to Client Attorney (Sept. 5, 2000), Ex. 238, Strait Decl. at 174.) By implication, if the call option is deep in the money, it is substantially certain to be exercised.[6] Indeed, as one of the leaders in KPMG's Washington National Tax group put it, if a warrant is deep in the money, "[y]ou'd either have to be impoverished or a nitwit not to exercise it." (Dep. of William Kelliher, Ex. R to Darmstadter Decl., at 141:14-15.)

SCVHG argues that during the SC2 transaction's holding period, the value of SCVHG stock might have declined to the point that exercising the warrants would be "overpay[ing] for new shares." (SCVHG Mem. Supp. MSJ 9 (ECF No. 70).) If that occurred, SCVHG continues, "it would not be financially prudent for the Warrant holders to invest an additional $1,468,170 [sic] in Santa Clara, [and] the Warrants would not be exercised." (*Id.* (footnote omitted).) In other words, SCVHG contends that exercise of the warrants was not substantially certain because the warrants might have gone out of the money. SCVHG does not elaborate on how greatly the company's value would need to decline for that to come to pass. The answer is instructive.

---

[6]KPMG also glossed the meaning of the "substantial certainty" test. It concluded that in a typical SC2 transaction, the warrants were not substantially certain to be exercised because the warrant holder would not also hold the voting stock. (Memorandum from Larry Manth to SC2 working file, Ex. 394, Strait Decl. at 542-43.) Consequently, if the warrant holder exercised, he or she would be stuck paying taxes but receiving no dividends, since the voting shareholders would simply cause the funds to be reinvested. (*Id.*) KPMG's reasoning ignores, among other considerations, the likelihood that the warrant holder would also hold the voting stock, as was the case here. It also ignores the possibility of a warrant exercise followed immediately by a sale of the interest gained through exercise.

First, the warrants' face price greatly overstates the actual cost of exercise. At the face price of $165.13, it would cost the warrant holder $1,486,170 to exercise all 9,000 warrants. (*See* Warrants, Ex. 274, Strait Decl. at 252-63.) Exercise, however, would also increase the proportion of the company the warrant holder owned. Since the Schott family already owned the 100 shares of voting stock in SCVHG, and exercising the warrants would give them an additional 9,000 shares of non-voting stock, exercise would nominally increase their ownership in SCVHG by 81%, from 10% to 91%. (Lys Report 20.) In reality, the Schott family continued to own all of SCVHG, and did throughout the transaction. The LAPF may have owned 900 non-voting shares on paper, but as explained briefly below, and in more detail in the United States' Opposition to Kristen Bowes' Motion for Summary Judgment, it did not act like it. Because the LAPF acted as an accommodation party, exercise of the warrants is a counterfactual that never arose.

However, accepting the transaction on paper, a 91% equity stake would entitle the Schott family to 91% of the company's cash, including 91% of the cash they had just paid for exercise of the warrants. Therefore, the *net* cost of exercising the warrants would only be 9% of the warrants' face price – the portion of the exercise price controlled by the 9% of the equity the Schott family would not own after exercise. Nine percent of the warrants' face price is only $133,755. (Lys Report 20.)

Since the Schott family would nominally gain 81% of SCVHG's ownership through exercise, its members would only "overpay" to exercise the warrants if an 81% share in the company was worth less than $133,755. That means the Schott family would only overpay if SCVHG was worth less than $165,130.[7] Not coincidentally, $165,130 is the equity value of SCVHG at which the warrants would be at the money – the point at which exercise of the warrants would neither be profitable nor unprofitable. (Lys Report 43.) At an equity value of $165,130, each of the company's 1000 outstanding shares would be worth $165.13. For each new share issued through exercise of the warrants, the dilutive effect of a new share would be precisely offset by the contribution of the $165.13 exercise price to the company. If SCVHG were worth more, the warrants would be in the money, and each share received through exercise would be worth more

---

[7]$133,755 / 0.81 = $165,130.

than the exercise price of $165.13.  If SCVHG were worth less, the exercise price would be worth more than the share received through exercise of the warrant, and the warrant holder would "overpay" for shares if he or she exercised the warrant.[8]  Therefore, the warrants were objectively substantially certain to be exercised if the value of SCVHG was substantially certain to exceed $165,130 at the end of the warrants' 35-year life.  (Lys Dep. 914:3-916:5.)

Plainly, SCVHG was going to be worth more than that.  The initial *cash* contributions to SCVHG exceeded $165,130.  (*See* Minutes of Org. Meeting, Ex. 274, Strait Decl. at 212.)  The Plaintiffs' own appraisers value the company at more than nine times that minimum.  Sharon's appraisal of the company as of July 11, 2000, shortly after its inception, contained numerous flaws depressing the company's value – but it still found SCVHG to be worth more than $1.7 million.  (2000 Mesirow Appraisal, Ex. 313, Strait Decl. at 348.)  The Plaintiffs' expert Daniel McConaughy offers the lowest valuation, but still appraises the company at more than $1.5 million as of the same date.  (McConaughy Report 24.)  Thus, even taking the facts in the facts most favorable *to the Plaintiffs*, as the United States did in its Motion for Summary Adjudication of Issues, it is clear that the SCVHG warrants were so deep in the money that they were substantially certain to remain there.  If SCVHG was worth $1.5 million, as McConaughy suggests, the company would have to lose more than 88% of its value before the warrants were no longer in the money.[9]

For purposes of considering SCVHG's motion, however, the Court should take the facts in the light most favorable to the United States.  *See, e.g.*, *Prospect Airport Servs.*, *supra*, 621 F.3d at 996-97.  And considering Dr. Lys's report to be accurate, SCVHG was worth about

---

[8]To take a set of concrete examples, suppose that SCVHG were worth $165,130, and 10 warrant shares were exercised.  The proceeds of the warrants would increase SCVHG's value to $165,130 plus $1,651.30, or $166,781.30 in total.  There would also be 1010 shares outstanding, so the per-share price would remain $165.13.  By contrast, suppose SCVHG's value was $175,000, and 10 shares were purchased through warrant exercise.  In that case, the proceeds would increase SCVHG's value to $176,651.30.  Since there would again be 1010 shares outstanding, each share would be worth $174.90 – and the warrant holder would immediately realize a profit through the exercise of the warrants.  Finally, if SCVHG's value were only $160,000, the proceeds from the purchase of 10 shares through the warrants would increase the company's value to $161,651.30.  With 1010 shares outstanding, each share would be worth $160.05 each, making exercise of the warrants a losing proposition.  (*See also* Lys Dep. 193:8-198:23.)

[9]$165,130 / $1,500,000 ≈ 0.11.

1  $40,000,000 when the Schott family entered into the SC2 transaction. (*See* Lys Report 79; Lys

2  Dep. 686:13-17.) If SCVHG had lost 99% of its value from that point, it would have been worth

3  $400,000 – and the warrants would *still* be in the money. From the initial value of the company

4  alone, a reasonable fact-finder could conclude that it was substantially certain SCVHG would be

5  worth more than $165,130 at the end of the warrants' lifespan and that the warrants would be

6  exercised.

7          Furthermore, the undisputed facts of the relationship between SCVHG and other Schott

8  entities further increases the likelihood that SCVHG would be worth more than $165,130 when

9  the warrants expired. The Schott family had a strong incentive to manipulate housing projects

10 among the Schott entities to ensure that SCVHG had profitable ones. Just as 90% of profits were

11 nominally allocated to the LAPF during the SC2 transaction, SCVHG would have had to allocate

12 90% of losses to the pension fund as well. That would be an income tax detriment, not a benefit,

13 since it would prevent the shareholders from using the loss to offset other income. (*See* Dep. of

14 Robert Huber, Ex. S to Darmstadter Decl., at 353:17-354:17.)[10]  Consequently, the Schott family

15 would maximize the tax benefit from the SC2 transaction by sorting profitable projects into

16 SCVHG and keeping loss-making projects in another entity, where the tax losses could flow

17 directly through to the Schott family members. They did just that.

18          The Schott family designed the relationship between SCS Development and SCVHG to

19 maximize SCVHG's profitability, and thereby maximize the benefit of the SC2 transaction.

20 SCVHG had capital contributions of a little over $500,000. However, it was able to acquire

21 $39,000,000 worth of real estate projects on a low-interest, principal-deferred, unsecured note to

22 SCS Development. SCVHG also performed all of the work on its projects through SCS

23 ─────────────

24          [10]This possibility does not state any real risk to the taxpayer from engaging in SC2. KPMG worked to
   ensure that only profitable companies would enter into SC2 transactions for that very reason. (*See* Tax Solution
25 Alert, Ex. 182, Strait Decl. at 166 (stating that "optimal" firm had at least $2.5 million in expected taxable income
   over two following years); Fuller Dep. 59:6-16.) Furthermore, the LAPF did not press its advantage when a
26 company in an SC2 transaction was in poor financial shape. One company, Capital Drywall, ran into financial
   difficulties after nominally donating stock to the LAPF, and it simply asked the LAPF to return its stock. The LAPF
27 agreed. (*See* Lopez Dep. 646:7-650:11.)

Development. The projects placed in SCVHG were chosen for their profitability. (*See, e.g.*, Schott Dep. 299:8-20.) When it became clear that one of the projects would not be profitable until after the expected end of the SC2 transaction, SCVHG simply transferred it back to SCS Development. (*See* Schott Dep. 453:9-18, 455:14-456:7.) Clearly, the Schott family had the ability to ensure that the only projects SCVHG held were profitable ones.

### 3. The Schott Family's Subjective Expectation that the LAPF Would Redeem Its Shares Only Arose Because the LAPF Was an Accommodation Party

SCVHG's primary argument that exercise was not substantially certain centers on its contention that "there is the more plausible scenario that the Warrants would not be exercised if the LA Pension Plan's stock is redeemed, which is in fact what actually occurred." (SCVHG Mem. Supp. MSJ 8 (ECF No. 70); *see also id.* at 9.) To be sure, the SC2 transaction contemplated that the LAPF would terminate its role as an accommodation party by redeeming its shares, which it did. But 26 C.F.R. § 1.1361-1(*l*)(4)(iii) requires the Court to consider "all the facts and circumstances," not just the intent of the parties participating in the tax shelter. Objectively, the LAPF's optimal strategy in the SC2 transaction was to hold out and refuse to redeem its shares – or at least to negotiate a price consonant with its nominal ownership of 900 shares of non-voting stock. It did neither, showing itself to be an accommodation party, not an equity owner.

While the SC2 transaction was in place, the LAPF nominally owned 900 out of 1000 shares of stock in SCVHG – a 90% ownership interest. That interest gave the LAPF the right to receive 90% of all distributions from the company and 90% of proceeds at liquidation. However, that 90% figure greatly overstates the percentage of Santa Clara's equity the LAPF actually owned. The Schott family could exercise its warrants, which were deeply in the money, at any time, thereby diluting the outstanding stock and reducing the LAPF's nominal ownership to 9%. At a minimum, then, the LAPF's nominal ownership of 900 shares of non-voting stock gave them the right to demand 9% of SCVHG's future distributions and liquidation proceeds. (Lys Dep. 889:24-890:17.)

Economically speaking, the LAPF was indifferent between whether it actually received its 9% or, instead, received an immediate lump-sum payment equivalent to the net present value of that future 9%. (*See id.*) In theory, the redemption agreement should have allowed it to obtain the lump-sum payment. But by redeeming the stock, the LAPF risked accepting an amount that was too low: the amount to which the LAPF was entitled under the agreement was to be determined by an appraiser the Schott family selected. The Schott family also had better information about SCVHG's finances and complete control over the company. The LAPF could have ensured itself 9% of future distributions simply by refusing to sell. That was its optimal strategy, and by failing to pursue it, the LAPF gave up at least $8,000,000.[11] Indeed, while the LAPF negotiated the price of their stock upward somewhat, the price they settled for was still absurdly low. It is less than 3% of the $55,000,000 in cash SCVHG had on hand even after paying all of its liabilities.

If the LAPF had pursued its optimal strategy and refused to redeem its shares, the warrants were substantially certain to be exercised. Indeed, that was the warrants' purpose all along – to provide the Schott family with insurance in case the accommodation party turned uncooperative. (Ikeda Dep. 98:14-20.) During the time that the LAPF nominally held the non-voting stock and the warrants were unexercised, the Schott family could not remove cash from SCVHG, because they would have had to give most of it to the LAPF. (*See id.* at 98:14-99:19.) If the warrants were not substantially certain to be exercised, it is only because the LAPF was an accommodation party to a transaction lacking in substance.

### B. The Schott Family and the LAPF Acted Throughout the SC2 Transaction As If the Warrants Were Certain To Be Exercised

For the reasons set out above, it is clear that the warrants were deep in the money. From an objective perspective, they were substantially certain to be exercised. And while SCVHG argues

---

[11]The LAPF's optimal strategy might have been different if it was hoping to get future SC2 transactions. (Lys Dep. 911:8-23.) After the Senate Permanent Subcommittee on Investigations castigated the shelter, though, the LAPF could reasonably expect that no future SC2 transactions were forthcoming – so its objectively rational strategy would have been to maximize the value of the S corporation stock it already held.

that the Schott family did not expect or need to exercise the warrants, the argument is undermined by the fact that the Schott family and the LAPF consistently treated the warrants as if they would be exercised.

First, the Schott family treated the warrants as certain to be exercised in valuing the non-voting stock they nominally donated to the LAPF. The appraiser of the stock, Wendy Sharon, assumed that the warrants would be exercised and valued the 900 shares of non-voting stock as if they had already been fully diluted. (*See* 2000 Mesirow Appraisal, Ex. 313, Strait Decl. at 330-32; Sharon Dep. 119:25-121:10, 265:20-267:18.) The Schott family incorporated that assumption in claiming a charitable contribution deduction for the donated stock. (*See* Claim for Refund, Ex. 922, Strait Decl. at 729.)

Similarly, at the Schott family's request, the LAPF expressly acknowledged and approved the assumption that the warrants were certain to be exercised. As a routine part of the SC2 transactions, the LAPF was required to sign an Acknowledgment of Receipt of Certificates and Disclosures. (*See* Lopez Dep. 265:19-266:17; 312:1-313:25.) The Acknowledgment for the SCVHG transaction noted the existence of the warrants and stated that "[t]he existence of these warrants has been properly accounted for in the determination of the value of the nonvoting common stock." (Acknowledgment of Receipt of Certificates and Disclosures, Ex. 274, Strait Decl. at 264-65.) That is, the Acknowledgment stated that Sharon's appraisal had treated the warrants properly – and as explained above, the appraisal treated them as certain to be exercised. The Redemption Agreement likewise stated that "any outstanding warrants of the Corporation should be accounted for in the determination of the value of the stock." (Redemption Agreement, Ex. 274, Strait Decl. at 244.) In context, considering the initial appraisal, that clause should be read to contemplate that the warrants would be treated as exercised when the stock was appraised for purposes of redemption.

Indeed, when Sharon performed her second appraisal pursuant to the Redemption Agreement, she again assumed that the warrants were certain to be exercised. (*See* 2005 Duff & Phelps

Appraisal, Ex. 340, Strait Decl. at 504-05.)  She again calculated the value of the 900 shares of non-voting stock on a fully-diluted basis.  (*Id.* at 505.)  SCVHG adopted that analysis, offering a fully-diluted share price to the LAPF for the 900 shares it nominally owned.[12]  (*See* Nicoletti Email, Ex. 40, Strait Decl. at 110.)  Nor did the LAPF argue that their share of the company should be increased in value because exercise might not occur.  To the contrary, both the Schott family and the LAPF negotiated as if the warrants were substantially certain to be exercised.  Because that stance diminished the value of the fee the Schott family had to pay to the LAPF, it directly increased their benefit from the SC2 transaction.[13]

In short, the warrants were exercised in substance because they served their function – capping the proportion of SCVHG that the LAPF could nominally claim to own.  (Lys Report 43-44.)  At least while the LAPF nominally owned the 900 shares of non-voting stock, exercise was substantially certain.  SCVHG's argument to the contrary is an attempt to have both the benefit of exercise for valuation purposes, as described above, and the benefit of non-exercise, for purposes of the S corporation regulations.  The Court should treat the warrants the same way the Schott family and SCVHG actually treated the warrants during the life of the SC2 transaction: as certain to be exercised.

## C.  A Third-Party Transferee of the Warrants Would Be Substantially Certain To Exercise

Finally, in addition to whether the Schott family was substantially certain to exercise the warrants, the Court should also consider whether a putative third-party transferee of the warrants would be substantially certain to exercise them.  The regulation provides that the test is met when

---

[12]As explained in the United States' Opposition to Kristen Bowes' Motion for Summary Judgment, the payment to the LAPF was in fact a payment to an accommodation party, not an arms'-length repurchase of the non-voting stock.

[13]Treating the warrants as certain to be exercised also decreased the value of the charitable contribution deduction the members of the Schott family claimed at the outset of the SC2 transaction, but that deduction is much less important than the fee they paid at the end of the transaction.  An increase in the claimed deduction would only benefit them at their marginal tax rate, while an increase in the fee paid to the LAPF would harm them dollar-for-dollar.

the warrants are substantially certain to be exercised "by the holder or a potential transferee." As the IRS explained in its Notice of Proposed Rulemaking:

> The determination of whether an option is substantially certain to be exercised takes into account not only the likelihood that the holder may exercise the option, but also the likelihood that a subsequent transferee may exercise the option. For example, a corporate holder may be unlikely (or unable) to exercise an option, but the option would still be substantially certain to be exercised if it could be transferred to an individual who would be substantially certain to exercise the option.

Notice of Proposed Rulemaking, One Class of Stock Requirement, 1991-2 C.B. 1092 (Aug. 13, 1991). SCVHG does not address the possibility of a potential transferee in its motion.

In fact, a third-party transferee would have a strong incentive to exercise the warrants immediately. Just as the warrants contained no restrictions on their exercise, they also contained no express protections to maintain, in the event of a stock split or other form of recapitalization, the proportion of equity in SCVHG they represented. (*See* Warrants, Ex. 274, Strait Decl. at 252-53.) Therefore, a potential transferee would exercised the warrants immediately; by converting the warrants to shares, the transferee would ensure that the value of the warrants was not lost. (*See* Lys Report 36 & n.155; *see also* Lys Dep. 695:20-699:8.) A rational purchaser of the warrants would realize this, and would only purchase the warrants if he or she believed the warrants were sufficiently in the money that the profit from exercise would offset the purchase price.[14]

As with the Schott family, a potential third-party transferee would measure whether the warrants were in the money by looking to whether SCVHG was worth more than $165,130.[15]

---

[14] The rational purchaser would also have to take into account the tax consequences of exercising the warrants, as KPMG suggested (*see supra* note 6) – but one may also presume that the transferee would have considered that effect before making the purchase.

[15] Since the warrants continue to have the same exercise price after transfer, the point at which they are at the money should be the same regardless of who holds them. Furthermore, a quick calculation shows that the point at which the warrants are at the money for the potential transferee is the same as the at-the-money point for the Schott family. A third-party transferee holding no stock in SCVHG would acquire a 90% interest in the company through exercise of the warrants (90% after exercise minus 0% before exercise). Therefore, the net cost of exercising the warrants would be 10% of their face value, or $148,617. The warrants would be at the money where 90% of SCVHG is worth $148,617. $148,617 / 0.90 = $165,130.

1  Since the putative transferee would have exercised the warrants immediately as long as they were

2  in the money, the warrants were substantially certain to be exercised as long as SCVHG's value

3  was substantially certain to exceed $165,130. Plainly, as discussed above, its value was

4  substantially certain to do so.

5  Therefore, it is irrelevant what the Schotts expected to happen with the accommodation party

6  to their SC2 transaction. As long as the warrants were likely to remain in the money, and they

7  were, they were "substantially certain to be exercised" by the Schott family or by the potential

8  transferee the regulation contemplates.

9  **IV.    CONCLUSION**

10  For the foregoing reasons, the United States respectfully requests that the Court deny

11  SCVHG's Motion for Summary Judgment (ECF No. 70).


13  Respectfully submitted this 22nd day of April, 2011.

14                          MELINDA HAAG
                           United States Attorney
15                          THOMAS NEWMAN
                           Assistant United States Attorney
16
                            /s/ Henry C. Darmstadter
17                          HENRY C. DARMSTADTER
                           JAMES E. WEAVER
18                          ADAM D. STRAIT
                           Trial Attorneys, Tax Division
19                          U.S. Department of Justice