**E-Filed 9/21/2011**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SANTA CLARA VALLEY HOUSING GROUP, INC., et al.,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>UNITED STATES OF AMERICA,<br><br>　　　　　　Defendant. | Case Number 5:08-cv-05097-JF (HRL)<br><br>ORDER[1] RE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT<br><br>[re: dkt entries 66, 70, 71 ] |

Plaintiffs Santa Clara Valley Housing Group, Inc. ("Santa Clara") and one of its shareholders, Kristen Bowes ("Bowes"), brought the instant refund action to recover taxes, penalties and interest collected by Defendant United States of America ("the government"). Each of the three parties has filed a motion for summary judgment or partial summary judgment. The Court has considered the moving and responding papers and the oral arguments presented at the hearing on July 19, 2011. The motions are addressed as follows:

**I. BACKGROUND**

For the most part, the facts giving rise to this action are undisputed. Santa Clara is a closely held corporation that was organized under the laws of the State of California in May

---

[1] This disposition is not designated for publication in the official reports.

2000. At the time of incorporation, all of the corporation's stock was held by Stephen C. Schott and his wife, Patricia A. Schott, and their three adult children, Bowes, Lisa Treadwell, and Stephen E. Schott (collectively, "the Schott family").[2] In June 2000, Santa Clara timely elected to be treated as a small business corporation, or "S" corporation, under 26 U.S.C. § 1362(a). An S corporation is not subject to income tax; "[i]nstead, each shareholder must pay tax on his pro rata share of the corporate profits." *Minton v. Commissioner of Internal Revenue*, 562 F.3d 730, 731 (5th Cir. 2009). This "pass through" tax applies whether or not the corporate profits actually are distributed to the shareholders. *United States v. Pirro*, 212 F.3d 86, 101 (2d Cir. 2000).[3]

During the late 1990s, the national accounting firm KPMG, LLP ("KPMG") developed a tax shelter product known as the S Corporation Charitable Contribution strategy ("SC2"). Pursuant to SC2, an S corporation's shareholders temporarily transfer most of the corporation's stock to a tax-exempt charitable entity via a "donation." Because an S corporation's annual income is "passed through" to its shareholders on a pro rata basis for purposes of calculating taxes, the effect of this transfer is to render most of the corporation's income tax-exempt. The "donated" shares to remain "parked" in the charity for a pre-determined period of time. During this period, the S corporation's income accumulates in the corporation; distributions are minimized or avoided. After the pre-determined period of time has elapsed, the charity sells the "donated" shares back to the original shareholders. Tax has been avoided for the period of time that the shares were "parked" in the charity, and the accumulated income of the S corporation may be distributed to the original shareholders either tax-free or at the favorable long-term capital gains rate.

The original shareholders retain control over the S corporation by donating only non-

---

[2] The shares were held in revocable trusts.

[3] "Generally the income of a corporation is taxed twice, once at the corporate level and again at the shareholder level when the money is distributed as dividends." *Minton*, 562 F.3d at 731. An S corporation avoids this double taxation by passing through tax liability on its profits to its shareholders. *Id*. However, because a shareholder may be taxed on undistributed income, unanimous consent of all shareholders is required for an S corporation election. *Pirro*, 212 F.3d at 101.

2

voting stock while retaining all shares of voting stock.  Moreover, to protect against the possibility that the donee charity might refuse to sell its majority stock back to the original shareholders after the agreed-upon length of time, warrants are issued to the original shareholders prior to the "donation."  The warrants enable the original shareholders to purchase a large number of new shares in the corporation; if exercised, the warrants would dilute the stock held by the charity to such an extent that the original shareholders would end up owning approximately ninety percent of the outstanding shares.  Thus the warrants[4] allow the original shareholders to retain their equity interest in the corporation even though the charity nominally is the majority shareholder.

Ultimately, the SC2 strategy was investigated and denounced by the United States Senate. In 2000, however, SC2 was alive and well and was marketed to the Schott family by KPMG.  In reliance upon KPMG's advice, the Schott family ensured that Santa Clara had a total of 1,000 shares of outstanding stock:  100 voting shares and 900 non-voting shares.  In June 2000, each of the Schott family shareholders was issued a warrant to purchase ten shares of non-voting stock for every share of non-voting stock he or she actually held.  Since the warrants were issued pro rata, they did not shift the percentage of ownership interests held by the shareholders.  The warrants were issued solely to protect the Schotts' equity interest in Santa Clara while they engaged in the SC2 strategy.  In July 2000, the Schotts collectively "donated" the 900 non-voting shares to the City of Los Angeles Safety Members Pension Plan ("LAPF")[5], with the understanding that LAPF would sell the shares back to the Schotts after a certain period of time. Over the next four years, Santa Clara reported more than $114 million in ordinary income, of which more than $100 million was attributed to LAPF for tax purposes because of the number of shares held by LAPF.  LAPF, a tax-exempt entity, paid no taxes on this income.  Moreover,

---

[4] The government refers to such warrants as "synthetic equity instruments" or "SEIs." For ease of reference, the court refers to them as "warrants."

[5] LAPF is a publicly controlled pension plan for the benefit of retired or injured firefighters and police officers of the City of Los Angeles, as well as for survivors of members who die in the line of duty.

Case No. 5:08-cv-05097-JF (HRL)
ORDER RE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT
(JFLC2)

during this four-year period Santa Clara distributed to LAPF only $202,500 in earnings, a figure representing approximately .02% of the income allocated to LAPF.  In December 2004, LAPF sold the 900 non-voting shares back to the original shareholders for a total of $1,645,002.  The warrants were canceled in March 2006.

In September 2006, the Internal Revenue Service ("IRS") audited Santa Clara and the individual Schott family shareholders, including Bowes.  The IRS concluded that the SC2 transaction was an abusive tax shelter, and it has advanced two separate and alternative legal theories in support of this conclusion.  Under the first theory, the IRS contends that the SC2 transaction lacked substance and should be disregarded or recharacterized for tax purposes.  Under this theory, Santa Clara would continue to be taxed as an S corporation, but the income allocated to LAPF would be reallocated to the Schott family for tax purposes.  Based upon this theory, the IRS took the position that for tax years 2000 through 2003, the "pass through" income that Santa Clara had allocated to LAPF should be reallocated to the individual shareholders, including Bowes.  The IRS issued a notice of deficiency against Bowes in an amount exceeding $4 million, comprised of tax and penalty, for tax years 2000 through 2003.

Under the second theory, the IRS contends that the warrants issued in connection with the SC2 transaction violated statutes and regulations governing S corporations, and thus automatically terminated Santa Clara's status as an S corporation.  Based upon this theory, the IRS took the position that for tax year 2000, Santa Clara was subject to income tax as a "C" corporation.  The IRS issued a notice of deficiency against Santa Clara in the amount of $608,252.40, comprised of tax and penalty, for the 2000 tax year.

Santa Clara and Bowes paid the deficiencies asserted by the IRS and through this action seek refunds plus interest as well as reasonable attorneys' fees.

The government and Santa Clara have filed cross-motions for summary adjudication as to the government's second theory, that issuance of the warrants resulted in termination of Santa Clara's status as an S corporation.  Bowes has filed a motion for summary judgment as to her refund claim, asserting that as a matter of law Santa Clara properly was characterized as an S corporation during the period in question, that the bulk of Santa Clara's income properly was

4

passed through to LAPF, and that Bowes' tax returns filed for years 2000 through 2003 were correct.

## II. LEGAL STANDARD

"Summary judgment is proper 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1117 (9th Cir. 2009) (quoting Fed. R. Civ. P. 56(c)). When determining whether an issue of material fact remains for trial, the court "must view the evidence and all inferences therefrom in the light most favorable to the non-moving party and may not weigh the evidence or make credibility determinations." *Id*. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, (1986)).

## III. DISCUSSION

**A.     Cross-Motions of Government and Santa Clara re Status as S Corporation**

"Only corporations that conform to the Internal Revenue Code's definition of a 'small business corporation' may elect to be an S-corp." *Minton*, 562 F.3d at 731-32. "The Code's definition limits small business corporations to those corporations that, among other characteristics, have only one class of stock." *Id*. at 732 (citing 26 U.S.C. § 1361(b)(1)(D)). "If an S-corp issues a second class of stock, it ceases to fit the definition of a small business corporation, and its S-corp status is automatically terminated." *Id*. (citing 26 U.S.C. § 1362(d)(2)(A).

The Department of Treasury has published regulations addressing the single class of stock requirement. *See* 26 C.F.R § 1.1361-1(*l*). This Court is bound to apply those regulations as long as they constitute a permissible construction of the relevant portions of the Internal Revenue Code. *See Texaco, Inc. v. United States*, 528 F.3d 703, 710 (9th Cir. 2008) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)). Ordinarily, "a corporation is treated as having only one class of stock if all outstanding shares of stock of the corporation confer identical rights to distribution and liquidation proceeds." 26 C.F.R § 1.1361-1(*l*)(1). It does not matter whether some of the shares are voting and others are non-voting. *Id*.

5

In general, "[i]nstruments, obligations, or arrangements are not treated as a second class of stock." 26 C.F.R § 1.1361-1(*l*)(4)(i). The regulations set forth two exceptions to this general rule that potentially are applicable in this case. As relevant here, the first exception provides that an "instrument, obligation, or arrangement issued by a corporation" is treated as a second class of stock if: (1) the instrument "constitutes equity or otherwise results in the holder being treated as the owner of stock under general principles of Federal tax law"; and (2) a "principal purpose" of issuing the instrument is "to circumvent the rights to distribution or liquidation proceeds conferred by the outstanding shares of stock." 26 C.F.R § 1.1361-1(*l*)(4)(ii). As relevant here, the second exception provides that a "call option, warrant, or similar instrument" is treated as a second class of stock if: (1) "taking into account all the facts and circumstances," the warrant "is substantially certain to be exercised"; and (2) the warrant "has a strike price substantially below the fair market value of the underlying stock on the date that the [warrant] is issued." 26 C.F.R § 1.1361-1(*l*)(4)(iii).

While the government contends that both exceptions apply to the warrants utilized in the SC2 transaction, Santa Clara argues that as a matter of statutory construction the first exception, which is set forth in subsection (*l*)(4)(ii), does not apply. Santa Clara points out that (*l*)(4)(ii) broadly addresses "instruments, obligations, or arrangements," while (*l*)(4)(iii) more narrowly addresses "call options, warrants or similar instruments." According to Santa Clara, "the specific controls the general" and thus only the narrower provision applies.

Statutory construction "begin[s] with the language of the statute." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002). "The first step is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Id*. (internal quotation marks and citation omitted). "The inquiry ceases if the statutory language is unambiguous and the statutory scheme is coherent and consistent." *Id*. (internal quotation marks and citation omitted). If there is a conflict between general statutory language and more specific language, the specific controls. *Nat'l Cable & Telecomm. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 335 (2002). If there is no conflict, the rule does not apply. *Id*. at 335-36 ("It is true that specific statutory language should control more general language when there is a conflict

between the two. Here, however, there is no conflict. The specific controls but only within its self-described scope.")

The language of subsection (*l*)(4)(ii) is not ambiguous. It applies to "any instrument, obligation, or arrangement issued by a corporation." The warrants issued by Santa Clara clearly constitute "instruments." *See Dreiling v. America Online, Inc.*, 578 F.3d 995, 999 (9th Cir. 2009) (referring to warrants as a type of instrument). The subsection's two-part test is equally clear. Moreover, subsections (*l*)(4)(ii) and (*l*)(4)(iii) are not in conflict. The two subsections set forth separate and independent tests under which an instrument issued by a corporation may be considered a second class of stock. Accordingly, the rule of construction favoring the specific over the general does not apply.

### 1. (*l*)(4)(ii)

The Court concludes that under the circumstances at issue here the warrants constitute a second class of stock pursuant to (*l*)(4)(ii). The warrants obviously were designed to permit the Schott family to retain nominal ownership of approximately 90% of the corporation even though 90% of the actual shares had been "donated" to LAPF. If LAPF refused to sell the shares back, the Schotts could exercise the warrants, thereby diluting LAPF's 900 shares such that LAPF would go from owning ninety percent to approximately ten percent of the outstanding shares. Accordingly, it fairly may be said that the warrants "constitute equity," and were intended to prevent LAPF from enjoying the rights of distribution or liquidation that ordinarily would come with ownership of the majority of a successful company's shares. There is no evidence that the warrants were issued for any purpose other than to protect the Schott family's equity in Santa Clara for the period of time that the majority shares were "parked" in LAPF. Accordingly, the Court concludes that the government is entitled to partial summary judgment that the warrants were a second class of stock under (*l*)(4)(ii).

### 2. (*l*)(4)(iii)

As noted above, a warrant is treated as a second class of stock under subsection (*l*)(4)(iii) if (1) "taking into account all the facts and circumstances," the warrant "is substantially certain to be exercised"; and (2) the warrant "has a strike price substantially below the fair market value of

the underlying stock on the date that the [warrant] is issued." 26 C.F.R § 1.1361-1(*l*)(4)(iii). With respect to the first prong of the test, there is no evidence that the warrants in question were substantially certain to be exercised. To the contrary, if all went according to plan, the warrants would *not* be exercised (and in fact, they were not). The Schott family planned to exercise the warrants *only* in the event that LAPF refused to sell back its 900 shares of the company.

The government asserts that "[i]t is no answer to suggest that the warrants were not substantially certain to be exercised because, under SC2, nobody expected them to be exercised." Mot. p. 30. However, the fact that *nobody* expected the warrants to be exercised in fact *is* the answer to whether the first prong of subsection (l)(4)(iii) is met under the facts and circumstances of this case. The answer is no. It is undisputed that the Schott family viewed the warrants as a "poison pill" to be used only as a last resort. *See* Fisk Decl. Tab B, Ikeda Dep. 98:15-20, 100:7-11). Based upon this record, no reasonable trier of fact could conclude that the warrants were substantially certain to be exercised.

The government argues that the Schott family consistently acted as though the warrants already had been exercised by using the warrants as leverage when negotiating the redemption price of the shares held by LAPF. *Id*. The government has not cited, and the Court has not discovered, any authority supporting the notion that the warrants should be deemed to have been exercised because they were used as leverage in negotiations. It is undisputed that in fact the warrants were canceled in March, 2006.

The parties devote significant argument and submit substantial evidence with respect to the second prong of the test, which is whether the warrants had a strike price substantially below the fair market value of the underlying stock on the date that they were issued. In light of its conclusion that the first prong of the test is not satisfied as a matter of law, the Court need not address the arguments and evidence submitted with respect to the second prong.

**B.    Bowes' Motion For Summary Judgment on her Refund Claim**

As the Court understands it, the bulk of the deficiencies and penalties assessed against Bowes were based upon the government's position that Bowes failed to report S corporation income in her tax returns for tax years 2000 through 2003. Because the government has

8

established that issuance of the warrants in June 2000 terminated Santa Clara's S corporation status, it appears that Bowes is entitled to refund of deficiencies and penalties relating to allegedly unreported S corporation income after June 2000. Presumably, the government will seek to recover corporate taxes on Santa Clara's income for the period after June 2000, when Santa Clara converted to a C corporation.

The only remaining issue appears to be the government's disallowance of Bowes' claimed deduction for her charitable donation of shares to LAPF. Bowes claimed a charitable deduction in the amount of $7,657 with respect to the 2000 tax year, based upon her donation to LAPF of 144 shares of Santa Clara Nonvoting Stock with a value of $181.96 per share. The government asserts that it was not a true charitable donation but instead was a sham donation in furtherance of the SC2 strategy. The Court concludes that it cannot resolve this issue based upon the record before it. Given the relatively small amount of money in question, it may be that the parties will be able to resolve their dispute with respect to the $7,657 in light of the present order addressing the larger disputed amounts.

## IV. ORDER

(1) The government's motion for partial summary judgment is GRANTED; the Court concludes as a matter of law that the warrants issued in June 2000 constituted a second class of stock, and that as a result the company's status as an S-corporation was terminated at that time;

(2) Santa Clara's motion for partial summary judgment is DENIED; and

(3) Bowes' motion for summary judgment is GRANTED IN PART AND DENIED IN PART; because the government has established that issuance of the warrants in June 2000 terminated the company's S corporation status, Bowes is entitled to refund of deficiencies and penalties relating to allegedly unreported S corporation income after June 2000. A triable issue of fact remains as to Bowes's charitable deduction of $7,657 for the 2000 tax year.

Dated: 9/21/2011

JEREMY FOGEL
United States District Judge

Case No. 5:08-cv-05097-JF (HRL)
ORDER RE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT
(JFLC2)