# EXHIBIT BB

# Company-Specific Risk Premiums: Update on the Scholarly Evidence

R. Brian Calvert*
Development Specialists, Inc
(bcalvert@dsi.biz)

David C. Smith*
University of Virginia McIntire School of Commerce and
Berkeley Research Group, LLC
(dcs8f@virgina.edu)

Draft: March 20, 2011

*The views expressed in this paper are the authors' and do not reflect the views of either Development Specialists, Inc. or Berkeley Research Group, LLC.

Electronic copy available at: http://ssrn.com/abstract=1791213

**Abstract**

We provide a comprehensive and up-to-date synthesis of empirical studies examining company-specific risk premiums (CSRPs). We cover a number of new papers that have revived an academic debate as to whether or not company-specific risk is priced into the cost of capital. We show that the current evidence supports the original Fama and MacBeth (1973) finding that company-specific risk does not explain variation in cross-sectional stock returns and that holders of risky securities do not appear to receive compensation for bearing company-specific risk. Thus, the most recent empirical evidence does not support the assertions of some practitioners that the CSRP should be included in the cost of capital.



Electronic copy available at: http://ssrn.com/abstract=1791213

This paper evaluates the scholarly evidence on the efficacy of including a company-specific risk premium (CSRP) in estimates of the cost of capital. CSRPs are enormously popular among valuation practitioners and are a common component in cost-of-capital models used by many investment bankers, appraisers, business valuation specialists, and accountants. Yet, the motivation for the use of CSRPs is often grounded in misguided interpretations of financial theory and evidence.

We provide a comprehensive and up-to-date synthesis of empirical studies examining CSRPs. In so doing, we cover a number of new papers that have revived an academic debate as to whether or not company-specific risk is priced into the cost of capital. We show that the current evidence supports the original Fama and MacBeth (1973) finding that company-specific risk does not explain variation in cross-sectional stock returns and that holders of risky securities do not appear to receive compensation for bearing company-specific risk. Thus, the most recent findings do not support the assertions of some practitioners that the CSRP should be included in the cost of capital.

Our review should be helpful to a variety of finance professionals. But our paper is especially useful to practitioners contemplating the use of company-specific risk in valuation reports that come under court or other legal scrutiny, such as in fairness opinions, litigated valuation disputes, lawsuits asserting economic damages, or bankruptcy valuations. Courts often oversee or render decisions involving a discounted cash flow valuation, and these decisions are based on expert testimony provided by valuation specialists. Court precedent has established standards for the qualifications of these experts, in particular on the *relevance* and *reliability* of the testimony.[1] The preponderance of the scientific evidence suggests that the use of a company-specific risk premium cannot be admissible as expert testimony because the use is not reliable. In particular, current practitioner techniques that incorporate a company-specific risk premium into cost-of-capital applications fail *all* four judicial checks for reliability of testimony.[2] Thus,

[1]Much of the court precedence extends from the decisions in two cases: Daubert v. Merrell Dow Pharamaceuticals, Inc. (commonly referred to as the "Daubert" standards) and Kumho Tire Company, LTD v. Carmichael.
[2]The four court standards for reliability are: (1) whether a theory or technique can be, and has been, tested; (2) whether the theory or technique has been subject to peer review and publication; (3) a techniques known or potential

our paper serves as a warning to valuation experts about the dangers associated with including a CSRP in their cost-of-capital models.

**Theory and Background**

In the context of company valuations, the cost of capital represents the return that investors can expect to make on their investment in a company. Because risk-averse investors will demand extra return for holding riskier assets, a primary component of the cost of capital is compensation for investing in companies in which future profits are uncertain. A central question in finance and economics is: What risks are *compensable* -- in the sense of receiving a return for bearing that risk -- in the cost of capital?

The traditional answer to this question is that for markets in which investors can easily hold multiple assets, investors are compensated for only *systematic* risks, i.e., those risks that cannot be diversified away by holding multiple assets. In such markets, company-specific risk is not compensable and CSRPs should not be included as a component in a cost-of-capital model. Today, investors can select and buy at low cost a wide variety of assets through mutual funds, index funds, defined contribution pension plans, insurance companies, and can invest directly into a variety of equities through low-cost discount brokers. Investors have access to alternative assets markets beyond public equity markets via hedge funds, real estate funds, private equity funds, and a host of other investment vehicles. Thus, at first glance, the traditional view that only systematic risks should be compensable should hold for most assets in most markets most of the time.

Economic theories teach us that in order for company-specific risk to be compensable in a world in which risky assets can be held for low cost in diversified portfolios, one of two scenarios must be true : (1) an investor must *choose* (or be forced) to hold an undiversified portfolio, in which case the valuation of the risky asset is different for that investor than other investors that hold diversified portfolios, or (2) a

---

rate of error and the existence and maintenance of standard controlling the techniques operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

market-wide friction must exist that prevents investors from holding, as a group, the same set of risky securities in their portfolio.

Scenario (1) has been studied by a variety of financial researchers, typically for situations in which an entrepreneur chooses to put most of her wealth and human capital into her business, or when a executive of a company is required to hold most of his wealth (compensation in the form of stock options, shares and pension holdings) and salary in one company.[3] These studies show that the company-specific component of a private cost-of-capital -- the cost internalized by the entrepreneur -- can be large for an entrepreneur eschewing a diversified portfolio in favor of being undiversified. The private cost is large because the entrepreneur requires a large premium for giving up diversified holdings in favor of holding a single risky asset.

But Scenario (1) has limited applicability to evaluating the cost of capital for purposes of a market valuation. Simply observing that an owner of a company is undiversified does not imply that one should value her company using a company-specific risk component in the cost of capital. By definition, a market value is the price paid in exchange for an asset between a willing buyer and willing seller. An undiversified seller, say the entrepreneur from above, will not want to sell her assets at a price that reflects company-specific risk. This is because a diversified bidder can always offer a higher price to the entrepreneur. The diversified bidder can offer the higher price because he requires less return for bearing the risk of the entrepreneur's company than an undiversified bidder. Thus, competition, or potential competition, from a diversified bidder will force the market compensation for company-specific risk to be zero.[4]

---

[3] For instance, see Brennan and Torous (1999), Hamilton (2000), Benartzi (2001), Meulbrook (2001), Heaton and Lucas (2001), Hall and Murphy (2002), Jones and Rhodes-Kropf (2003), Kerins, Smith, and Smith (2004), and McConaughy and Covrig (2007, 2009). An investor exposed to scenario (1) risk will price that risk according to a "total beta" model, as discussed in Damodaran (2006) and below in the "Inferences from Practitioner Models" section.

[4] In their popular corporate finance textbook Berk and Demarzo (2007) characterize the reason why Scenario (1) is not a viable explanation for a CSRP as follows:

In the next section, we review several papers that examine empirically the returns to entrepreneurs and investors in private, undiversified assets. Consistent with the competitive forces discussed above, these papers demonstrate that private and small investments earn no extra return for company-specific risk.

Scenario (2) challenges the traditional assumption that investors, in aggregate, can form well-diversified portfolios by assuming that certain groups of investors are constrained in the types of risky assets they can hold. Possible constraints include transactions costs, trading restrictions, incomplete information, behavioral biases towards undiversified portfolios, and the inability to diversify labor market income. Merton (1987) studies a model in which investors are constrained to gather information and invest in only a subset of all available securities. Theoretical models similar to Merton (1987) have also been explored by Levy (1978) and Malkiel and Xu (2004). In these models, assumed constraints on trading prevent any one investor from holding an optimally diversified portfolio. When such constraints are economically significant, they create an *equilibrium* pricing impact on all securities: When one group of investors is constrained to holding a subset of all diversifiable assets, other investors must necessarily hold in larger supply the assets excluded from the constrained group. Since assets cannot be optimally diversified, company-specific risk matters.

As a market equilibrium concept, scenario (2) implies that company-specific risk will be important to the pricing of *all* companies in a market (large and small, public and private), and that higher company-specific risk implies a higher cost of capital. The most important takeaway from scenario (2) is that its implications are empirically testable: If we live in a world where frictions meaningfully constrain investment in diversified portfolios, then financial statisticians should be able to observe a positive relation between company-specific risk and measures of the cost of capital.

---

If the diversifiable risk of stocks were compensated with an additional risk premium, then investors could buy the stocks, earn the additional premium, and simultaneously diversify and eliminate the risk. By doing so, investors could earn an additional premium without taking on additional risk. This opportunity to earn something for nothing would quickly be exploited and eliminated. (p. 305).

**Empirical Evidence on the Company Specific Risk Premium**

In this section of the paper, we examine the evidence on whether company-specific risk is compensable and should be included in the cost of capital. A resurgent interest in the topic has lead to a wave of new papers that use large samples of stock return data and sophisticated statistical techniques to attempt to answer this question. Our conclusion at the end of this section is that the recent evidence weighs heavily against including a CSRP in the cost of capital.

The intuition behind the tests for a CSRP is straightforward. Researchers use historical data to examine whether firms with more company-specific risk earn higher returns than firms with less company-specific risk, holding all else constant. From a practitioner's standpoint, this is the test of whether company-specific risk is compensable and therefore should be included in a cost-of-capital calculation. If company-specific risk is found to be compensable, these tests also provide direct estimates of the magnitude company-specific risk premium.

The tests usually take the form of a regression in which a measure of a firm's average return is the dependent variable and a measure of the firm's company specific-risk, often referred to as *unsystematic, idiosyncratic,* or *residual* risk in scholarly studies, is one of several independent variables; the other independent variables in the regression are important control variables. For instance, as discussed in the next paragraph, a primary control variable is a measure of systematic risk (e.g., beta from the capital asset pricing model). The regression coefficient on the company-specific risk variable measures the marginal impact of company-specific risk on average return, holding the control variables in the equation constant. The coefficient is the measure of the company-specific risk premium. A positive coefficient estimate that is statistically different from zero suggests that company-specific risk is compensable, while a statistically insignificant estimate indicates that company-specific risk is not compensable.

The "holding all else constant" caveat is important because, by definition, company-specific risk is that part of a company's total risk that remains after controlling for all systematic risk. Thus, a good test of whether company-specific risk is compensable must first control properly for the influence of systematic risk by either including systematic risk as a control variable or by netting out the influence of systematic risk before conducting the tests.

*Early empirical studies*

Tests of whether company-specific risk is compensable date back at least to Douglas (1969), who studied the influence of company specific risk within the context of the -- then new – capital asset pricing model (CAPM) developed by Sharpe (1964) and Lintner (1965). Using annual and quarterly stock return data, Douglas (1969) finds that the residual risk remaining after controlling for CAPM-beta risk has a positive effect on average company stock returns. However, Miller and Scholes (1972) point out that the Douglas analysis suffers from potential measurement errors created by his statistical techniques and rather limited data set. These errors could induce a spurious relation between the measure of company-specific risk and average returns. In their classic empirical analysis of the CAPM, Fama and Macbeth (1973) correct the statistical deficiencies of the Douglas (1969) study and use a larger sample of monthly stock return observations to estimate the importance of company-specific risk. They find the company-specific risk premium to be indistinguishable from zero.

For nearly 30 years, the findings in Fama and MacBeth (1973) lay to rest the question of whether company-specific risk is compensable.[5] Interest reemerged in the early 2000s following a study by Campbell, Lettau, Malkiel, and Xu (2001) that showed that the average total risk of publicly listed companies – measured by the average standard deviation of the returns of companies tracked by the

[5] Two exceptions are Longstaff (1989) and Lehmann (1990). Longstaff (1989) studies the cross-sectional relation between returns and total variance by first sorting stocks into portfolios based on market capitalization. He finds no significant relation between returns and company-specific risk. Lehmann (1990) corrects for measurement error in market model parameter estimates and examines estimates using individual, rather than grouped securities. Lehmann (1990) finds a positive association between residual risk and return in some of cases, but finds his results to be sensitive to the benchmark and methodology selected for the test.

Center for Research in Security Prices (CRSP) – more than doubled during the period 1962 to 199. Campbell, et al. (2001) find that most of the increase in average total risk was due to increased company-specific risk, rather than systematic risk, and that the increased risk requires holding larger portfolios of stocks to diversify away the company-specific risk component. They speculate that the increased risk was due to trends that favored the stock market listing of more focused firms as opposed to conglomerates, to initial public offerings that brought companies to the stock market earlier in their life cycle, and to changes in executive compensation that favors more risk-taking.

Figure 1 illustrates the increase in average company-specific risk from the 1960s through the 1990s found by Campbell, et al. (2001). The graph is reproduced from a newer study by Brandt, Brav, Graham, and Kumar (2010) that tracks company-specific risk patterns of publicly listed companies through the end of the 2000s. The figure shows that average-company specific risk peaked right about the time of the publication of Campbell et al. (2001) and then declined through the 2000s to levels below the early 1960s.[6] Brandt, et al. (2010) attribute the increase company-specific risk during the 1990s to a transitory trend .

While the findings of Campbell, et al. (2001) did not imply anything about the compensability of company-specific risk, they did provide researchers in the early 200s with an impetus to re-examine the original Fama and Macbeth (1973) results. Namely, higher average company-specific risk could make it easier to detect a relation between risk and returns missed by the earlier scholarly papers. In addition, by the early 2000s, researchers had at their disposal far more stock return data, as well as new statistical techniques, that were unavailable at the time of the writing of Fama and Macbeth (1973).

Below, we review the set of new empirical studies examining the compensability of company-specific risk. Table 1 provides summary information on the studies, including their publication outlet, primary finding, and comments and critiques about the study.

[6] Bekaert, Hodrick, and Zhang (2010) report findings similar to Brandt, et al. (2010).

*Recent empirical studies: Public firms*

With an eye-catching title of "Idiosyncratic Risk Matters!," Goyal and Santa Clara (2003) provide one of the first post-Campbell et al. (2001) investigations of the relation between company-specific risk and return. Rather than look at the relation between risk and return across companies, Goyal and Santa Clara (2003) focus on how aggregate stock market returns vary with aggregate measures of risk through time. To conduct their investigation, Goyal and Santa Clara (2003) define two types of risk: (1) the standard deviation of aggregate stock market returns, and (2) the average standard deviation of return across the individual CRSP stocks. Risk type (1) is a measure of market volatility and, by definition, only contains systematic risk. Risk type (2) is the Campbell et al. (2001) measure of average total risk that, as mentioned above, reflects the company-specific risk of the average firm in the market. Using a regression analysis of aggregate monthly stock market returns on lagged monthly measures of market volatility (risk type (1)) and average total risk (risk type (2)), Goyal and Santa Clara (2003) find market volatility explains very little of the movements in the aggregate stock market through time, whereas average total risk enters with a strong positive relationship. In other words, aggregate stock market returns are higher when average company-specific risk is higher, but not when average systematic risk is higher. It is in this sense that Goyal and Santa Clara (2003) argue that idiosyncratic (company-specific) risk is compensable.

However, the Goyal and Santa Clara (2003) study suffers from two severe drawbacks. These drawbacks are detailed in a follow-up paper by Bali, Cakici, Yan, and Zhang (2005). First, Goyal and Santa Clara (2003) mix "apples and oranges" by weighing companies differently when they compute average market returns versus average total risk. Aggregate stock market returns and market volatility are computed using the *market capitalization*-weighted average of all returns on CRSP. Market capitalization weights (also called "value weights") put a higher weight on the returns of firms with large market capitalizations and lower weights on lower market-cap stocks. At the same time, Goyal and Santa Clara (2003) compute their measure of company-specific risk – risk type (2) – using an *equally* weighted

average of individual company risks, which as the term suggests, gives equal weight to each company in the average. The equally weighted scheme weights small-cap stocks more heavily and large stocks more lightly than the value-weighted index. Comparing the two averages will lead to potentially misleading inferences because the influence of small stocks and large stocks are treated differently when calculating returns and systematic risks on the one hand, and company-specific risks on the other. Bali, et al. (2005) correct this issue of comparing differently weighted samples. They show that when an apples-to-apples comparison is made between value-weighted aggregate stock market returns and similarly value-weighted measures of average risk, the Goyal and Santa-Clara (2003) result disappears.

Second, the Goyal and Santa Clara (2003) results appear to be highly sensitive to the choice of sample period used in their study. The study includes data from 1963 through the late 1990s, but excludes data from the early 2000s that includes the stock market crash during that period. Bali, et al. (2005) find that once you add monthly observations through the year 2001, the Goyal and Santa Clara (2003) findings no longer hold, even under their original apples-to-oranges weighting scheme.

Given the criticisms and corrections provided by Bali, et al. (2005), the conclusion to be drawn about Goyal and Santa Clara (2003) is that it provides no reliable evidence that company-specific risk is priced into the cost of capital.

Another paper to report finding a positive relation between return and company-specific risk is in the unpublished working paper by Malkiel and Xu (2004). Unlike Goyal and Santa Clara (2003), Malkiel and Xu (2004) do examine how company-specific risk is related to returns *across* companies, or more accurately across portfolios of companies. They do so first by updating the results of Fama and MacBeth (1973) with data through 2000, and second by examining company-level relationships between risk and return. The second methodology adapts the techniques from a study by Fama and French (1992). To reduce measurement error without removing variation in measures of systematic risk, Fama and French (1992) estimate systematic risk using portfolios of stocks sorted by company beta and size. Malkiel and

Xu (2003) take the Fama and French (1992) methodology one step further by also drawing an estimate of company-specific risk from the portfolios. Malkiel and Xu (2004) find that the Fama and Macbeth (1973) update through 2000 produces only weak evidence that company-specific risk is compensable. In particular, once they control for the size of the company, the estimate of the company-specific risk premium is often no different from zero based at conventional levels of statistical significance. Under their second method that mimics the Fama and French (1992) practice of sorting firms into beta and size portfolios, Malkiel and Xu (2004) find that the company-specific risk premium is positive and strongly significant.

But the Malkiel and Xu (2004) second methodology suffers from two problems. First, like Goyal and Santa Clara (2003), there is an "apple and oranges" problem. Malkiel and Xu (2004) run their second-round regressions using company-level returns, which increases the size of their sample and delivers more powerful statistical tests. But the measure of company-specific risk is formed at the beta and size portfolio level and repeatedly used for companies grouped in the same portfolio. Thus, Malkiel and Xu (2004) are not actually comparing company-level returns to their own company-specific risk, they are comparing company-level returns to a portfolio-aggregated measure of company-specific risk. This makes the Malkiel and Xu (2004) results difficult to interpret. Second, by using company-specific risk measures formed by groups sorted based on beta and size, Malkiel and Xu (2004) could simply be measuring a systematic effect related to beta and size. In a statistical sense, they do not let company-specific risk "speak" to its own separate explanatory ability; rather they have constructed it to be related to beta and size.

A paper that takes a different approach to estimating the company-specific risk premium and gets very different results is Ang, Hodrick, Xing, and Zhang (2006). Like Malkiel and Xu (2004), Ang et al. (2006) study the cross-sectional relation between company returns and company-specific risk by grouping firms into portfolios. But, in contrast to Malkiel and Xu (2004), Ang et al. construct their portfolios by sorting and grouping stocks based on company-specific risk rather than beta and size and then compare

average returns in a portfolio to average measures of company-specific risk. This takes care of the two problems in Malkiel and Xu (2004). First, apples are compared to apples in the sense that portfolio returns are compared to portfolio risks. Second, and more importantly, portfolios are constructed to tease out the effect of company-specific risk separately from measures of systematic risk like beta and size.

The findings in Ang, et al. (2006) are surprising. They find that the average returns on portfolios with high company-specific risk have the *lowest* returns, suggesting that company specific risk premiums are negative. The results are strong and statistically significant. For instance, the difference in returns between the highest and lowest company-specific risk portfolios is -1.01% per month. This implies that in a trading strategy that buys the high company-specific risk portfolio (expecting high returns) and shorts the low company-specific risk portfolio (expecting low returns) will *lose* more than 12% of its value each year. Of course, the opposite strategy of buying the low company-specific risk portfolio and shorting the high company-specific risk portfolio would earn more than 12% per year.

Further, in a more recent paper, Ang, et al. (2009) show that their results are not an artifact of U.S. markets alone. They find that the negative relation between returns and company-specific risk extends to 23 markets around the world and that these returns are correlated across markets. Importantly, Ang et al. (2009) argue that the strong correlation observed across markets indicates that their measure of company-specific risk probably picks up an unmeasured systematic risk with a negative risk weighting.[7] In other words, the negative relation observed between company-specific risk and returns is not a negative company-specific risk premium *per se* but evidence that current cost-of-capital models fail to capture all relevant systematic risks. One interpretation both Ang, et al. (2006) and Ang, et al. (2009) do adhere to is the idea that their results fly in the face of papers reporting evidence of a positive company specific risk premium.

---

[7] Recall that any calculation of company-specific risk depends on the model of systematic risk – company-specific risk is the residual not explained by the model of systematic risk. Ang et al. (2009) examine the residuals from both a traditional CAPM model and from a more sophisticated Fama-French (1993) "three-factor" model. They conjecture that both models exclude a latent systematic risk variable that shows up as a negative company-specific risk premium.

The Ang, et al. (2006, 2009) papers are not without weaknesses. First, they calculate monthly measures of volatility by taking averages of daily volatilities. While this methodology can sharpen the estimates of monthly volatility (because the researcher is using more data), it can also lead to biased estimates of monthly volatility if daily price swings are affected by market frictions such as infrequently traded stocks. Second, they do not actually measure the relation between returns and contemporaneous measures of company-specific risk. Instead, they examine the relation across companies in returns in one month against company-specific risk measured in the previous month. They do this in order to mimic a trading strategy, which requires them to form portfolios based on a measure of company-specific risk at the beginning of each month, and then observe how the portfolios perform over the next month. Ang, et al. (2006, 2009) find that returns over the next month are lower for the portfolios with the higher company-specific risk. While this is arguably a compelling method for demonstrating their result, to link the method to theory, one must assumes that a current month's measure of company-specific risk is a good predictor of next month's level of company-specific risk. Finally, as highlighted in Ang, et al. (2006), much of their findings are driven by a relatively small set of firms in the high company-specific risk portfolios.

In an extensive follow up to Malkiel and Xu (2004) and the Ang, et al. (2006) U.S. study, Bali and Cakici (2008) study whether company-specific risk is compensable under a variety of different scenarios related to choice of data, weighting of the data, and the periods over which the data are calculated. Specifically, Bali and Cakici (2008) first examine the sensitivity of the Ang, et al. (2006) results to different breakpoints for forming the company-specific risk portfolios. They find that changing breakpoints in ways that makes the number or size of firms more balanced across the comparison portfolios reduces the difference in returns to zero. Likewise, equal weighting the portfolios also wipes out the Ang, et al (2006) result. Finally, Bali and Cakici (2008) show that using monthly rather than daily data to calculate volatilities also drives the Ang, et al. (2006) negative risk premium to zero. Using a variety of specification tests, Bali and Cakici (2008) argue that volatilities calculated using monthly data

are a better predictor of volatility patterns than those based on daily data and should be therefore the favored period over which to estimate risk.

To get a sense for the relation between company-specific risk and stock returns, Table 2 presents some results from Bali and Cakici (2008). The table reproduces average monthly portfolio returns reported in Tables 1 through 4 of Bali and Cakici (2008), where the portfolios are formed by first sorting stocks by the level of their company-specific risk, from lowest to highest (company-specific risk is measured relative to the Fama and French (1993) three-factor model) and then placing the stocks into one of five portfolios. The portfolios are formed in one month and then value-weighted returns on those portfolios are computed over the next month. This process is repeated for all months from July 1963 to December 2004. In each month, Portfolio 1 contains the 20% of the stocks with the lowest company-specific risk in a given month and Portfolio 5 contains the 20% of stocks with the highest company-specific risk. The difference in average monthly returns between Portfolio 5 and Portfolio 1 yields an estimate of the CSRP, i.e., how much extra return is earned for bearing high company-specific risk compared to low company-specific risk.

The different estimates across the columns in Table 2 differ by how company-specific risk is calculated and what sample of stocks is used. The first column reports results portfolio return estimates using a daily measure of company-specific risk, averaged over one month, and the sample of all stocks listed on the NYSE, AMEX, and NASDAQ exchanges. The second column uses a similar company-specific risk calculation, but includes only those stocks listed on the NYSE, which tend to be larger and more liquid than stocks listed on the AMEX or NASDAQ. The third and fourth columns repeat the samples of the first two columns, but uses a measure of risk computed using the start and end of the month as endpoints.

The difference in returns between the high company-specific risk and low company-specific portfolios represents an estimate of the CSRP. Table 2 shows that the differences between returns on

Portfolios 5 and 1 are small and statistically insignificant (i.e., t-statistics reported in parentheses are all well below 2.0). That is, return differences between portfolios with high-company specific risk and low company-specific risk are very small.

The Table 2 results summarize only a small subset of the results reported by Bali and Cakici (2008). Their robust finding across all specifications is that the relation between company returns and company-specific risk is statistically and economically indistinguishable from zero. These conclusions have important implications for the empirical CSRP literature because they show that across many cuts of the data, different measures of company-specific risk, and different methods for measuring the CSRP, the CSRP is essentially zero.

The Bali and Cakici (2008) study has not precluded further endeavors to document a relation between company-specific risk and returns. For instance, Fu (2009) reexamines the Ang, et al. (2006) results using a forward-looking "EGARCH" predictor of company-specific risk and finds a strong positive cross-sectional relation between the forward-looking measure of company-specific risk and returns. But Guo, Kassa, and Ferguson (2010) and Fink, Fink, and He (2010) show that the Fu (2009) results are driven by a "look ahead" bias that arises because Fu (2009) uses data on future realized volatilities to build his current forecasts of volatility. In other words, Fu (2009) uses information from the future in his forecasts that would be unavailable to an actual investor at the time the forecast was produced. Both Guo, Kassa, and Ferguson (2010) and Fink, Fink, and He (2010) show that once Fu's predictive model is corrected for the look-ahead bias, no relation exists between the forward-looking measure of idiosyncratic risk and returns.

Similarly, Cao and Xu (2010) decompose company-specific risk into two components: a "short run" component that can move up and down a lot over short periods of time, and a "long-run" component that is relatively constant over time and show that companies with a higher long-run component of company-specific risk earn higher returns, independent of the relation between measures of short-run risk

and returns, which could be negatively related to returns. But the Cao and Xu (2010) study also suffers from a problematic look-ahead bias: the decomposition analysis assumes that investors have access to future realized volatilities that would not be available to investors in an actual trading or valuation setting. Absent this decomposition, Cao and Xu (2010) find that company-specific risk and returns are unrelated, implying once again that company-specific risk receives no compensation in the form of higher returns.

*Recent empirical studies: Private firms*

The studies discussed thus far rely exclusively on data from publicly traded companies. The preponderance of the evidence from these studies suggests that company-specific risk is not a reliably compensable component of the cost of capital. From a theoretical standpoint, these studies provide no support for the Scenario (2) described in the previous section.

However, drawing inferences based on publicly traded companies could be misleading if company-specific risk matters more to privately held companies, as asserted by the Scenario (1) described in the section above. If the set of investors holding privately held companies tend to be undiversified *and* the market for acquiring and selling privately held companies is shielded from competitive bids by diversified investors, then company-specific risk could matter more among privately traded companies.

There are two problems with studying the risk and returns to holding private firms. First, because these firms are not publically traded, it is difficult to observe the returns to these firms through time because the securities prices are observed relatively infrequently – because they are not traded often – and because the prices, when traded, are not reported in public sources. Second, even when returns to holding private firms are reported publically, they are done so on a voluntary basis. Because poor performance is less likely to be disclosed voluntarily than good performance, reported private returns suffer from a *selection problem* in that returns observable to a researcher will be biased upwards relative to the true (unobservable) returns.

While access is obviously more of challenge, a number of new studies use data on private firm returns and try to overcome the data problems to study issues related to the risk and return of private companies. These studies suggest that investors holding claims against privately held companies do not earn compensation for bearing company-specific risk.

Moscowitz and Vissing-Jørgensen (2002) combine comprehensive data on private equity holdings from the U.S. *Survey of Consumer Finances*, *National Income and Product Accounts*, and *Flow of Fund Accounts* to study the returns to entrepreneurs investing in private businesses. They show that while these investors hold highly undiversified portfolios and expose themselves to significant company-specific risk, they earn a return on private equity that is no higher than the market return of public traded stocks.

Meanwhile, Jones and Rhodes-Kropf (2003), Kaplan and Schoar (2005), and Cochrane (2005) study the returns to private equity investors using the reported performance of venture capital and leveraged buyout firms. Jones and Rhodes-Kropes (2003) and Kaplan and Schoar (2005) show that net-of-fee returns to limited partners in these private equity funds are comparable to market returns to publicly traded investors. Gross-of-fee returns to general partners of venture capital firms tend to exceed returns on publicly traded firms, but Kaplan and Schoar (2005) argue that this probably reflects either superior investment selection or higher systematic risk rather than compensation for idiosyncratic risk. Cochrane (2005) applies the statistical analysis of truncated distributions to venture capital returns, which suffer from a substantial self-reporting bias because disclosures of performance by venture capital firms are completely voluntary. Cochrane (2005) finds that once venture capital returns are corrected for self-reporting biases, their return performance is no higher than small publicly traded companies.

Korteweg and Sorensen (2010) take the analysis of returns to holding private companies a step further by using enhanced adjustments for systematic risk and to account dynamically for selection biases associated with the reporting of private returns. Korteweg and Sorensen (2010) show that investments in

private firms exhibit higher systematic risk and lower abnormal performance than documented by Jones and Rhodes-Kropf (2003), Kaplan and Schoar (2005), and Cochrane (2005). For instance, Korteweg and Sorensen (2010) show that VC investments tend to have betas in the range of 2.0 to 4.0, which implies that the systematic risk of private portfolios is substantially higher than the average market risk. In turn, their results strengthen the idea that compensation earned by investors in private firms reflects no company-specific risk.

*Empirical studies: Summing up*

To conclude, the weight of the empirical evidence – dating back to the time of Fama and Macbeth (1973) and continuing through to the most recent working papers – suggests that company-specific risk is not compensable in the sense that investors bearing this risk receive higher returns for doing so. The science, therefore, implies that company-specific risk premiums should not be included in models of the cost of capital.

**Inferences from Existing Practitioner Models**

Despite the preponderance of scientific evidence against CSRPs, a variety of valuation practitioners and commercial vendors advocate the use of CSRPs in company valuations.[8] Practitioners likely enjoy the freedom of adding an ad-hoc premium to discount rates, which allows them, for example, to discount cash flow forecasts that "look too big." But the cost of capital measures a specific, market determined opportunity cost; it is not amenable to ad-hoc adjustments based on subjective assessments of what looks right.

In this section, we summarize and critique two of the most popular methodologies used by practitioners to justify asserting that company-specific risk is compensable, so-called "factor" methods for

[8] For instance, see Reilly (2008), who remarks that "Company-specific risk should be considered in every bankruptcy valuation-related analysis of any investment that is: 1. not perfectly liquid, 2. not perfectly diversified, 3. not subject to limited liability." (p.48)

quantifying company-specific risk and the Butler-Pinkerton model. Both of these methodologies claim to be quantitative methods for reliably estimating a CSRP. We discuss why such claims are misguided.

Factor methods, such as the models developed by Schilt (1982), Black and Green (see, e.g., Linton, 2004, page 312), and Miller (2003) attempt to map qualitative measures of company-specific risk into scores that can then be added together to determine a company-specific risk premium. For instance, the Black and Green method breaks factors into four categories related to the operating risk of the company, including competition, financial strength, management ability and depth, and stability of earnings. Within each of the categories, Black and Green provide a variety of attributes than can then be scored, weighted, and then converted to a premium that can then be added to a traditional measure of the cost of capital.

Problems with factor methods for determining a CSRP are probably obvious. The system is completely ad-hoc and relies on the judgment of the user in supplying inputs for each factor to come up with a measure of the premium. None of these factor methods have been established via any sort of formal tests of their efficacy. Their popularity is based more on practitioner folklore than anything else. Often, the factors appear to be more relevant to scoring expected cash flow levels, with higher premiums being assigned to companies with poorer cash-generating ability, than to risks that a given company will do better or worse. Thus, these models might be useful for adjusting cash flow forecasts, but have no place as models of the cost of capital.

The Butler-Pinkerton model is based on the concept of incorporating "total beta" into models of the cost of capital. Total beta is defined as the ratio of the standard deviation of a company's stock return to the standard deviation of the market return.[9] The Butler-Pinkerton model relates expected return to total beta using the equation of the capital market line. As any student of finance should recognize, this relation has no economic content. Unlike the CAPM, which is derived from an equilibrium theory of how

[9] Total beta for company i is defined as $\sigma_i / \sigma_m$, where $\sigma_i$ is the standard deviation of stock i (and is a measure of the company's total risk) and $\sigma_i$ is the standard deviation of the market return. Note that total beta is related to the standard CAPM beta as $\beta_i = \rho_{im}\, \sigma_i/\sigma_m = \rho_{im} \times$ total beta$_i$, where $\rho_{im}$ is the correlation coefficient between company i and the market. Note for $\rho_{im} < 1$, total beta will always be larger than CAPM beta.

capital markets clear, the capital market line is merely a statistical relationship between expected returns and standard deviations when an investor can hold a risk-free asset and a risky asset together. The only way to support the use of a total beta in a cost-of-capital model is to assume an economy in which no investor holds more than one risky asset at a time, i.e., no investor is allowed to diversify by holding more than one asset at a time.

While the theoretical motivation for the Butler-Pinkerton model is misguided, its biggest problem is that it has no empirical content. In their writings, Butler and Pinkerton (2006, 2007a,b) confound the existence of company specific risk – a fact that nobody disputes – with the presence of a company-specific risk premium, which actual empirical tests have found to be indistinguishable from zero. For instance, Butler and Pinkerton (2006) write:

> Even though, according to traditional financial theory, public markets do not price company specific risk, it does not mean that it does not exist or is not quantifiable for public comparables. In all instances, the company specific risk premium for publicly traded companies is greater than 0%. . .(p.1)

When Butler and Pinkerton (2006) refer to estimating a company specific risk premium in "all instances" greater than zero, they are actually referring to measuring company-specific risk, which will assuredly be greater than zero for individual stocks. In none of their works do they actually attempt to measure the reward for bearing company specific risk – i.e., whether the cost of capital includes compensation for company-specific risk – and hence can say nothing about whether the company-specific risk premium is greater than zero. As we review in the previous section, empirical studies have consistently shown that this premium is zero; there in no measurable compensation for bearing company specific risk.

The confusion in Butler and Pinkerton is unfortunate because many practitioners have interpreted the Butler-Pinkerton results as legitimate and empirically documented motivation for using a company specific premium. Of course, none of their papers presents such evidence. Instead, Butler and Pinkerton simply back out estimates of total beta from estimates of the standard CAPM beta and the measured correlation between a stock's return and the market, and gross up standard market risk premiums by the

total beta rather than CAPM beta.[10] Thus, Butler and Pinkerton's CSRP estimates are determined by assumption and contain no empirical content relevant to whether company specific risk is actually compensable.[11]

**Conclusion**

Valuation, in practice, is a frustrating endeavor. It relies on forecasts of future outcomes that are far from known at the time they are made and on inputs that are often unobservable, even after the fact. Discerning the cost of capital for a company or project is particularly elusive. Financial scholars have a good sense for what types of risks – systematic risks -- should be compensable in the cost of capital, but are often unsuccessful in capturing all important systematic risks into one coherent model. This leads to understandable confusion among practitioners and leaves room for filling in gaps left by science with practical experience.

However, on the question of whether company-specific risks should be incorporated into the cost of capital, economic principles are backed by well-founded empirical investigations. Robust data, sophisticated statistical techniques, and over forty years of published studies show consistently that company-specific risks are not compensable in the cost of capital. The studies show this to be true among both public and private firms, small and large companies, and among both diversified and undiversified investors. Given the preponderance of evidence, the company-specific risk premium should be one tool left out of the credible practitioner's toolbox.

---

[10] Essentially, Butler and Pinkerton assume the company specific risk premium = total $beta_i \times (1- \rho_{im}) \times$expected market risk premium.
[11] Kasper (2009) presents similar and more extensive criticisms of the Butler-Pinkerton model.

**REFERENCES**


Ang, A., R. J. Hodrick, Y. Xing, and X. Zhang, 2006. "The Cross-Section of Volatility and Expected Returns," *Journal of Finance* 61, 259-299.

Ang, A., R. J. Hodrick, Y. Xing, and X. Zhang,,2009. "High idiosyncratic volatility and low returns: International and further U.S. evidence, *Journal of Financial Economics* 91, 1-23.

Bekaert, G., R. J. Hodrick, and X. Zhang, 2010. "Aggregate Idiosyncratic Volatility," Columbia University Graduate School of Business working paper.

Bali, T. G., and N. Cakici, 2008. "Idiosyncratic Volatility and the Cross Section of Expected Returns." *Journal of Financial and Quantitative Analysis* 43, pp. 29–58.

Bali, T. G.; N. Cakici; X. Yan; and Z. Zhang, 2005. "Does Idiosyncratic Risk Really Matter?" *Journal of Finance* 60, 905-929.

Benartzi, S., 2001. "Excessive Extrapolation and the Allocation of 401 (k) Accounts to Company Stock." *Journal of Finance* 56, 1747-1764.

Berk, J. and P. Demarzo, 2007. *Corporate Finance*, Pearson, New York, NY.

Brandt, M., A. Brav, J. Graham, and A. Kumar, 2010. "The Idiosyncratic Volatility Puzzle: Time Trend or Speculative Episodes?", University of Texas McCombs School of Business working paper.

Brennan, M., and W. Torous, 1999. "Individual Decision-making and Investor Welfare." *Economic Notes* 28, 119-143.

Butler, P. and K. Pinkerton, 2006. "Quantifying Company Specific Risk -- A Different Paradigm: A New Approach," *Business Valuation Review*, 22-28.

Butler, P. and K. Pinkerton, 2007a. "Quantifying Company Specific Risk: A New Empirical Framework with Practical Applications", mimeo from *Deluxe BVUpdate*, February.

Butler, P. and K. Pinkerton, 2007b. "Comparing the Butler-Pinkerton Model to Traditional Methods Under Four Daubert Criteria," mimeo from *Deluxe BVUpdate*, November.

Campbell, J. Y.; M. Lettau; B. G. Malkiel; and Y. Xu, 2001. "Have Individual Stocks Become More Volatile? An Empirical Exploration of Idiosyncratic Risk." *Journal of Finance* 56, 1-43.

Cao, X. and Y. Xu, 2010. "Long-run Idiosyncratic Volatilities and Cross-sectional Stock Returns," University of Texas Dallas working paper.

Cochrane, J., 2005. "The risk and return of venture capital," *Journal of Financial Economics* 75, 3-52.

Damodaran, A., 2006. *Damodaran on Valuation*. Wiley, New York.

Douglas, G. W. "Risk in the Equity Markets: An Empirical Appraisal of Market Efficiency." *Yale Economic Essays*, 9 (1969), 3-45.

Fama, E. F., and K. French, 1992. "The Cross Section of Expected Stock Returns," *Journal of Finance* 47, 427-465.

Fama, E. F., and K. French, 1993. "Common Risk Factors in the Returns on Stocks and Bonds." *Journal of Financial Economics* 33, 3-56.

Fama, E. F., and J. D. MacBeth, 1973. "Risk and Return: Some Empirical Tests." *Journal of Political Economy* 81, 607-636.

Fink, J.D., K.E. Fink, and Hui He, 2010. "Idiosyncratic Volatility Measures and Expected Return," James Madison University working paper.

Fu, F., 2009. "Idiosyncratic Risk and the Cross-Section of Expected Stock Returns," *Journal of Financial Economics* 91, 24-37.

Goyal, A., and P. Santa-Clara, 2003. "Idiosyncratic Risk Matters!" *Journal of Finance* 58 (2003), 975-1008.

Guo, H., H. Kassa, and M.F. Ferguson, 2010. "On the Relation between EGARCH Idiosyncratic Volatility and Expected Stock Returns," University of Cincinnati working paper.

Hall, B., and K. J. Murphy, 2002. "Stock Options for Undiversified Executives." *Journal of Accounting and Economics* 33, 3-42.

Hamilton, B., 2000. "Does Entrepreneurship Pay? An Empirical Analysis of the Returns to Self-Employment." *Journal of Political Economy* 108, 604-631.

Heaton, J., and D. Lucas, 2000. "Portfolio Choice and Asset Prices: The Importance of Entrepreneurial Risk." *Journal of Finance* 55, 1163-1198.

Jones, C. M., and M. Rhodes-Kropf, 2003. "The Price of Diversifiable Risk in Venture Capital and Private Equity." Working Paper, Columbia University.

Kaplan, S. N, and A. Schoar, 2005. "Private Equity Performance: Returns, Persistence, and Capital Flows," *Journal of Finance* 60, 1791-1823.

Kasper, L. J., 2009, "Anomalous Findings from the Butler Pinkerton Model for Company Specific Risk Premiums," Monograph prepared for the American Society of Appraisers' 28th Annual Advanced Business Valuation Conference, May 2009.

Kerins, F. J.K. Smith, and R.Smith, 2004. "Opportunity Cost of Capital for Venture Capital Investors and Entrepreneurs." *The Journal of Financial and Quantitative Analysis* 39, pp. 385-405.

Korteweg, A. and M. Sorensen, 2010. "Risk and Return Characteristics of Venture Capital-Backed Entrepreneurial Companies," *Review of Financial Studies* .

Lehmann, B. H., 1990. "Residual Risk Revisited," *Journal of Econometrics* 45, 1-2, 71-97.

Levy, H., 1978. "Equilibrium in an Imperfect Market: A Constraint on the Number of Securities in the Portfolio," *American Economic Review* 68, 643-658.

Lintner, J., 1965. "The Valuation of Risk Assets and the Selection of Risky Investments in Stock Portfolios and Capital Budgets," *The Review of Economics and Statistics* 47, 13-37.

Linton, H. S., 2004. *Streetwise Business Valuation: Proven Methods to Easily Determine the Value of Your Business*, Adams Media, Avon, MA.

Longstaff, F. A., 1989. "Temporal Aggregation and the Continuous-Time Capital Asset Pricing Model," *Journal of Finance* 44, 871-887.

Malkiel, B. G., and Y. Xu., 2004. "Idiosyncratic Risk and Security Returns." University of Texas at Dallas working paper, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=255303.

McConaughy, D., and V. Covrig. 2007. "Owner's Lack of Diversification and the Cost of Equity Capital for a Closely Held Firm." *Business Valuation Review* 26, 115–120.

McConaughy, D., and V. Covrig. 2009. "A Method for Adjusting Public Companies: Multiples for Firm-Specific Risk." *Business Valuation Review* 28, 8-13.

Merton, R. C., 1987. "A Simple Model of Capital Market Equilibrium with Incomplete Information." *Journal of Finance*, 42, 483-510.

Meulbroek, L., 2001. "The Efficiency of Equity-Linked Compensation: Understanding the Full Cost of Awarding Executive Stock Options." *Financial Management* 30, 5-44.

Miller, M., and M. Scholes, 1972. "Rates of Return in Relation to Risk: A Re-ex amination of Some Recent Findings," in *Studies in the Theory of Capital Markets,* M. Miller and M. Scholes, ed. Praeger Press, New Yor,.

Miller, W., 2003. "An Overview of the Analysis and Interpretation of Investment-Specific Risk," *Business Valuation Review*.

Moskowitz, T., and A. Vissing-Jorgensen, 2002. "The Returns to Entrepreneurial Investment: A Private Equity Premium Puzzle?" *American Economic Review* 92, 745-778.

Reilly, R, F., 2008. Analysis of Company Specific Risk in Bankruptcy Business Valuations, *ABI Journal*, February, 48-54.

Sharpe, W. F., 1964. "Capital Asset Prices: A Theory of Market Equilibrium under Conditions of Risk," *The Journal of Finance* 19, 425-442.

Schilt, J., 1982. " A Rational Approach to Capitalization Rates for Discounting the Future Earnings Stream of a Closely Held Company". *The Financial Planner*, 58.

**Figure 1: Average Company-Specific Risk through Time**




This figure is reproduced from Figure 1 of Brandt, Brav, Graham, and Kumar (2010) and shows the 12-month moving average of the annualized mean company specific-risk (dark line) and the annualized mean standard deviation (light line) for each month from January 1962 to June 2007. Company-specific risk is measured as the idiosyncratic volatility in daily returns using a CLMX volatility decomposition.

**Table 1: Summary of Recent Scholarly Empirical Studies of the Company Specific Risk Premium**

This table summarizes the publication outlets, findings, and criticisms of recent empirical studies of the company-specific risk premium (CSRP). The table includes studies on both public and private firms. Panel A lists those studies reporting evidence of a positive CSRP. Panel B lists those studies finding no evidence of a positive CSRP.

**Panel A: Studies reporting to find a positive company-specific risk premium (CSRP)**

| **Study** | **Publication outlet** | **Data source** | **Primary Finding** | **Comments/Critiques** |
|---|---|---|---|---|
| Goyal and Santa Clara (2003) | *Journal of Finance* | Publicly traded U.S. firms | Aggregate stock market returns are higher when average company-specific risk is higher. | Mixes different weighting methods and uses a specific sample period. Bali, et al. (2005) show result dissappears using corrected weights or longer sample period. |
| Jones and Rhodes-Kropf (2003) | Unpublished working paper | Reported returns earned by private equity funds | Net returns and 'alphas' are positively correlated with company-specific risk. | Net returns are not risk adjusted; assumes a beta of 1.0 on all private investments. Korteweg and Sorensen (2010) show that VC investments tend to have betas in the range of 2.0 to 4.0 and find no evidence of a CSRP. |
| Malkiel and Xu (2004) | Unpublished working paper | Publicly traded U.S. firms | Positive CSRP using firm-level regressions when sorting firms first into size and beta portfolios. | Mixes portfolio-level measure of company-specific risk with firm-level returns. Portfolio measure of company-specific risk could be capturing systematic variable related to size and beta. |
| Fu (2009) | *Journal of Financial Economics* | Publicly traded U.S. firms | Strong evidence of a positive CSRP using a forward-looking EGARCH model of conditional company-specific risk. | Suffers from a "look-ahead" bias by using information on future volatilities to calculate current measure of risk. Guo, et al. (2010) and Fink, et al. (2010) show that once look-bias is corrected, CSRP is zero. |
| Cao and Xu (2010) | Unpublished working paper | Publicly traded U.S. firms | Company-level returns are positively related to a measure of the long-run component of company-specific risk. | Finds no relation between usual measure of company-specific risk and returns. Short- and long-run decomposition likely suffers from look-ahead bias. |

**Table 1 (continued)**

**Panel B: Studies reporting to find no evidence of a positive company-specific risk premium (CSRP)**

| Study | Publication outlet | Data source | Primary Finding | Comments/Critiques |
|---|---|---|---|---|
| Moscowitz and Vissing-Jørgensen (2002) | *American Economic Review* | Returns to U.S. individuals holding equity in single firms. | Returns on private holdings no higher than return on aggregate public stock market returns. | Suggests that entrepreneurs take on substantial unsystematic risk for reasons other than earning proper risk-adjusted returns. |
| Cochrane (2005) | *Journal of Financial Economics* | Bias-corrected returns to private venture capital funds | Venture capital return performance no higher than a small publicly traded company. | More robust models of sample selection developed by Korteweg and Sorensen (2010) show that VC investment betas are much higher, and adjusted performance much lower, than shown by Cochrane (2005) |
| Kaplan and Schoar (2005) | *Journal of Finance* | Reported returns earned by private equity funds | Net-of-fee returns to limited partners in these private equity funds are comparable to market returns to publicly traded investors | Net returns are not risk adjusted; assumes a beta of 1.0 on all private investments. Korteweg and Sorensen (2010) show that VC investments tend to have betas in the range of 2.0 to 4.0 and find no evidence of a CSRP. |
| Ang et al. (2006, 2009) | *Journal of Finance* (2006); *Journal of Financial Economic* (2009) | Publicly traded U.S. firms (2006); publicly traded firms in 23 markets around the world (2009). | Negative relation between one-month forward portfolio returns and portfolio measure of company-specific risk, suggesting CSRP is negative. | Daily measures of volatilty can be problematic for estimating volatility at monthly frequency. Measure of risk not contemporaneous with returns. |
| Bali and Cakici (2008) | *Journal of Financial and Quantitative Analysis* | Publicly traded U.S. firms. | CSRP is statistically not different from zero under a variety of different scenarios related to choice of data, weighting of the data, and the periods over which the data are calculated that. | Addresses many of the statistical and data shortcomings of earlier papers reporting to find positive or negative CSRPs. |

**Table 2: Returns on Portfolios Sorted by Company-Specific Risk from Bali and Cakici (2008)**

This table summarizes the average monthly returns on value-weighted portfolios sorted by company-specific risk as reported by Bali and Cakici (2008) in their Tables 1 through 4. Stocks are sorted into five portfolios on a monthly basis from July 1963 to December 2004 with breakpoints determined by NYSE quintiles Portfolio 5 has the highest company-specific risk, Portfolio 1 has the lowest risk. Company-specific risk is the residual risk from the Fama-French (1993) three-factor model of systematic risk and is computed using data over the month previous to portfolio formation. Statistics in parentheses are t-tests of the hypothesis that the difference between Portfolio 5 and Portfolio 1 returns is significantly different from zero. A value for a t-statistic that is roughly 2.0 or higher indicates an estimate is statistically different from zero.

| | | % return for NYSE/AMEX/ NASDAQ stocks using daily returns | % return for NYSE stocks only using daily returns | % return for NYSE/AMEX/ NASDAQ stocks using monthly returns | % return for NYSE stocks only using monthly returns |
|---|---|---|---|---|---|
| Portfolio | 1 | 0.97 | 0.96 | 0.96 | 0.95 |
| | 2 | 1.08 | 1.04 | 1.04 | 1.03 |
| | 3 | 1.12 | 1.11 | 1.08 | 1.05 |
| | 4 | 1.14 | 1.11 | 1.07 | 1.04 |
| | 5 | 0.6 | 0.73 | 1.02 | 1.15 |
| | Return difference 5 - 1 | -0.37 | -0.23 | 0.06 | 0.20 |
| | | (-1.37) | (-1.02) | (0.20) | (0.79) |