United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANTA CLARA VALLEY HOUSING GROUP, INC., and KRISTEN BOWES,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant.<br>_____ / | No. C 08-05097 WHA<br><br>**ORDER DENYING MOTION TO BIFURCATE AND VACATING HEARING** |

## INTRODUCTION

In this tax-refund dispute, plaintiffs move to bifurcate the jury trial into a tax phase and a penalty phase. For the reasons stated below, the motion is **DENIED**. The hearing scheduled for August 9 is **VACATED**.

## STATEMENT

**1. FACTUAL BACKGROUND.**

The background of this dispute has been discussed in prior orders (Dkt. Nos. 96, 121). This tax-refund action arises out of an alleged tax shelter scheme called the S corporation Charitable Contribution Strategy (SC2). The SC2 tax shelter was developed by the national accounting firm KPMG, LLP in the late 1990s. To summarize, participants in the SC2 tax shelter created a S corporation with non-voting and voting shares. The participants retained the voting shares and "donated" the non-voting shares to a tax-exempt organization. The number of

non-voting shares greatly outnumbered the number of voting shares. While the tax-exempt organization held the non-voting shares, the S corporation allocated, on paper, the vast majority of its income to the organization. Because a S corporation was taxed pro rata to its shareholders, the effect of this arrangement was to render most of the S corporation's income tax-exempt.

Eventually, the participants in the tax shelter (voting shareholders) reacquired the non-voting shares from the tax-exempt organization. The income that accumulated tax free was then distributed to the participants and taxed at long-term capital gains tax rates. To prevent the tax-exempt organization from refusing to sell back its majority shares, "warrants" were put into place. These warrants, discussed in more detail below, allowed voting shareholders (participants in the tax shelter) to dilute the tax-exempt organization's non-voting shares if they were not sold back. For example, the warrant allowed the participant to obtain ten shares of new stock for every one share owned by the tax-exempt organization. Thus, in effect, the warrants prevented the tax-exempt organization from meaningfully asserting majority ownership of the S corporation despite nominally holding the majority of shares.*

In June 2000, with the assistance of KPMG, the Schott family (Stephen C. Schott and his wife, Patricia Schott, and their three adult children, Kristen Bowes (a plaintiff in this action), Lisa Treadwell, and Stephen E. Schott) implemented the SC2 tax shelter through the creation of plaintiff Santa Clara Valley Housing Group, Inc., a California S corporation. Santa Clara had a total of 1,000 shares of outstanding stock: 100 voting shares and 900 non-voting shares. Each of the Schott family shareholders was issued a warrant to purchase ten shares for every one share of non-voting stock he or she actually held. In July 2000, the Schotts collectively "donated" the 900 non-voting shares to the City of Los Angeles Safety Members Pension Plan (LAPP), a tax-exempt entity. The government alleges that this "donation" was made with the understanding that LAPP would eventually sell the shares back to the Schotts. According to the warrant, the

---

\* A warrant is akin to a stock option issued by a corporation. *Custom Chrome, Inc. v. Commissioner*, 217 F.3d 1117, 1120 (9th Cir. 2000). A warrant holder has the right, but not the obligation, to purchase shares of stock directly from the corporation by paying a contractually specified exercise price ("strike price") during a specified duration period.

2

"strike price" at which the Schott family could exercise their warrants and purchase additional shares of new stock was $165 per share. This new stock would have, of course, diluted LAPP's majority ownership. Over the next four years, Santa Clara reported more than $114 million in ordinary income, of which more than $100 million was attributed to LAPP due to its number of shares. In December 2004, LAPP sold the 900 non-voting shares back to the original shareholders for a total of $1,645,002. The parties dispute whether this price was negotiated at arm's length. The government alleges that much of the SC2 transaction, including negotiations with LAPP, was conducted by KPMG employees acting as agents for the Schott family.

Ultimately, the SC2 strategy was investigated and denounced by the United States Senate and IRS. In late 2003, the Senate Committee on Governmental Affairs conducted a hearing on the role of tax professionals in the tax shelter industry. One focal point of the hearing and accompanying investigation report was criticizing tax shelters promoted by KPMG, including the SC2 transaction. In September 2006, the IRS audited Santa Clara and shareholder Kristen Bowes, a member of the Schott family. The IRS concluded that the SC2 transaction was an abusive tax shelter and issued a notice of deficiency against the Schott family of over four million dollars, comprised of unpaid tax and accuracy-related penalty, for tax years 2000 through 2003. Santa Clara and Bowes paid the deficiencies asserted by the IRS and now seek a refund through this instant action.

**2. PROCEDURAL HISTORY.**

This action was reassigned to the undersigned last year. Before reassignment, District Judge Jeremy Fogel found on summary judgment that Santa Clara's warrants were not issued for any legitimate business reason, that their sole purpose was to enable the Schott family to continue holding the majority equity in the S corporation even after most of the total shares were nominally transferred to LAPP, a tax-exempt entity. Judge Fogel concluded that the warrants constituted a second class of stock pursuant to 26 C.F.R. 1.1361-1(l)(4)(ii). Thus, because S corporations cannot have more than one class of stock, and the warrants were found to constitute a second class of stock, Judge Fogel terminated Santa Clara's status as an S corporation. Santa Clara sought reconsideration of that ruling, asserting that the warrants did not constitute a second

class of stock if they fell within the safe harbor provision of subsection (*l*)(4)(iii)(C), which provides as follows:

> (C) Safe harbor for certain options. A call option is not treated as a second class of stock if, on the date the call option is issued, transferred by a person who is an eligible shareholder under paragraph (b)(1) of this section to a person who is not an eligible shareholder under paragraph (b)(1) of this section, or materially modified, the strike price of the call option is at least 90 percent of the fair market value of the underlying stock on that date. For purposes of this paragraph (l)(4)(iii)(C), a good faith determination of fair market value by the corporation will be respected unless it can be shown that the value was substantially in error and the determination of the value was not performed with reasonable diligence to obtain a fair value. Failure of an option to meet this safe harbor will not necessarily result in the option being treated as a second class of stock.

26 C.F.R. 1.1361-1(*l*)(4)(iii)(C).

On his order granting reconsideration, Judge Fogel agreed with plaintiffs and vacated his summary judgment order on the issue of safe harbor under subsection (*l*)(4)(iii)(C). Because of that reconsideration, a few issues remain in dispute regarding safe harbor. *First*, whether the instruments in question were "warrants," which receive might receive safe harbor, or "synthetic equity instruments," which allegedly do not. *Second*, even if the instrument is determined to be a warrant for purposes of safe harbor, whether the strike price of the warrants was at least 90% of the fair market value of the underlying stock on the date the warrants issued. *Third*, if the instrument was not at least 90% of the fair market value, the jury must determine whether Santa Clara made a good faith determination of the fair market value, which would be respected unless the government can show (1) the value was substantially in error and (2) the determination of value was not performed with "reasonable diligence to obtain a fair value." There are many other issues outstanding as well, as discussed below.

### 3. ISSUES TO BE DECIDED AT TRIAL.

Plaintiffs argue that their SC2 transaction was not an abusive tax shelter and seek a refund of all taxes and penalties paid to the IRS. In anticipation of the jury trial set for September 24, 2012, plaintiffs move to bifurcate the trial into a tax-liability phase and a penalty phase.

4

### A. Tax Liability.

The government advances three legal theories for treating the SC2 transaction as an abusive tax shelter. Under its first theory, the government argues that LAPP was not an actual beneficial owner of the shares in Santa Clara that it nominally held. Thus, all of Santa Clara's income should have been taxable to its true owners, the Schott family. Under its second theory, the government argues more broadly that the SC2 transaction was a sham lacking any motivation or real economic consequence beyond tax savings. Thus, the SC2 transaction should be taxed on its economic substance, not its paper form. Under its third theory, the government argues that the issued warrants constituted a second class of stock and thereby terminated Santa Clara's status as an S corporation. Thus, Santa Clara should have been taxed as a C corporation.

Notably, both parties agree that the government's different legal theories of tax liability are mutually exclusive, that is, advancing one theory (that Santa Clara should be taxed as a C corporation) is inconsistent with an alternative theory (that Santa Clara was a sham corporation and all income should be taxed on the Schott family shareholders). Our court of appeals has expressly allowed the IRS to take inconsistent positions for its theories of tax liability. *Fayeghi v. C.I.R.*, 211 F.3d 504, 508 n.3 (9th Cir. 2000). While this may be a difficult concept for the jury to comprehend at trial, importantly, plaintiffs' motion is *not* requesting bifurcation of trial to separate out the government's different theories of liability.

### B. Penalties.

In addition to tax liability, there remains the issue of penalties for understatement in plaintiffs' income tax returns. Section 6662 imposes a 20-percent penalty for any portion of tax underpayment that is attributable to negligence or disregard of rules or regulations or any substantial understatement of income tax. 26 U.S.C. 6662. Of course, the imposition of this penalty is conditioned on first finding that there was underpayment of tax liability, the issue discussed above.

Plaintiffs argue that the accuracy-related penalties should not have been imposed even if the SC2 transaction is ultimately found to be an abusive tax shelter. *First*, plaintiffs argue that there is substantial authority for treating the SC2 transaction as appropriately lessening their tax

5

liability. 26 U.S.C. 6662(d)(2)(B)(i). *Second*, plaintiffs argue that the SC2 transaction was adequately disclosed on their tax returns and they had a reasonable basis for the tax treatment. 26 U.S.C. 6662(d)(2)(B)(ii). Finally, plaintiffs argue that they acted in good faith and had reasonable cause for underpayment because they reasonably relied on KPMG's professional advice. 26 U.S.C. 6664(c); 26 C.F.R. 1.6664-4(c).

## ANALYSIS

Courts have broad discretion under FRCP 42(b) to bifurcate trials. The rule provides:

> For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. When ordering a separate trial, the court must preserve any federal right to a jury trial.

The moving party has the burden of proving that the bifurcation will promote judicial economy, and avoid jury confusion or unfair prejudice. *See Netflix, Inc. v. Blockbuster, Inc.*, Civ. No. 06-2361, 2006 WL 2458717, at * 9 (N.D. Cal., August 22, 2006) (Alsup, J.)

### 1. OVERLAPPING ISSUES.

There are many overlapping considerations in deciding issues of tax liability and penalties. For example, plaintiffs' subjective motivation in entering into the SC2 transaction is relevant both to plaintiffs' tax liability and penalties. Subjective motivation is relevant to whether the SC2 transaction had real economic effects other than creation of tax benefits. *See Sochin v. Commissioner*, 843 F.2d 351, 354 (9th Cir. 1988). Plaintiffs' subjective motivation is also relevant to whether the warrants' strike price was valued in good faith, which is relevant to the issue of penalties. *See* 26 C.F.R. 1.6664-4(c).

Similarly, the objective economic consequences of plaintiffs' actions are relevant to both tax and penalty liability. The objective economic consequences inform whether LAPP had actual benefits of stock ownership, which is relevant for tax liability. *See Speca v. Commissioner,* 630 F.2d 554, 556. (9th Cir. 1980). The economic consequences also inform whether plaintiffs' treatment of the SC2 transaction on their tax returns was reasonable, which is relevant for penalties. *See* 26 U.S.C. 6662(d)(2); 26 U.S.C. 6664(c).

6

Lastly, the nature of the relationship between plaintiffs, KPMG, and LAPP is relevant to both tax and penalty liability. For example, KPMG's involvement in creating and facilitating the SC2 transaction is relevant to whether plaintiffs could reasonably rely on KPMG's opinion letters for underpayment. 26 C.F.R. 1.6664-4(c). KPMG's involvement is also relevant to plaintiffs' subjective intent in entering the SC2 transaction, which as discussed, will inform whether the transaction had a real economic purpose other than creation of tax benefits. KPMG's relationship with LAPP will also inform whether LAPP had actual benefits of ownership or was mere a "parking lot" for sheltering plaintiffs' taxable income.

### 2. JUDICIAL ECONOMY FAVORS SINGLE TRIAL.

Because there are broad, overlapping considerations for issues of tax liability and penalties, many of the witnesses and evidence will be relevant for both issues. Therefore, judicial economy favors a single trial so that witnesses would not have to be called back and evidence would not have to be presented again in separate phrases. Instead of identifying all the evidence relevant for both tax liability and penalty (which would be a lot), this order will only address plaintiffs' argument for bifurcation.

Plaintiffs argue that evidence and witnesses relating to KPMG's involvement in the SC2 transaction are only relevant on the issue of penalties and not tax liability. Plaintiffs' argument is unpersuasive. Witnesses and evidence relating to KPMG are relevant to both issues of tax liability and penalty.

The record shows that Santa Clara employed KPMG to assist and advise it in all aspects of the implementation of the SC2 tax shelter. For over a million dollar in fees, KPMG analyzed the economic consequences of plaintiffs' SC2 transaction, assisted in drafting and reviewed documents implementing the SC2 transaction, and prepared Santa Clara's tax returns for the years at issue (Strait Decl. Exh. 400). Thus, KPMG witnesses and documents will help the jury understand the purpose of plaintiffs' SC2 transaction, the economic consequences of plaintiffs' SC2 transaction, and the relationship between plaintiffs and LAPP. As discussed, these issues are relevant to both issues of tax liability and penalty.

For example, former KPMG employees presented the SC2 tax shelter to the Schott family and LAPP, and their testimony may shed light on the relationship between the parties of the SC2 transaction (Fuller Dep. at 65, Ikeda Dep. at 127). KPMG witnesses may be able to testify that they led LAPP to expect additional stock "donations" as long as LAPP acted passively. Also relevant is whether KPMG created dozens of other SC2 transactions similar to the one at issue in this case. Our court of appeals has explained that evidence of other taxpayers' near-identical transactions is relevant to issues of tax liability. Specifically, near-identical transactions may cast doubt on plaintiffs' credibility in claiming to have a non-tax-based motivation for the SC2 transaction. *Sochin*, 843 F.2d at 355. Moreover, KPMG's one-size-fits-all approach for SC2 transactions may suggest that the only economic benefit was tax savings.

Finally, the government plans to argue at trial, in connection with the tax liability issue, that KPMG was plaintiffs' agent during the SC2 transaction, such that at least some of KPMG's knowledge and actions should be imputed onto plaintiffs. For example, the government will argue that plaintiffs acted through KPMG to request LAPP to accept the stock and remain passive on the promise of future donations. Thus, evidence and witnesses related to KPMG will be relevant to issues of tax liability and penalties at trial.

### 3. NO PREJUDICE IN A SINGLE TRIAL.

Plaintiffs argue that they will be prejudiced if trial is not bifurcated because mere mention of the word 'penalties' would "give[] the perception the SC2 Transaction is not compliant under the [Tax] Code and Plaintiffs have failed in their obligations to file accurate returns." That is, telling the jury that penalties are at issue in this action will give the perception that plaintiffs engaged in wrongdoing and bias the jury on the issue of tax liability. Plaintiffs' argument is unpersuasive. With proper instructions, the jury will understand that penalties are only at issue if they first find that plaintiffs understated their tax liabilities.

8

**CONCLUSION**

For the reasons stated above, plaintiffs' motion to bifurcate trial is **DENIED**. The hearing scheduled for August 9 is **VACATED**.

**IT IS SO ORDERED.**

Dated: August 6, 2012.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE